BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon
**GREGORY R. NYHUS, OSB #913841**
Assistant United States Attorney
greg.r.nyhus@usdoj.gov
**NATALIE K. WIGHT, OSB #035576**
Assistant United States Attorney
natalie.wight@usdoj.gov
1000 S.W. Third Ave., Suite 600
Portland, Oregon  97204-2902
Telephone:  (503) 727-1000
Attorneys for United States of America

### UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA** | Case No. 3:16-CR-00105-AA |
| v. | **GOVERNMENT'S TRIAL MEMORANDUM** |
| **ROBERT EVANS MAHLER,** | |
| Defendant. | *Trial: September 17, 2018* |

The United States of America, by Billy J. Williams, United States Attorney for the District of Oregon, and through Gregory R. Nyhus and Natalie K. Wight, Assistant United States Attorneys for the District of Oregon, respectfully submits the following trial memorandum setting forth the factual nature and legal aspects of the trial in this case.

### PROCEDURAL HISTORY AND CHARGE

On March 8, 2016, a federal grand jury returned an indictment charging defendant with Felon in Possession of a Firearm pursuant to 18 U.S.C. § 922(g).  This offense carries a ten (10) year statutory maximum.  Defendant has two prior felony convictions for False Statement in

Acquisition of a Firearm (Case No. 92-00175-1-JO, D. Oregon 1994) and for Illegally Exporting a Defense Article (Case No. 95-00022-1-HA, D. Oregon 1995). On October 5, 2016, the government sought, and the grand jury issued a superseding indictment to include an additional firearm. The instant offense took place on or about, or between, January 19, 2016, and February 16, 2016. Defendant is not in custody, and is under pretrial supervision with conditions. Trial remains set for Monday September 17, 2018, at 9:00 a.m. The government has served its witness subpoenas and is prepared for trial. The government expects the government's case in chief will last no more than three days.

## STATEMENT OF FACTS

**I.    Defendant's Storage of Firearms at the Daggett Residence.**

William and Constance ("Bill and Connie") Daggett lived in a house on 1.6 acres of property in Mollala, Oregon. They knew the defendant, Robert Evans Mahler, as a customer of their print shop business, from around town, and they had also purchased a dog from defendant. The defendant also has a distant tie to Connie's family (defendant is her brother's wife's stepfather). Bill and Connie both believed the defendant had at one time been an accomplished competitive shooter and that defendant had previously owned his own gun shop. Around 2013 or early 2014 defendant asked Bill and Connie if he could temporarily park a few trucks that he had purchased at auction on their property because they had a lot of space. After the trucks, defendant then asked Bill and Connie if he could also park a trailer and store some supplies on their property. Bill and Connie did not mind helping him out, at first. They knew that defendant was a preparer and Bill somewhat shared defendant's belief that it was a good idea to a keep supplies such as canned foods, grains, and paper products stored up for emergencies.

In approximately early 2014, the defendant asked if he could store his firearms at their house. Bill has firearms of his own, and did not mind, and defendant told him that he could not store the supplies and firearms at his own house because defendant claimed that his wife did not want the firearms there. Bill helped defendant move three locking containers into Bill and Connie's garage to store the firearms: a large Liberty brand safe, a large Knaack brand toolbox, and a smaller foot-locker storage box. All three storage containers locked with either a key, or a key and combination lock. After the boxes were in place, Bill helped defendant bring the firearms and ammunition into the garage to place in the locking storage containers. Defendant usually drove the firearms over to Bill and Connie's house in his Kia Sorrento. Connie and Bill recall some initial discussion with defendant where he offered to pay a small rental fee to store all defendant's property. No payments were ever exchanged, but sometimes defendant would take Bill and Connie out to dinner, or he would buy small gifts for their children.

In approximately 2015, the emergency supplies were really starting to pile up, and defendant had multiple trucks on their property. Bill and Connie finally decided it was time to ask defendant to come take his stuff. Bill repeatedly asked defendant to pickup his trucks, supplies, guns and ammunition. Defendant always had some excuse not to do so.

In late 2015, defendant paid Connie $200 to help him edit and proofread a book that defendant was writing; and, during that time, she discovered some information that led her to believe defendant was a convicted felon. Although, she and Bill had been asking defendant to pick up his stuff, she also became very concerned about returning firearms and ammunition to defendant, now that she believed he was a convicted felon. Therefore, on January 19, 2016, Connie contacted law enforcement to discuss her concerns. Special Agent Johnson at the Bureau of Alcohol, Tobacco, and Firearms (ATF) learned from Connie that defendant had been storing

approximately 50 firearms in lockboxes in the garage attached to the Daggett's house. Connie had personally seen the firearms, and reported that defendant had both pistols and rifles stored in the lockboxes. Although Bill owns firearms of his own, he never stored any of his firearms in defendant's lock boxes.

After gathering some background information about defendant, including the fact that he had two prior felony convictions for federal firearm-related offenses in 1994 and 1995, SA Johnson went to meet with Bill and Connie at their business on January 22, 2016. During the meeting, Bill said defendant had previously been storing his safe and firearms at another couples' residence, but defendant claimed their house was subject to foreclosure, so that initiated the move of the safe to Bill and Connie's garage. Bill confirmed that he helped defendant move numerous firearms into the lockboxes, and although he did not count, he estimated defendant had approximately 12-20 "long guns," some "AR-style," and numerous hand guns. Bill said both he and defendant had a set of keys to the lock boxes and they both knew the combinations.

Bill also told SA Johnson about a pallet of ammunition, approximately 19,000 rounds, that defendant had shipped to their business in March 2014. Defendant had come to Bill and said he did not have time to run to the bank and complete an ammunition purchase defendant had already placed. Defendant asked Bill if he could help out by picking up a cashier's check and mailing it to the ammunition distributor. Defendant gave Bill $5000 cash, and Bill picked up the cashier's check and mailed it to the address for J&G Sales that defendant had provided to him. After the ammunition arrived at Bill's business, he and defendant moved the ammunition into defendant's lockboxes in Bill's garage. Bill was surprised to learn that defendant had actually placed the order using Bill's name and address, and that defendant's name was not identified anywhere on the purchase order.

**Government's Trial Memorandum**                                                                                    **Page 4**

## II.    Execution of the Search Warrants.

On February 3, 2016, law enforcement executed three search warrants at the Daggett residence for defendant's three lockboxes in the garage.  From the three containers, law enforcement seized 34 firearms, approximately 32,000 rounds of ammunition, and numerous magazines.  Some of the boxes of ammunition were marked with the initials "RM."  Eleven of the 18 firearms charged in this case were seized from defendant's three lockboxes (Count 1, Nos. 1-10 and No. 18).

On February 16, 2016, law enforcement executed search warrants on the residence, the vehicle and the person of defendant Robert Mahler.  Defendant was driving his vehicle when officers pulled him over and arrested him.  The vehicle, a Kia Sorrento, was brought to the Silverton Police Department where it was searched.  Inside the back compartment area of the SUV, officers located a gun bag under a mat that contained one loaded .45 caliber Glock 21 pistol model 2, six additional loaded magazines, and some loose ammunition.  The glock seized from the car is listed in Count 1, No. 11 of the superseding indictment.

At defendant's residence, defendant's wife allowed the officers into the residence to execute the search warrant.  Officers learned that defendant and his wife had separate bedroom areas, and that defendant's area was locked.  No firearms were located in the wife's area of the house, or in the shared common areas.  When defendant arrived at the residence with law enforcement, he told officers where the keys were to his locked doors that led to his bedroom and office.  The officer's searched defendant's bedroom and seized six (6) firearms (Count 1, Nos. 12-17), numerous magazines and approximately 2000 rounds of ammunition.

One of the firearms, a loaded .45 caliber Kimber pistol, was found underneath the pillow on defendant's bed.  Another firearm, the .45 ACP Armscor of the Phillipines Charles Daly pistol,

**Government's Trial Memorandum**                                                                                          **Page 5**

was associated with a letter also found in defendant's residence from the Los Angeles Police Department (LAPD). The letter indicated that the Armscor pistol was discovered in a hotel room in California on February 22, 2009, where cleaning personnel found the pistol underneath one of the pillows on the bed. The room had been registered to, and paid for with the credit card of, Robert Mahler, with an address of Salem, Oregon. The Armscor pistol was taken into custody by local California law enforcement and transferred to the Silverton Police Department in approximately May 2009. The Silverton Police Department searched for any records related to the release of the firearm, but no documents could be located.

During the search warrants, law enforcement also found pieces of paper with the combination to the Liberty safe in defendant's car, his residence, and inside defendant's wallet that he had on his person. Officers also found keys at defendant's residence that fit inside the locks of the three lockboxes in the Daggett's garage.

### III.    Defendant's Illegal Purchase of the Auto Ordnance 1911 .45 Caliber Pistol.

Following the warrants, in March 2016, ATF agents reached out to set up a meeting with a man named Curtis Allen, Jr., who they believed had gone recreational shooting with defendant. When Mr. Allen met with the agents, he stated the one person he could think of that the ATF would want to talk to him about, was Bob Mahler. Mr. Allen said he knew defendant used to be a firearms dealer and that he had gotten into trouble, but did not know what the trouble was. Mr. Allen said that Mahler had been to his property several years ago, and that defendant brought his own firearm. He also stated that he sold defendant an Auto Ordnance 1911 .45 caliber pistol a few years before. He could not remember the exact date, but he kept a copy of an informal bill of sale that defendant had typed up and given to him. Mr. Allen remembered the sale was unusual because defendant did not put his own name on the bill of sale, instead he put the name "Alex

Mahler" on the document and said he was buying the gun for his brother. Alexander Mahler is the name of defendant's brother who lives in Arkansas. Using the federal firearms transaction record filed when Mr. Allen first purchased the firearm from a pawn shop in 2006, ATF was able to determine that the gun Mr. Allen sold to defendant was the Auto Ordnance 1911 .45 caliber pistol seized from defendant's locked toolbox during the search warrant at the Daggett's garage.

**IV.    Forensic Latent Finger Print Analyses.**

As part of the investigation, Oregon State Police Forensics Lab conducted forensic analyses on a sampling of the firearms (one from each search location) and a latent print examiner examined the firearms. After processing the firearms, the examiner determined that the ridge detail of any prints were insufficient to provide a latent fingerprint of value for comparison and identification purposes. In preparation for trial, the government has requested the latent print examiner to analyze eight (8) additional firearms seized from defendant's safe, toolbox and footlocker located in the Daggett's garage.

**ELEMENTS OF THE OFFENSE & STIPULATIONS**

Title 18, United States Code, Section 922(g)(1) prohibits felons from possessing firearms. To support a conviction, the government must prove the following elements beyond a reasonable doubt:

> First, on or about or between January 19, 2016, and February 16, 2016 in the District of Oregon, defendant knowingly possessed a firearm;
>
> Second, the firearm had previously been transported in interstate commerce; and
>
> Third, at the time defendant possessed the firearm, he had been previously convicted of a crime punishable by imprisonment for a term exceeding one year.

It is not necessary for the government to prove that defendant knew the firearm had previously been transported in interstate commerce. *See United States v. Beasley*, 346 F.3d 930,

**Government's Trial Memorandum                                                                 Page 7**

934 (9th Cir. 2003). The government need only prove that the defendant knowingly possessed the firearm insofar as the act of possession requires consciousness of that act. A person has possession of an object if the person knows of its presence and has physical control of it, or knows of its presence and has the power and intention to control it. Ninth Circuit Model Jury Instruction 3.17; *see also United States v. Cain*, 130 F.3d 381, 382-84 (9th Cir. 1997) (approving similar language for defining possession). Possession is distinguishable from ownership. *See United States v. Casterline*, 103 F.3d 76, 79 (9th Cir. 1996) (distinguishing ownership from dominion and control).

The parties are in the process of conferring over the following stipulations of fact as to the second and third elements of the offense, as follows:

(1)    On or between January 19, 2016, and February 16, 2016, defendant had previously been convicted of a felony, that is, a crime punishable by imprisonment for a term exceeding one year;

(2)    Prior to police seizing the 18 firearms listed in the Superseding Indictment, the firearms had been transported in interstate commerce.

If the parties agree to the stipulations, the government requests the Court read the stipulations at the beginning of the case in order to focus the juror's attention to the element at issue – whether defendant possessed the firearm. At the conclusion of the case, the government requests that the Court include Model Instruction 2.4 along with these two stipulations of fact.

## EVIDENTIARY ISSUES

### I.    Admissions of a Party Opponent.

Under Rule 801(d)(2)(A), a party-opponent's own statements are admissible against that party-opponent as non-hearsay. Fed. R. Evid. 801. Although the Government may offer a statement into evidence against a defendant as an admission, the defendant cannot offer his prior

statements on his own behalf for proof of the truth of the matter asserted since these self-serving statements are hearsay if not offered against a party opponent. *See United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000) (defendant could not introduce his own non-inculpatory statements because they were inadmissible hearsay). Nor can the defendant seek to introduce such hearsay statements through examination of other witnesses. *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988).

## II.     Rule 609:  Impeachment by Criminal Conviction.

Defendant has two felony convictions: Acquisition of a Firearm (Case No. 92-00175-1-JO, D. Oregon 1994) and Illegally Exporting a Defense Article (Case No. 95-00022-1-HA, D. Oregon 1995). The parties are in the process of conferring about an agreed stipulation of fact that on or about, or between, January 19, 2016, and February 16, 2016, defendant had previously been convicted of a felony, that is, a crime punishable by imprisonment for a term exceeding one year. If agreed, the government will not offer evidence of the nature of defendant's prior felony in its case in chief. However, should defendant testify at trial, the government should be allowed to impeach his credibility with that prior felony conviction pursuant to Rule 609. The Court must analyze the five following factors to determine if the probative value of the conviction outweighs its prejudicial effect: (1) the impeachment value of the prior crime; (2) the point in time of the conviction and defendant's subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of the defendant's testimony; and (5) the centrality of the defendant's credibility. See *United States v. Browne*, 829 F.2d 760, 762 (9th Cir. 1987) *cert denied* 485 U.S. 991 (1988). It is important to note that the court is not required to rule on this issue until it has heard the defendant's testimony. *See Luce v. United States*, 469 U.S. 38 (1984).

**Government's Trial Memorandum**                                                                                                **Page 9**

**III.     Expert Witness Testimony.**

The government intends to offer one expert witnesses. The summary of his background and anticipated testimony are filed in the Government's Expert Witness List.  Federal Rule of Evidence 702 provides that "if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," an expert "may testify thereto." FED. R. EVID. 702.  The Supreme Court's trilogy of cases – *Daubert*, *Kumho Tires*, and *Joiner* – governs the admissibility of scientific evidence and "impose[s] a gatekeeping duty on the district court, requiring the court to screen the proffered evidence to ensure that any and all scientific testimony admitted is not only relevant, but reliable." *United States v. Alatorre*, 222 F.3d 1098, 1101 (9th Cir. 2000)(citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), internal quotations omitted).

In order to make an admissibility determination for scientific evidence, the district court evaluates (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of a particular scientific technique and the existence of standards that control the technique's operation; and (4) whether the technique is generally accepted. *Daubert*, 509 U.S. at 593-94.  The reliability inquiry is a flexible test that will vary depending on the case and type of expertise at issue. *Alatorre*, 222 F.3d at 1102.  "The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595.

The trial court is not required to conduct a *Daubert* hearing pretrial, but may instead discharge its gatekeeping function during trial through voir dire of the expert. *Alatorre*, 222 F.3d at 1104-1105 (citing *United States v. Nichols*, 169 F.3d 1255, 1263 (10th Cir. 1999)).  Where the

**Government's Trial Memorandum**                                                                                     **Page 10**

"evidence does not involve any new scientific theory and the testing methodologies are neither new nor novel," a pretrial *Daubert* hearing is unnecessary. *Nichols*, 169 F.3d at 1263 (10th Cir. 1999); *United States v. Sherwood*, 98 F.3d 402, 408 (9th Cir. 1996) (no clear error where district court declines to perform full *Daubert* analysis for fingerprint expert). In this case, there are no new or novel methodologies, and the expert testimony involves fairly standard and widely accepted fingerprint identification laboratory analyses. Therefore, the government does not anticipate a need for a *Daubert* hearing.

### IV.   Inextricably Intertwined Evidence.

During the execution of the search warrants, 42 firearms and approximately 35,000 rounds of ammunition were seized by law enforcement. While the superseding indictment only included 18 of the firearms seized, evidence of the other seized firearms and ammunition; and, evidence related to the purchase of 19,000 rounds of ammunition by defendant is inextricably intertwined with the current case.

In the Ninth Circuit, the court has held that where evidence is "inextricably intertwined" with the charge in the indictment, "we need not consider its admissibility under Rule 404(b)." *United States v. DeGeorge*, 380 F.3d 1203(9th Cir. 2004). In this case, the other firearms and ammunition were seized from defendant at the same time, in the exact same locations as the firearms charged in the superseding indictment and are clearly connected to the conduct alleged in the 18 U.S.C. 922(g) possession charge. With regard to defendant's use of Mr. Daggett to purchase *19,000 rounds of ammunition* for defendant (as an unknowing straw-buyer)—that prior bad act is necessarily enmeshed with a case that indicts a defendant for illegally possessing 18 firearms. Moreover it was this trusting relationship with Mr. Daggett and his wife that defendant abused to partially perpetrate and conceal the conduct in the charged crime. These other illicit

**Government's Trial Memorandum**                                                                                                          **Page 11**

acts link up all of defendant's culpable conduct investigated in this case to show the defendant not only had possession of firearms, but that defendant was keenly aware of the fact that he was not allowed to be in possession.

Alternatively, the evidence is equally admissible if the Court decides to apply FRE 404(b).  FRE 404(b) allows the admission of evidence to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.  *Id.*  Defendant's not guilty plea in this case places his knowledge as to possession squarely at issue and thus, the other firearms and his purchase of 19,000 rounds of ammunition should be admitted during the government's case-in-chief.  *See United States v. Butler*, 102 F.3d 1191, 1195-96 (11th Cir. 1997).

In the Ninth Circuit, if:  "(1) the evidence tends to prove a material point; (2) the other act is not too remote in time; (3) the evidence is sufficient to support a finding that defendant committed the other act; and (4) (in certain cases) the act is similar to the offense charged"  the challenged evidence would meet the Rule 404(b) test.  *United States v. Romero*, 282 F.3d 683, 688 (9th Cir. 2002) (internal citations omitted).   And in this case, the evidence of more guns and ammunition is clearly probative, and any prejudicial impact under Rule 403 would be negligible.

Defendant was hiding 42 firearms and 35,000 rounds of ammunition under lock and key, away from his wife, in order to avoid detection.  While the suggestion that defendant did not know he possessed one or more of these firearms is difficult to contemplate, to the extent that is defendant's position, all the evidence of the additional firearms, and the purchase of ammunition, underscores defendant's intent, plan, knowledge and lack of mistake in possessing a firearm.

If the Court believes that the proffered evidence is subject to a Rule 404(b) analysis, the government will propose a limiting jury instruction, in order to cure any prejudice the defendant might claim or suffer from the admission of 404(b) evidence. *See Romero*, 282 F.3d at 688 n.1.

Therefore, the government respectfully requests the Court allow admission of evidence related to defendant's other firearms and ammunition seized at the time of the warrants, and the evidence that defendant purchased 19,000 rounds of ammunition using Bill Daggett, and Bill Daggett's name, as inextricably intertwined with the instant offense. In the alternative, the statements are non-prejudicially admissible pursuant to Rules 404(b) and 403 as evidence of defendant's, intent, plan, knowledge, and absence of mistake.

## V.     References to Punishment or Penalties.

The government moves the Court to preclude defendant and his counsel from introducing any evidence, making any statement, or asking any questions regarding potential penalties defendant faces if convicted, in the presence of the jury. Information about penalties draws the attention of the jury away from their chief function as the sole judge of the facts, opens the door to compromised verdicts, and confuses the issues to be decided. *See United States v. Olano*, 62 F.3d 1180, 1202 (9th Cir. 1995). In federal court, the jury may not consider punishment in deciding whether the United States has proved its case against a defendant beyond a reasonable doubt. *See* 9th Cir. Crim. Jury Instr. § 7.4. Any such argument or reference would be an improper attempt to have the jury unduly influenced by sympathy for defendant.

## CRIMINAL FORFEITURE

The parties are in the process of evaluating whether a bifurcation of the forfeiture and/or a waiver of a jury trial on the forfeiture count would be an appropriate request in this case. If agreed to, the government would request the Court make the forfeiture determination after a

**Government's Trial Memorandum**                                                                                                                   **Page 13**

verdict is rendered. Pursuant to Title 18, United States Code, Section 924(d)(1), any firearm or ammunition involved in a knowing violation of Title 18, United States Code, Section 922(g), where such intent is demonstrated by clear and convincing evidence, shall be subject to seizure and forfeiture. Thus, if defendant is found guilty beyond a reasonable doubt, a standard of proof greater than clear and convincing, then the firearms are subject to forfeiture.

## WITNESSES AND EXHIBITS

Subject to potential stipulations on chain of custody issues and other facts that could limit this list, the government will call eleven (11) witnesses and offer approximately eighty (80) exhibits, to include mostly photographs but also firearms, diagrams, and a few documents. The government will file a separate and more detailed exhibit list (with bates numbers where applicable). As the parties continue to confer regarding the exhibit and witness lists, the government respectfully reserves the right to object to potential defense exhibits and witness testimony.

DATED this 24th day of August 2018.

Respectfully submitted,

BILLY J. WILLIAMS
United States Attorney

*/s/ Natalie K. Wight*
GREGORY R. NYHUS, OSB #913841
NATALIE K. WIGHT, OSB #035576
Assistant United States Attorneys