1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF OREGON

3                       PORTLAND DIVISION

4
   UNITED STATES OF AMERICA,        )
5                                    )
                       Plaintiff,   )   Case No. 3:16-cr-00105-AA-1
6                                    )
                  v.                 )
7                                    )   September 17, 2018
   ROBERT EVANS MAHLER,             )
8                                    )
                       Defendant.    )   Portland, Oregon
9  _____)

10

11

12

13                       TRIAL DAY 1

14                TRANSCRIPT OF PROCEEDINGS

15           BEFORE THE HONORABLE ANN L. AIKEN

16           UNITED STATES DISTRICT COURT JUDGE

17

18

19

20

21

22

23

24

25

```
1                              APPEARANCES

2    FOR THE PLAINTIFF:
                            NATALIE K. WIGHT
3                           U.S. Attorney's Office
                            1000 SW Third Avenue
4                           Suite 600
                            Portland, OR 97204
5
     FOR THE DEFENDANT:
6                           ERNEST WARREN, JR.
                            ALICIA HERCHER
7                           VERA WARREN
                            Warren & Sugarman
8                           838 SW First Avenue
                            Suite 500
9                           Portland, OR 97204

10

11

12

13

14

15   COURT REPORTER:     Jill L. Jessup, CSR, RMR, RDR, CRR
                         United States District Courthouse
16                       1000 SW Third Avenue, Room 301
                         Portland, OR 97204
17                       (503)326-8191

18

19                              *   *   *

20

21

22

23

24

25
```

```
 1                              INDEX
 2   PROCEEDINGS:                                    PAGE:
 3    Plaintiff's Opening Statement by Ms. Wight      27
 4    Defendant's Opening Statement by Mr. Warren     35
 5   PLAINTIFF'S WITNESSES
 6    CONSTANCE THERESE DAGGETT
 7   Direct Examination by Ms. Wight                  46
 8   Cross-Examination by Mr. Warren                  73
 9   Redirect Examination by Ms. Wight               96
10   WILLIAM ALAN DAGGETT
11   Direct Examination by Ms. Wight                 101
12   Cross-Examination by Mr. Warren                 110
13   Redirect Examination by Ms. Wight              125
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                    TRANSCRIPT OF PROCEEDINGS
 2                       (September 17, 2018)
 3   (In open court:)
 4   (Whereupon voir dire took place but wasn't transcribed.)
 5                          (Jury sworn.)
 6              THE COURT:  Please be seated.
 7              MS. WIGHT:  Your Honor.
 8              THE COURT:  Yes.
 9              MS. WIGHT:  Your Honor, I do have one matter to
10   address while the jury is still here for voir dire.  It relates
11   to Mr. Warren's discussion about the jury instruction of
12   possession.  I believe, unless we address it, it will cause a
13   lot of confusion for the jury throughout the entire trial.
14              THE COURT:  The instruction on what?
15              MS. WIGHT:  During his voir dire, he did discuss the
16   jury instruction of possession.  I believe he stated it
17   incorrectly; that if they continued following Mr. Warren's
18   instruction, it would be very confusing.
19              THE COURT:  I'm going to suggest that that is a
20   different time to take that matter up.  We will take that up --
21   there will be instructions from the Court.  Those will be the
22   instructions that the jury will follow, and I believe everyone
23   said they will follow my instructions.  You'll have time in
24   opening statement and you will be able to talk about that at a
25   later date.  But I don't think that, right now, affects the
```

1    ability to seat a jury competent to be -- to go forward in this

2    case.

3              MS. WIGHT:  Thank you, Your Honor.

4              THE COURT:  Okay.  So for those of you who are in the

5    back, you're free to go.  Thank you very, very much for your

6    service.  Your summons is now extinguished.  You have no other

7    responsibilities.  If you get a summons at some later date,

8    please honor it.  I thank you for your service and your

9    attention to this matter, and you may -- if you would just go

10   on outside the door -- do they need to go anywhere else?

11   Downstairs?  Can they just go home?

12       If you need anything, go down to the second floor.

13   Otherwise, you're free to go.  Once they're done, I'll give

14   preliminary instructions, which allows us to reorganize people.

15   I'll do that.

16       Starting at the top row, if -- I apologize, in the orange

17   shirt, if you'd just move over one chair.  And then at the

18   second row, starting with the far end, if you could go take the

19   seat next to -- I'm sorry.  I'm going to -- I don't have the

20   names right in front of me.

21             JUROR 1:  Ms. Scialpi.

22             THE COURT:  Use the next seat in order.  We keep

23   people in order.

24       Okay.  So if the front row would just go up and go into

25   the second row -- just in your seat in order.  Is anybody else

 1  there?  Wait, wait, wait.  You're last in.  You're last in.

 2      You're last.  You sit there.  Sit there.  Go in order from

 3  the far end over there.  There you go.  Right.  Then -- wait.

 4  Then you're next.  Next.  Then you go -- I think he is --

 5          MS. WIGHT:  He's on the end.

 6          THE COURT:  All right.  And after lunch, when you

 7  come back, all these chairs will be moved.

 8      Briefly, I'm going to take a few moments and give you

 9  preliminary instructions, and then we'll break for lunch.  I

10  appreciate everybody's attention to everyone in this case, and

11  we will -- we will resume after lunch, and we'll talk about how

12  this case will proceed, and I'll give you some things to think

13  about over the lunch hour.

14      You've all been sworn now as the jurors in this case, and

15  you are now the jury of this case, and I want to take these few

16  moments to give you some instructions about your duties as

17  jurors and some just preliminary instructions that I think will

18  be helpful as we go forward.

19      At the end of the trial, I will give you more detailed

20  written instructions that will control your deliberations.

21  When you deliberate, it will be your duty to weigh and to

22  evaluate all the evidence received in the case in that process

23  to decide the facts.  To those facts, as you find them, you'll

24  apply the law that I will give to you, whether you agree with

25  the law or not.  You must not decide the case solely on the

evidence -- you must decide solely on the evidence and the laws

before you in the instructions.  Before these duties are

undertaken, you're to remember that they're to be done fairly

and impartially.  Do not allow personal likes or dislikes,

sympathy, prejudice, fear, or public opinion to influence you

in any degree.  You should also not be influenced by any

person's race, color, religion, national ancestry, gender,

sexual orientation, profession, occupation, celebrity, economic

circumstances, or position in life or in the community.

This is a criminal case brought by the United States

Government.  The government charges the defendant with Count 1,

that on or about or between January 19, 2016, and February 16,

2016, of having been convicted of crimes punishable by

imprisonment for a term exceeding one year, and he knowingly

and unlawfully possessed a firearm.  The charge against the

defendant is contained in a superseding indictment.  The

superseding indictment simply describes the charge the

government brings against the defendant.  The superseding

indictment is not evidence and does not prove anything.

The defendant has pled not guilty to the charge and is

presumed innocent unless and until the government proves the

defendant's guilt beyond a reasonable doubt.  In addition, the

defendant has the right to remain silent and never has to prove

innocence or to present any evidence.  In order to convict the

defendant of felon in possession of a firearm, as charged in

1  Count 1, the government must prove each of the following

2  elements beyond a reasonable doubt:  One, the defendant

3  knowingly possessed a firearm on or about or between

4  January 19, 2016, and February 16, 2016, in the District of

5  Oregon; second, the firearm had previously been transported

6  from one state to another; and, third, at the time the

7  defendant possessed the firearm, he had previously been

8  convicted of a crime punishable of imprisonment for a term

9  exceeding one year.

10      What is evidence?  The evidence you are to consider in

11  deciding the case -- in deciding the facts -- in deciding the

12  facts are -- consist of, one, the sworn testimony of any

13  witness; and, two, the exhibits which are received in evidence;

14  and, three, any fact to which the parties agree, or, in our

15  legal parlance, we call it a stipulation.

16      What is not evidence?  The following things are not

17  evidence and you must not consider them as evidence in deciding

18  the facts of this case:  One, statements and arguments of the

19  attorneys; two, questions and objections of the attorneys;

20  three, testimony I instruct you to disregard; and, four,

21  anything you may see or hear when court is not in session, even

22  if what you see or hear is done or said by one of the parties

23  or by one of the witnesses.

24      Direct and circumstantial evidence.  Evidence may be

25  direct or circumstantial.  Direct evidence is direct proof of a

fact, such as testimony by a witness about what that witness personally saw or heard or did. Circumstantial evidence is indirect evidence. That is, it is a proof of one or more facts from which you can find another fact. You are to consider both direct and circumstantial evidence. Either can be used to prove any fact. The law makes no distinction between the weight to be given to either direct or circumstantial evidence. It is for you to decide how much weight to give any evidence.

There are rules of evidence that control what can be received into evidence. When a lawyer asks a question or offers an exhibit in evidence and a lawyer on the other side thinks it's not permitted by the rules of evidence, the lawyer may object. If I overrule the objection, the question may be answered or the exhibit received. If I sustain the objection, the question cannot be answered or the exhibit cannot be received. Whenever I sustain an objection to a question, you must ignore the question and you must not guess what the answer would have been. Sometimes I may order evidence stricken from the record and that you are to disregard or ignore the evidence. That means when you are deciding the case you must not consider the evidence I told you to disregard.

Credibility of witnesses. In deciding the facts in this case, you have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says or part of it or none of it. In considering the testimony

of any witness, you may take into account the following:  One,
the witness's opportunity and ability to see or hear or know
the thing testified to; second, the witness's memory; third,
the witness's manner while testifying; fourth, the witness's
interest in the outcome of the case, if any; five, the
witness's bias or prejudice, if any; six, whether other
evidence contradicted the witness's testimony; seven, the
reasonableness of the witness's testimony in light of all the
evidence; and, eight, any other factor that bears on
believability.

The weight of the evidence as to a fact does not
necessarily depend on the number of witnesses who testify about
it.  What is important is how believable the witnesses are and
how much weight you think their testimony deserves.

Conduct of the jury while we're through this trial
process.  First, keep an open mind throughout the trial.  Do
not decide what the verdict should be until you and your fellow
jurors have completed your deliberations at the end of the
case; second, because you must decide this case based only on
the evidence received in the case and on my instructions as to
the law that applies, you must not be exposed to any other
information about the case or to any issues it involves during
the course of your jury duty.  Thus, until the end of the case
or until I tell you otherwise, do not communicate with anyone
in any way and do not let anyone else communicate with you in

any way about the merits of the case or anything to do with it.
This includes discussing the case in person, in writing, by
phone, or electronic means, by email, text messaging, or any
internet chatroom, blog, website, or application, including but
not limited to Facebook, YouTube, Twitter, Instagram, LinkedIn
SnapChat, or any other form of social media.  This applies to
communicating with your fellow jurors until I give you the case
for deliberations.

And it applies to communicating with everyone else,
including your family members, your employer, the media or
press, and the people involved in the trial; although, you may
notify your family and your employer that you have been seated
as a juror in this case and how long you can expect the trial
to last.

But if you are asked or approached in any way about your
jury service or anything about this case, you must respond that
you have been ordered not to discuss the matter and you are to
report that fact to this Court.

Because you will receive all the evidence and legal
instructions you properly may consider to return a verdict in
this courtroom, do not read, watch, or listen to any news or
media accounts or commentary about the case or anything to do
with it.

We don't know, on any given day, when it would show up, so
I would ask you, if you get a newspaper or if you have a habit

1    of looking at some media form on -- every morning when you get

2    up, to ask somebody else to look at it, before you look at it

3    and are exposed to anything, to make sure there isn't an

4    article.  There may well be an article.  It's hard to say.  I

5    would ask you to have somebody take a look at it and, by

6    mistake, read the article.  If you should, by chance, read an

7    article or come across it, don't read it, and still report that

8    information to the Court.  It's just important.  I'll do a

9    follow-up.

10       Do not do any research, such as consulting dictionaries,

11   searching the internet, or using any other reference materials,

12   and do not make any investigation or in any other way try to

13   learn about the case on your own.  Do not visit or view any

14   place discussed in this case and do not use any internet

15   programs or other devices to search for or view any place

16   discussed during the trial.  Also, do not do any research about

17   this case, the law, or the people involved, including the

18   parties, witnesses, or the lawyers, until you've been excused

19   as a juror.  If you happen to read or hear anything that

20   touches on this case in the media, turn it away, and then

21   report it to me as soon as possible.

22       These rules are to protect each parties' right to have

23   this case decided only on the evidence that's been presented in

24   court.  Witnesses here in the court take an oath to tell the

25   truth and the accuracy of their testimony is tested through the

1   trial process.

2       If you do any research or investigation outside the

3   courtroom or gain any information through improper

4   communications, then your verdict may be influenced by

5   inaccurate, incomplete, or misleading information that has not

6   been tested by the trial process.  Each of the parties is

7   entitled to a fair trial by an impartial jury.  And if you

8   decide the case based on information not presented in court,

9   you will have denied the parties a fair trial.

10      Remember you have taken an oath to follow these rules, and

11  it's very important that you do follow these rules.  A juror

12  who violates these restrictions jeopardizes the fairness of

13  these proceedings and a mistrial could result, which would

14  require the entire process -- trial process to start over.  So

15  if any juror is exposed to any outside information, please

16  notify the Court immediately.

17      At the end of the trial, you'll have to make your decision

18  based on what you recall of the evidence.  You will not have a

19  written transcript to consult, so I would urge you to pay close

20  attention to the testimony as it's given.  If you wish, you may

21  take notes to help you remember the evidence.  If you do take

22  notes, please keep them to yourself until you and your fellow

23  jurors go to the jury room to decide the case, and please do

24  not let your note-taking distract you from being attentive to

25  the witnesses and their demeanor as they testify.

1      When you leave the court for any reason, your notes will

2   be left in the jury room.   And please know that whether or not

3   you take notes, you should rely on your own memory of the

4   evidence.   Notes are only to assist your memory.   You should

5   not be overly influenced by your notes or the notes of your

6   fellow jurors.

7      As you know, the next phase of this case will be opening

8   statements from the respective parties' lawyers.   Each side

9   will get up and give you a roadmap or an outline of what they

10  think the evidence will be, and it's simply an outline to help

11  you understand what the party expects the evidence to show.

12  The party is not required to make an opening statement.

13     The government -- once those opening statements are made,

14  then the government will present evidence.   And counsel for the

15  defendant may cross-examine the witnesses.   Then if the

16  defendant chooses to offer evidence, counsel for the government

17  may cross-examine after all the evidence has been presented.

18  We will return, and the attorneys will make closing arguments

19  to you, and, thereafter, I will instruct you on the law that

20  applies to this case.   Then you will retire to the jury room

21  and deliberate your verdict.

22     So what we're going to do now is we're going to break for

23  lunch.   I'm going to talk for just a second, and I'll talk to

24  the lawyers for just a second.   The trial is just getting

25  started, so do not discuss this case with anyone, including any

1    of your fellow jurors, members of your family, anyone else

2    involved in this case.  I think I've gone over that

3    sufficiently.

4         Ms. Kramer is my courtroom deputy throughout this

5    proceeding.  What will happen now is when I break I'll have you

6    go look at the jury room.  We'll pick a time, and I'll have you

7    report to the jury room before -- so that we know everyone is

8    here before we reconvene.

9         If you need to speak to the Court or there's something

10   that comes up, the way we communicate is you -- either one or

11   more of you would write a note, sign the note, send it out to

12   Ms. Kramer.  I will take the note.  I will consult with the

13   lawyers and answer the questions if I need to or call you back

14   in on some other matter.

15        From time to time during the trial, it may become

16   necessary for me to take up a legal matter with the attorneys

17   privately, either at -- by recessing and then having that

18   discussion on the record.  I don't do what others may call

19   sidebars.  I don't do that.  We'll take those issues up at

20   recesses.  So if a matter comes up that is something the Court

21   needs to deal with outside your presence, I'll have you excused

22   for a short period of time and have you back as soon as

23   possible.

24        Do not -- please do not consider my granting or denying a

25   request for a conference as any indication of my opinion about

1    the case or what your verdict should be.  In fact, oftentimes,

2    unless there's a real need to break, I hold some of those

3    issues, and then we take it up in the normal course of our

4    trial -- in trial breaks and recesses.

5        The parties have agreed to certain facts.  They are called

6    stipulations.  You should therefore treat these facts as having

7    been proven.  And there are a couple of them.  If you don't

8    have notepapers -- I'm missing -- there.  Got it.  There are

9    two facts they have agreed upon that are stipulated.

10        First, on or about January 19, 2016, and February 16,

11    2016, defendant had previously been convicted of a felony; that

12    is a crime punishable by imprisonment for a term to exceed one

13    year.

14        So agreed to, Counsel?

15            MS. WIGHT:  Yes, Your Honor.

16            MR. WARREN:  Yes.

17            THE COURT:  And the second one is prior to police

18    seizing the 18 firearms listed in the superseding indictment,

19    the firearms had been transported in interstate commerce.

20        So agreed to, Counsel?

21            MS. WIGHT:  Yes, Your Honor.

22            MR. WARREN:  Yes.

23            THE COURT:  Therefore, you can take those two

24    stipulations as facts, and they need not be proven in court.

25        It's 12:42.  Would an hour lunch -- I know people have

1  cars and things -- to make phone calls and getting a lunch and

2  getting in and out of the building.  Is an hour sufficient for

3  all of you to come back and start the case?

4      So one hour from now I'll have Ms. Kramer take you out,

5  show you the jury room, and then you're free to go up --

6  downstairs and come back.  Once everyone is here in an hour,

7  which will be 1:45, we will then start with opening statements.

8      Then I will talk to you later.  This was the question I

9  want you to think about.  I'm happy to run this trial based on

10 concerns and issues you have about your own family time and

11 traffic.  So I can run this case until 5:00.  But if people

12 have to be somewhere to pick up someone -- childcare

13 responsibilities or some other folks, I'll need to know about

14 that, and I'll talk about what time we'll start in the

15 mornings.

16     So I'll give that to you so maybe when you come back,

17 while you're waiting for us to reconvene, you can talk about

18 any issues that we might need to know about in terms of running

19 this trial.  I really am confident that we will have this done

20 in four days, maybe a little less; but if there's some way I

21 can make it convenient for all of you, to either go a little

22 longer to hear evidence while traffic clears out or -- we can

23 do that, or we can get in here at a particular time that's

24 helpful to people with their personal obligations at home.  I'm

25 happy to do that as well.  Maybe somebody can give us some

1    guidance.  All right?

2        Anything else?  I think -- did I cover everything,

3    Counsel?

4                MS. WIGHT:  Yes.  Yes, Your Honor.

5                MR. WARREN:  Yes.

6                THE COURT:  Have a great lunch.  Put this out of your

7    mind.  Come back, and we'll resume as close as we can to 1:45.

8    Thank you.

9        Ms. Kramer, can you take the jury out?

10               DEPUTY COURTROOM CLERK:  Yes.

11                          (Jury not present.)

12               THE COURT:  Anything we need to take up now, or do we

13   take it up when we come back?

14               MS. WIGHT:  If Your Honor wants to talk right now

15   about just my concerns during voir dire, but I think you

16   addressed it -- that's something I can address during opening

17   statement -- just regarding possession.

18               THE COURT:  Basically, I would suggest that what you

19   tell the jury is that the Court will tell you what the law is.

20               MS. WIGHT:  Yes.

21               THE COURT:  And lots of things get stated, but

22   they're not necessarily complete facts.

23               MS. WIGHT:  I believe, though, Your Honor --

24               THE COURT:  I really think that my instructions at

25   the end will clear that up.

1          MS. WIGHT:  I do believe, though, it goes to the very
2    heart of the case.  I believe that when he stated about
3    possession having physical control instead of physical --
4    physical control or the knowledge and intention to obtain it,
5    and I don't believe that that was stated properly.  If they
6    believe -- the entire jury -- that he has to have physical
7    control, that will be a very big problem.
8       So I'm just hoping during my opening I can say the
9    "either/or" in following the exact language of the first
10   sentence of that rule.
11      That's all I'll say.
12         MR. WARREN:  Your Honor, I think they can follow your
13   instruction.  What I was referring to is the uniform
14   instruction, and so I think they can follow your instruction.
15         MS. WIGHT:  I do believe he's referring to the
16   instruction.  I believe it was stated improperly, and I do
17   believe the jury is believing he has to have physical control.
18         THE COURT:  You'll have opening statement.  You can
19   clarify.
20         MS. WIGHT:  Thank you, Your Honor.
21         MR. WARREN:  Your Honor, the only other thing was to
22   put on the record that there's no conflict of interest with
23   respect to the case of *Kristine Yates v. United States*
24   6:17-cv-01819.
25      Remember my client was very concerned about there being a

1   conflict?

2           THE COURT:  You better make a record here.

3           MR. WARREN:  Yes.  So --

4           THE COURT:  Let's just, as follows:  It was

5   brought -- you brought in a preliminary meeting that your

6   client was concerned there was a conflict on a case, a civil

7   case, that is filed and is one of my cases.

8           MR. WARREN:  Yes.

9           THE COURT:  This criminal case -- as I recall, this

10  is a 2015 --

11          MR. WARREN:  '16.

12          THE COURT:  -- '16 case assigned to me in its

13  original wheel assignment.

14          MR. WARREN:  Yes.

15          THE COURT:  In 2016.  And I've had it continuously.

16          MR. WARREN:  Yes.

17          THE COURT:  Then there's a second case filed in --

18          MR. WARREN:  Yes.  A second case filed in -- I

19  believe the complaint says -- I believe it says March 6, 2018.

20          THE COURT:  2018.  It's a civil matter.  And that

21  case was filed and assigned to me, and in the -- one of the

22  affidavits attached, it referenced that Mr. Mahler is married

23  to the -- one of the parties in that case.

24          MR. WARREN:  Yes.

25          THE COURT:  It's a civil case.  What's the nature of

1  the lawsuit?

2          MR. WARREN:  It says it's a -- it's looking for

3  declaratory injunctive relief.  A civil rights proceeding.

4  Negligence, trespass, nuisance.

5          THE COURT:  All right.  And she's represented;

6  correct?

7          MR. WARREN:  Not that I know of.

8          THE COURT:  She's not represented.

9          MR. WARREN:  So it's pro se.

10          THE COURT:  And your client today, for the first

11  time, raised that there might be a conflict?

12          MR. WARREN:  Yes.

13          THE COURT:  And I don't see a conflict in any way,

14  shape, or form with this case.

15          MR. WARREN:  Yes.

16          THE COURT:  All right.  So does anyone else --

17  anything to state with regard to that?

18          MS. WIGHT:  No, Your Honor.  We don't see a conflict

19  with these two cases.

20          THE COURT:  I don't see a conflict with this case.

21          MR. WARREN:  No.

22          THE COURT:  Anything else?

23          MS. WIGHT:  I do, Your Honor.  I would like to

24  address, just before opening statements, the issue of the

25  entrapment by estoppel motion that we filed earlier.  I talked

1   with Ernie a little bit earlier.  I got the impression it was

2   something that was not going to come up, but I wanted to

3   address it with the Court to see if that was something we could

4   rule on.

5              MR. WARREN:  That's real fine, Your Honor.  I don't

6   think that's an issue in this case -- is entrapment by

7   estoppel.

8              THE COURT:  I don't either.  So it shouldn't come up

9   in opening statement unless there's some other basis to bring

10  it up.  We are not going to discuss it, then, unless you bring

11  it up and there's something I need to rule on.  Specifically, I

12  looked at the case, and it seems like the objection is well

13  taken.

14             MR. WARREN:  She sent me the motion, and what it said

15  was something about a government agent doing something that

16  seems to be unlawful, and that's not a part of our case.

17             THE COURT:  Okay.

18             MS. WIGHT:  Thank you, Your Honor.  There was one

19  more thing just regarding the inextricably intertwined evidence

20  related to the other firearms that were seized.  There were a

21  total of 41 firearms seized; 38,000 rounds of ammunition.  You

22  know, only 18 were charged.  We were wondering if you wanted to

23  rule in advance, as far as opening statements --

24             THE COURT:  You will have to slow down, or this will

25  be a very painful trial for the court reporter, and that's not

1    fair.

2         MS. WIGHT:  Just regarding those other firearms,

3    whether or not we're allowed to address them in opening

4    statement, including the additional 19,000 rounds of ammunition

5    that was purchased by Mr. Mahler.

6         MR. WARREN:  I object.  I don't think they should be

7    able to bring up anything that's not before this Court for him

8    to take responsibility for now.  If they wanted to try him for

9    all 40 cases and thousands of rounds of ammunition, then that

10   should have been a part of this case.  I do object to that.

11        MS. WIGHT:  Your Honor, it's our position that that

12   evidence regarding the other firearms and the additional

13   ammunition, that is actually inextricably intertwined to all

14   the search and seizures that were found in this case.  Even if

15   the Court chooses not to rule, as far as it being inextricably

16   intertwined, we believe that it's truly 404(b) evidence to show

17   it's not a mistake.  There certainly was no lack of knowledge

18   for the defendant regarding the other firearms.

19        The other firearms go to show that the 18 that were found

20   was not a mistake.  The other firearms also show that he had

21   knowledge that there were firearms there.  And the fact that

22   there's 38,000 rounds of ammunition also goes to show that he

23   had knowledge that he had firearms and that he had the ability

24   to use them.

25        MR. WARREN:  We would have to -- Your Honor, there --

1  you have seen in the motions in limine there's evidence that

2  rounds of ammunition were delivered to the Daggetts' in the

3  Daggetts' name from a Chase cashier's check made to the

4  Daggetts, and they are trying to say this applies to my client.

5  I think that's inappropriate for her to make this type of

6  argument in opening statement, and I think we need a -- besides

7  the fact that it's prejudicial, I would think we need

8  foundation to let anything in that is not alleged in the

9  indictment beyond these 18 weapons.  That should be more than

10  enough.  If it's going to prove my client wrong, then that's

11  more than enough.  We don't need all this other evidence.

12           MS. WIGHT:  Your Honor, as far as the remoteness in

13  time, it occurred instantaneously.  These are not guns that

14  were found years before.  They were found at the exact same

15  time.  We believe it is sufficient to support the charges

16  against the defendant.  And then, also, any prejudicial impact

17  this could have is just negligeable compared to the probative

18  value.

19           THE COURT:  I am going to take a look at this, but

20  the -- and the 404(b) is the basis on which I think you have

21  the ability to link this in, but I'm going to go take a look at

22  it.  I'd like, at this point, until I come back, not to be a

23  part of the opening statement.

24           MS. WIGHT:  Yes, Your Honor.

25           THE COURT:  Mr. Warren, particularly to take care of

1    this, your defendant went out with the jurors when they went to

2    the bathroom.  And I sent Mr. Reeves out to go with him, not --

3    to make sure there was no interaction.  I didn't want to have

4    that happen.  So I would really ask that you work with your

5    client so there isn't any of that cross pollination in this

6    case with jurors.  I really had Mr. Reeves there in case there

7    was some kind of a conversation.  And I would really ask you to

8    have your client not engage with the jurors.

9               MR. WARREN:  Yes.  Yes.

10               THE COURT:  I just observed that and thank you very

11    much for going.  There was no interaction; correct?

12               THE LAW CLERK:  No.  No.

13               THE COURT:  And I appreciate he had to go to the

14    bathroom, but I needed to keep him separate from the jurors.

15               MR. WARREN:  Yes.

16               THE COURT:  Is there anything else?

17               MS. WIGHT:  I believe that's it for the government.

18               THE COURT:  All right.  See you back at 1:45.

19               MR. WARREN:  Thank you, Your Honor.

20               DEPUTY COURTROOM CLERK:  Court is in recess.

21                         (Lunch recess taken.)

22               THE COURT:  Is everybody ready to go?  Before the

23    jury comes back in, I asked Ms. Kramer to have me back in.  I'm

24    going to read the uniform jury instruction on possession.  I'm

25    just going to read the jury instruction as we start and then

1    you can do our opening statement.

2            MS. WIGHT:  Okay.  I can leave it out of my opening

3    then.

4            MR. WARREN:  Thank you.

5            THE COURT:  I'll just read it and clear it up for

6    everybody.  We won't have a debate over which version is which.

7            MR. WARREN:  Thank you, Your Honor.

8            MS. WIGHT:  Thank you.

9            THE COURT:  Have them back, please.

10                           (Jury present.)

11            THE COURT:  Would somebody please close the doors in

12    the back there?  I don't have any problem with people standing

13    when the jury comes in.  You all can be seated.

14        Do you need more pads?  Here.  Take this.

15        Before we begin, members of the jury, I'll read you an

16    instruction.  This will be a uniform instruction we'll receive

17    at the end of the case.  But to avoid some confusion that may

18    have happened during voir dire, I just want to be clear so you

19    have this instruction regarding possession.

20        Possession.  A person has possession of something if the

21    person knows of its presence and has physical control of it or

22    knows of its presence and has the power and intention to

23    control it.  More than one person can be in possession of

24    something if each knows of its presence and has the power and

25    intention to control it.

1        All right.  So we'll begin with opening statements for the

2    government.

3                    PLAINTIFF'S OPENING STATEMENT

4            MS. WIGHT:  May it please the Court, Counsel, members

5    of the jury.  In this case, the defendant, Mr. Robert Mahler,

6    he thought this was a game, a game of hide-and-seek.  But

7    Mr. Mahler is not allowed to possess even one firearm, so when

8    it comes to the 18 firearms that are involved in this case, he

9    knew he had to keep them hidden.  In fact, he hid some of those

10   guns over at a friend's house, just outside of town, and he hid

11   another one of those guns in his car, underneath the trunk

12   area.  But when it came to those six firearms that he kept

13   close, the ones in his bedroom, the defendant had let down his

14   guard.

15       When the officers arrived to search his bedroom, they

16   walked in and they found that .45 caliber pistol tucked under

17   the defendant's pillow.  The game was over.

18       This case actually started back in January of 2016.

19   That's when ATF Special Agent Amanda Johnson received a phone

20   call from a concerned citizen -- Connie Daggett.  Connie was

21   concerned.  She wanted to know what does she do if she thinks

22   somebody was illegally possessing a firearm.  It was a really

23   hard call for Connie to make and an even harder call for

24   Connie's husband, Bill, because they were calling on

25   Robert Mahler -- somebody they thought was a friend.

1      Bill and Connie felt they had no other choice.  They lived

2  out in Molalla, Oregon, about 30 miles south of Portland.  It's

3  a rural community.  Bill and Connie owned a print shop just

4  right in town, in Silverton, nearby, and they knew

5  Robert Mahler as Bob; Bob Mahler.  He was a friend.  He was a

6  customer of their shop.  He was actually even distantly related

7  to Connie, so he was kind of like family.

8      Well, their relationship started to grow.  In about 2012

9  Bob asked Bill for some help.  Bob had just bought these

10  brand-new trucks online at an auction, and Bill had a

11  commercial driver's license.  He asked Bill, "Hey, can you help

12  me go pick up these trucks?"  Bill said, "Great."  It sounded

13  kind of fun.  They drove up to Washington.  They brought those

14  trucks down.  And on the way back Bob said, "By the way, is it

15  okay if we keep those trucks at your property in Molalla?"

16  They had about an acre and a half.  Lots of space.  "Oh, and by

17  the way, I didn't actually tell my wife I bought these trucks."

18  So Bill said of course.  He help out a friend.  Kept the trucks

19  on the property.

20      But after the trucks, Bob came back and said, "Is it okay

21  if I also keep a trailer on your property, just so we can store

22  some emergency supplies?"  Paper products, rice, grain, canned

23  goods, generator.

24      Well, actually, Bill and Connie thought this was kind of a

25  good idea.  Hadn't been that long that there was an ice storm.

1    They were without power for a week.  So along came a trailer

2    and the emergency supplies.

3        But after that, after the trucks and the trailer and the

4    emergency supplies, Bob then came to Bill and Connie and asked,

5    "Is it okay if I store some guns on your property?"  Bob

6    explained his wife did not like guns, and he also said the

7    place that he had been storing his guns, that house was going

8    into foreclosure.

9        So Bill said okay, and Bob brought over three gun safes,

10   and Bill helped him set these gun safes up in Bill and Connie's

11   garage.

12       Soon after, the guns arrived.  So Bob drove over in his

13   Kia Sorento -- it's a small SUV -- and he had backed that Kia

14   Sorento up into the garage, right in front of Bill and Connie's

15   garage, and both Bill and Connie saw that.  Back hatch open,

16   and they saw layer after layer of guns.  Guns, then a blanket,

17   guns, then a blanket.  Connie left, but Bill stayed and he

18   helped Bob unload those guns, and they filled up the safes.

19       Then Bob left and he got another load, and then he got

20   another load.  Bill didn't really mind.  He was helping out a

21   friend.  Bill had his own guns.  He had several guns.  He keeps

22   them in a gun safe inside his house.  Connie didn't really mind

23   either, at first.  But with all those guns and all that

24   ammunition in her house, what if there was a fire?  What would

25   happen?  And then those emergency supplies that were supposed

to be out in that trailer started encroaching.  And then they
were in her garage, and then they were on her canning shelves.
There was no room for her own stuff.

So she tried to talk to Bill and said, "We have got to get
Bob to get his stuff out of here."  It was causing a lot of
tension.  They were fighting about it.  So they came together,
and they said to Bob it's time for him to take his stuff back.

But around that time Connie was still helping Bob.  In
fact, she was working with him.  She was helping him edit a
book that he had been writing.  Because Bob had always been a
pretty interesting guy; a lot of interesting stories to tell.
So when Connie was doing work for him, she Googled him.  And
when she Googled him, she found out that Bob had been convicted
and that he had spent time in prison.

Connie didn't know what to do.  This was her friend.  This
was one of her husband's really good friends.  So her and Bill
talked about it for months.  In fact, they thought about maybe
we should just bury our heads in the sand, not tell anyone.
But they talked about other options too.  Maybe we just load up
all his guns and drop them on his front porch and just pretend
like it didn't happen.  But they finally decided they needed to
do the right thing.  What was best for them and what was best
for their family?  They decided to call the police.

This is when they called ATF Special Agent Amanda Johnson.
And when Amanda got that phone call, she did her own

1   investigation, and she confirmed that Connie was correct.

2   Bob Mahler was a convicted felon.

3       So Amanda got some of her fellow agents, and they sought

4   and obtained search warrants for Defendant Mahler's three gun

5   safes that he kept over at Bill and Connie's.  And on

6   February 2, 2016, those gun safes were searched, and those ATF

7   agents, they seized a stock pile of firearms and ammunition.

8       But before Bob knew that his safes had been emptied, they

9   went and got another batch of search warrants.  So on

10  February 16, 2016, they got three more warrants.  One for Bob's

11  residence; one for Bob's car, the Kia Sorento; and one for Bob.

12  They were searching for the keys.  Did Bob have the keys for

13  those safes?  They were searching for ammunition associated

14  with all those firearms that they seized.

15      When they got to Bob's house, they got to his residence,

16  the only doors locked in the house were to Bob's bedroom and to

17  his office.  But when the officers were able to get into Bob's

18  room, they found those keys, and those keys fit those safes.

19  They also found thousands of rounds of ammunition.  They also

20  found guns.  Those six guns that I was telling you about.  They

21  found an AR-style rifle in his closet.  They found another

22  rifle and a 12 gauge shotgun on the other side of the closet.

23  They found a revolver hidden under his bed.  They found a

24  pistol hidden next to his bed, and they found that .45 caliber

25  pistol tucked under his pillow, loaded, with one in the

1    chamber.

2        Ladies and gentlemen of the jury, the government has

3    charged the defendant, Bob Mahler, with one count of being a

4    felon in possession of a firearm.

5        During this trial, the United States -- and hopefully you

6    guys will be able to see this on your screen.  I'm not sure why

7    I'm not able to see it on the screen.  There we go.  One count.

8    And during this trial, the government is going to have to prove

9    to you beyond a reasonable doubt these three elements:  First,

10   that the defendant knowingly possessed any firearm on or

11   between January 19, 2016, and February 16, 2016; second, that

12   that firearm had previously been transported in interstate

13   commerce; and then, third, that at the time that the defendant

14   possessed that firearm he had already been convicted of a crime

15   that was punishable by imprisonment of a term that exceeded one

16   year.

17       You already heard from the Court, and you'll hear again

18   later, the parties have stipulated -- we have agreed -- that

19   number two, the firearm had been previously transported, that's

20   true.  We don't need to prove that.  That's done.  You don't

21   need to worry about that one.

22       The parties also agreed on number three.  The defendant is

23   a felon, and he was a felon at the time that we charged.

24       So the only thing that you have to decide about, that one

25   issue, whether the defendant knowingly possessed any firearm on

1   or between January 19, 2016, and February 16, 2016.

2        So in order to do that, the government is going to put on

3   some evidence, and I'm just going to quickly summarize it for

4   you guys.  We've got some physical evidence.  We've got

5   photographs, pictures of the safe, pictures of the keys,

6   pictures of the guns, some ammunition, the locations, that kind

7   of stuff, and then we've also got the firearms.  You probably

8   see them sitting back there.  We've brought all 18 firearms,

9   and you -- we'll be able to see every single one.

10       What we didn't bring is we did not bring any ammunition

11  into the courtroom today.  All the firearms have been rendered

12  safe by the ATF agents, and you'll be able to see that and

13  identify that today.

14       You'll also hear from some witnesses.  You'll get witness

15  testimony.  Connie and Bill are here.  They're going to tell

16  you their story.  They will tell you what happened.  They will

17  tell you how they were betrayed by their friend.  He used them,

18  and he used them so that he could hide his guns at their house.

19  He took advantage.

20       You're also going to meet with six ATF agents who executed

21  all those warrants and were in charge of seizing the evidence.

22  You'll meet the team that went to the February 2nd search

23  warrant, the ones that were for the safes at Bill and Connie's

24  garage, and you'll hear that 11 of the firearms were found

25  there.  Then you'll meet the team that went to the

1  February 16th search, those searches, and you'll see and hear

2  about the seven firearms that they seized.

3      You're also going to have a fingerprint examiner.  He's

4  going to tell you about his analysis.  He's going to tell you

5  that he was able to get some fingerprints off some of these

6  guns that he got from Bill and Connie's, but he will also tell

7  you that when he compared them to the defendant, Bob Mahler, it

8  was inconclusive.  But he's going to let you know that the

9  quality of those comparative prints, they really make a

10 difference on whether or not you can actually do a valuable

11 analysis.

12     The last person you'll hear from today -- or this trial is

13 a citizen from Silverton named Curtis.  Curtis is just a

14 regular guy, and he sold a gun to the defendant.  The thing

15 that was a little unusual about that sale is that when he sold

16 it to the defendant, the defendant typed up a bill of sale and

17 gave it to him, and Curtis remembers that the defendant put --

18 didn't put his name on it.  He signed somebody else's name.  He

19 wrote his brother's name.

20     The defendant explained to Curtis, though, that was -- he

21 was buying the gun for his brother.  That's why Curtis

22 remembers that story.  And the gun that Curtis sold to

23 defendant was one of the guns that was seized from the safes at

24 Bill and Connie's.

25     Ladies and gentlemen of the jury, at the end of this

1    trial, I'm going to be back here, and I'm going to have a

2    chance to speak with you again.  You'll have already seen all

3    the evidence.  You will have heard all the witnesses, and I'll

4    have a chance, then, to ask you to find that Defendant

5    Robert Mahler is guilty of being a felon in possession of a

6    firearm.

7                THE COURT:  Mr. Warren, go ahead.

8

9                     DEFENDANT'S OPENING STATEMENT

10               MR. WARREN:  Thank you, Your Honor.

11         Thank you.  Good afternoon, folks.  The most important

12   facts that you can know today is that Mr. Mahler is not guilty

13   because there's no evidence to firmly convince you that he

14   possessed firearms between January 19, 2016, and February 16,

15   2016.  The facts, between those dates, this man did not

16   knowingly possess firearms.  Yes, we are here to concede 23

17   years ago he was convicted of a felony, and it was a non -- it

18   was not a crime of violence.  It was a white-collar crime.

19         What we have here and what the government can't concede is

20   that this is a family fued.

21         Connie Daggett, on January 18, 2016, was upset with

22   Mr. Mahler because he didn't pay her $300 to read a manuscript

23   of a book that Mr. Mahler wrote.  That's what motivated her.

24   The first thing when she got on the phone with Special Agent

25   Amanda Johnson, she says, "He didn't pay me my $300 for writing

1   a manuscript."

2        And that's what this is all about.  She got upset because

3   Mr. Mahler took his wife, Kristine, on a cruise to Florida

4   without paying $300 up front.

5        The reason Mr. Mahler didn't pay her, she didn't finish

6   the manuscript.  He paid her $300 up front.  He says, "Connie,

7   when you finish, I'm going to pay you the remaining money."

8   30 days went by.  60 days went by.  160 days went by.  She

9   didn't get the job done, and she was mad.  This wasn't no --

10  this wasn't hard for her to think about this.  She was texting

11  him, "My kids don't have gifts."  Mr. Mahler had purchased

12  gifts for the children all the time.  Mr. Mahler would take the

13  Daggett family to dinner with him and his wife and family.

14       Mr. Mahler had not been in possession of those guns for

15  over three, four years, and that's what that was all about.

16       And this is what this is, is a family feud.

17       Now, on that same day, on January 18, 2016,

18  Mrs. Connie Daggett tells Special Agent Amanda Johnson:  I went

19  over and trespassed on Mr. Mahler's property and took items

20  back to his house and put them in a barn.

21       So Special Agent Amanda Johnson was very eager, "Well,

22  what's your relationship with this guy?  I mean, really, what

23  is your relationship with this guy?"  It doesn't come out in

24  the first interview.  It doesn't come out in the second

25  interview.  It doesn't come out in the third and the fourth and

the fifth interview, until finally what we know is Mr. Mahler's stepdaughter, Kara, is Connie Daggett's brother, Special Agent Adam Sully's wife.  That's what makes this a family feud.

And so that's it.  Mrs. Daggett's family, for ten years they knew Mr. Mahler already had a record.  They were keeping that over his head.  They didn't like the fact that Mr. Mahler married their mother and/or mother-in-law.  That's what this case is all about, and now they're going to do things to put him in position.

Now, we heard about this emergency response stuff and that Mr. Mahler would bring things over.  Well, in Mt. Angel, where some of you might live in that neck of the woods, they had a citizens emergency response team.  They had military trucks that they had purchased for the purpose of mending bridges and fixing roads in case of a natural catastrophe.  That was the reason why Mr. Mahler bought a vehicle and the reason why he had Bill Daggett drive it is because he had a commercial driver's license.

So they were concerned -- and they had a citizens emergency response team in Silverton, so they were trying to position one in Molalla.  So Connie Daggett was the one who gave Mr. Mahler lists of supplies to buy.  She would write down food items that wouldn't spoil, and Mr. Mahler would go purchase them.  She wrote down medications to purchase.  And I didn't know this, but I guess you can get antibiotics for fish

1   on the internet.  And if you use them in certain doses, guess

2   what?  They work just like antibiotics that you get from the

3   pharmacy, and Mr. Mahler did it.  He was faithful to do what

4   the Daggetts wanted him to do, and that's what he did.

5        So Special Agent Amanda Johnson asked the Daggetts, "Well,

6   do you have the keys to the safe?  Do you have the combinations

7   to the toolbox and safes?"  Guess what?  They had all the

8   combinations and keys to the toolbox already.  Why did they

9   have to go find it over at Mr. Mahler's house when the Daggetts

10  had it?

11       Not only did the Daggetts have the keys to the toolbox and

12  safes, they were in and out of them.  Mrs. Connie Daggett was

13  in and out of them all the time, putting things in and putting

14  things out.  She finally admitted that.  She didn't admit that

15  in the first conversation with Special Agent Amanda Johnson,

16  but she finally, after this great investigation that she did,

17  finally came back and admitted, "Yes, I'm taking things in and

18  out of there," and that's what she was doing.

19       They admit when those safes and toolboxes showed up to

20  their garage, they were empty.

21       So that's -- those are issues.

22       With respect to ammunition, we hear all of this talk about

23  ammunition.  Let me tell you the facts about ammunition.

24  Bill Daggett, with a cashier's check in his name, orders rounds

25  of ammunition from Prescott, Arizona, in his name, and it comes

1   back to his place of business in his name.  And nothing is in

2   Mr. Mahler's name.  And Special Agent Amanda Johnson says, "Why

3   is this not in Mr. Mahler's name?"

4        "I don't know."  No explanation for that.  It was all in

5   the Daggetts' name.

6        And they knew that, but yet they want to keep up this

7   charade because he didn't pay.  They were mad.  They were going

8   broke because their Victory Printing business was going out of

9   business.  They were breaking up as a couple, and so

10  Connie Daggett was mad.

11       Now, both the Daggetts admitted they had never saw

12  firearms.  They occasionally go to Mr. Mahler's home, and

13  they've never seen him in possession of firearms in his

14  residence ever.

15       Finally, they try to say that Mr. Mahler, within one year,

16  brought firearms to their residence when the safe was moved and

17  they were uncertain about that, but Special Agent Amanda

18  Johnson got to the bottom of that.  All of a sudden, that moved

19  back to -- Mr. Mahler hadn't even been there for two years, so

20  how is he in possession of anything within January 19 of 2016

21  or February 16 of 2016?

22       The Daggetts also admit that Mr. Mahler was a customer of

23  theirs at the Victory Prints.  We have the invoices of that.

24  Now there are things that were put in to these toolboxes and

25  these safes that have Mr. Mahler's name on it, boxes from the

United States Postal Service.

Now, I haven't asked this question yet, but I believe the facts are going to show that you cannot send any guns or ammunition through the United States Postal Service without a federal firearms license, period.  There's no way.  You can't even receive them in the mail without a federal firearms license.  So they can do their homework on that.

Now, Special Agent Amanda Johnson goes further because they're trying to prove possession, knowing possession, against my client.  She asks excellent questions.  She asks, "Does he have an agreement with you that he can come and go from your house any time he wants?"  The Daggetts say, "No.  He, can't do that."

She asks, "Does he have a key that he can enter?  A garage door opener?"

"No."  Bill Daggett says, "My kids don't even have a key or a garage door opener to my house."

So how is that access?  How is that joint ownership?  It's not.

And under the law, that's not right to even suggest that. He doesn't have keys.  He doesn't have access.  He hasn't been in touch over there for over two years; but, yet, they say when he's on vacation they go back to his house in Silverton and trespass and put items in his barn and admit that, and they don't get charged with trespass.  This man has no access to

1   their house whatsoever.

2        So they made this big hype thing up.  They knew he was on

3   vacation -- they were mad about that -- in Florida on a cruise

4   with his wife.  And so he's coming back, and he's going to

5   come -- this 69-year-old man is going to come, break into our

6   garage, and steal two safes and a toolbox.  So what does the --

7   what does the ATF do?  They go put up a surveillance camera in

8   this garage, hoping that Mr. Mahler is going to do that.

9        What do you think that surveillance camera showed?  It

10  showed their ignorance.  Mr. Mahler was never on that

11  surveillance camera ever.  So they did that for nothing.

12       So they go and they do -- and they get this search

13  warrant, and they say Mr. -- remember Mr. Mahler has been out

14  of town for weeks.  Anybody can come over to his house.  He

15  keeps the keys in a bowl in his kitchen to all 12 vehicles that

16  he owns.  Okay?

17       So they say, "Well, you know, he probably transports

18  weapons in his Kia Sorento."  Mr. Mahler has a Chrysler

19  Concorde.  That's his favorite car.  A luxury car.  He has a

20  Mercedes Benz for his wife.  They're all ten years old -- these

21  cars.  He has a Mustang, a 2004.  He has a flatbed truck.  He

22  has a -- and, certainly, if you're moving a safe and guns,

23  you're not driving a Kia Sorento.  He has a trailer.  He has

24  these things.  And so they say in a Kia Sorento he's going to

25  have a firearm.  That's what the Daggetts tell them -- the

1   people that have trespassed on his property.

2       So, lo and behold, they go and get their search warrant,

3   and there's all these guns, and some of them are right there.

4   Let's take a good look at them.  They're right there.  And I'm

5   going to tell you something about them in just one second.

6       So Mr. Mahler doesn't even know that they've searched the

7   residence.  He doesn't even care.  They arrest him almost two

8   weeks after that.  And he's not hiding from anybody, and he's

9   cooperating with authorities, and his wife is cooperating with

10  authorities.  And then, you know, he just gets back off of

11  vacation, and they go and they search the Kia Sorento, and

12  hidden way down in the bottom, in the back where you have your

13  spare tire underneath, there's the gun.  Just like the Daggetts

14  said.  Not in his truck, not in his Chrysler Concorde, not in

15  the Mercedes Benz, not in anything else but this Kia Sorento.

16      So they take all these guns to the Department of State

17  Forensic Laboratories, the Oregon Department of State Forensic

18  Laboratories, and the -- one of them is going to come and

19  testify about it.

20      Guess what?  On all those guns right there, there's not

21  one ounce of Mr. Mahler's DNA.  And on all those guns right

22  there -- they have fingerprints of somebody on those guns,

23  fingerprints of somebody whose fingers were not tested on those

24  guns, but they don't have Mr. Mahler's fingerprints on those

25  guns.

So what was he doing?  Wiping off every gun when he got a
chance to, to come before this jury?  Is that even possible?
No, that's not possible.

So we don't have any surveillance camera.  We have no DNA.
We have no fingerprints.  And what else happens?  So now they
arrest Mr. Mahler.  They bring him into this courthouse,
arraign him on charges, give him an attorney.  Okay?  Put him
in jail overnight, then he's released.  And then he goes back
down and of course they have executed a search warrant at his
home.  Remember he had been on vacation.  He didn't know what
was going on, and the Alcohol, Tobacco & Firearms special
agents are specially trained to look under every rock, look in
every corner, look in every place for firearms.  He gets back,
and they had already searched the place and cleared it.

He gets back and goes into his barn again, and there is a
suitcase with firearms.  He immediately calls, "Hey, they're
trying to set me up.  What's going on here?  What's going on?"
That could have been a reason to violate his pretrial release.
And they come down.  He voluntarily surrendered them.  How did
they get there?

Now, the ATF certainly wouldn't have missed it.  Something
is going on.

Finally, Ms. Wight has talked about Curtis Allen.  That's
the last person she mentioned.  He's a barber in Silverton who
claims over five years ago he sold Mr. Mahler a gun.  Over five

years ago.  Mr. Mahler has not possessed guns because he knows

he's not supposed to do so.  And Mr. Mahler, the reason he had

a problem with Mr. Curtis Allen -- and Mr. Allen told this to

the ATF agents.  He said I bought -- "I brought a guy named

Brandon over to Mr. Mahler's house," okay, "and Mr. Mahler

didn't like that, and he took issue with it."

Brandon was a drug dealer who had just got out of prison,

and Mr. Mahler said, "Hey, I don't want this guy around my

house."  Curtis Allen brings him over there anyway.  So he

tells him again, "I don't want this guy and I don't want you

over at my house.  Get off of my property."  And they did.

Now, Mr. Mahler is at Mr. Allen's barbershop, and he

doesn't like being fronted off like that.  So what does he do?

He kicks Mr. Mahler out.  Don't talk to me like that anymore.

Don't come back to my barbershop.  And whatever happened, ATF,

happened over -- not even -- we can't even see it on this list

because it was so long ago.

And that's not what we're here for.  We're here for

January 19 of 2016 to February 16 of 2016.

Folks, it's your job.  This is not firmly convincing

evidence.  At the end of the day, after you have heard

everything, you should come back and say "not guilty."

THE COURT:  Call your first.

MS. WIGHT:  Just a moment, Your Honor, I'll just move

these.

C. Daggett - D

1          THE COURT:  We can help do that.  Just call your

2    first.

3          MS. WIGHT:  The government calls Connie Daggett.

4       Do you have a preference if we sit or stand, Your Honor?

5          THE COURT:  I'm sorry?

6          MS. WIGHT:  Do you have a preference if we sit or

7    stand, Your Honor?

8          THE COURT:  I prefer you to sit because the

9    microphones pick you up better.  The microphones in this

10   courtroom -- in any of the courtrooms are not very good.

11         MS. WIGHT:  Okay.

12         THE COURT:  Please come forward and be sworn.

13         DEPUTY COURTROOM CLERK:  Please raise your right

14   hand.

15

16              CONSTANCE THERESE DAGGETT,

17   called as a witness in behalf of the Plaintiff, being first

18   duly sworn, is examined and testified as follows:

19

20         THE WITNESS:  Yes.

21         DEPUTY COURTROOM CLERK:  Please be seated.  State

22   your full name and spell your name for the record.

23         THE WITNESS:  Constance Therese Daggett.

24   C-o-n-s-t-a-n-c-e.  T-h-e-r-e-s-e.  D-a-g-g-e-t-t.

25

C. Daggett - D

1                    DIRECT EXAMINATION

2   BY MS. WIGHT:

3   Q.   Good afternoon, Ms. Daggett.  Do you know go by "Connie"?

4   A.   Yes.

5   Q.   Can you please tell the Court and the jury where you work?

6   A.   I work at Total Satellite TV.  It's a satellite

7   installation company.

8   Q.   And where are you living right now?

9   A.   Bremerton, Washington.

10  Q.   How long have you lived there?

11  A.   A little over a year.

12  Q.   Before you lived in Bremerton, did you live in Molalla,

13  Oregon?

14  A.   Yes.

15  Q.   And is Molalla located about 30 miles south of Portland?

16  A.   Yes.

17  Q.   Can you just tell us a little bit about that community?

18  A.   It's a very small country rural community.  Farmers and

19  small businesses.

20  Q.   Is it a pretty close-knit community?

21  A.   Oh, yes.

22  Q.   I'm going to have to ask you today, Connie, just a few

23  personal questions, just in order to help the jury understand

24  why you're here.

25       Can you tell the jury why you moved to Washington?

C. Daggett - D

1  A.    I moved to Washington because my ex-husband and I had

2  gotten a divorce, and I moved up there to be with my new

3  boyfriend.

4  Q.    And is your ex-husband Bill Daggett?

5  A.    Yes.

6  Q.    Does Bill still live in Molalla, Oregon?

7  A.    Yes.

8  Q.    Do you know if Bill still lives in the same house that you

9  lived in together in Molalla?

10  A.    Yes, he does.

11  Q.    Let's go ahead, then, and focus on that time when you and

12  Bill were living in Molalla.

13       When you were there in Molalla, did you and Bill know the

14  defendant, Robert Mahler?

15  A.    Yes.

16  Q.    How did you know him?

17  A.    He had originally -- he had come into our business to

18  order T-shirts.  He was my sister-in-law's stepdad.  We had

19  talked several times, originally doing business together at the

20  business that Bill and I owned.

21  Q.    Did you eventually start to socialize with Mr. Mahler?

22  A.    Yes.

23  Q.    Did you ever entertain Mr. Mahler at your house and go to

24  his house?

25  A.    Yes.  We went to his house for dinner a couple of times.

C. Daggett - D

1  He came over to our house for dinner.  We would go out to

2  dinner.

3  Q.   Is it fair to say he was considered a family friend?

4  A.   Yes.

5  Q.   Do you see Mr. Mahler today in this courtroom?

6  A.   Yes.

7  Q.   Can you describe maybe his -- what he's wearing?

8  A.   He's wearing a blue suit and a blue tie.  To my far left.

9  Q.   Thank you.

10      So if you can, approximately give us the time when this

11  friendship with Mr. Mahler really first started to develop.

12  And I know it's probably hard, but if you can approximate.

13  A.   The friendship part started when we bought a puppy from

14  him.  That is when it went from beyond just coming in to our

15  business to actually socializing together.  That was fall of

16  2012.

17  Q.   You mentioned, though, that he had been to your house and

18  you had gone to his house.  I do want to talk to you about some

19  of those early visits that Mr. Mahler had at your home.  What

20  was your understanding of what Mr. Mahler thought of your home?

21  A.   He seemed to really enjoy the rural location.

22  Q.   And when you say "rural location," how far out are you?

23  A.   We're about 12 miles out of Silverton.  Like you said,

24  about 30 miles out of Portland.  The very edge of Molalla

25  limits.  It's a little dirt road in.  Only one way in.  Kind on

C. Daggett - D

1  the -- it's very secluded, very rural, not a lot of traffic.

2  Q.   And you just mentioned that Mr. Mahler enjoyed that about

3  your property?

4  A.   Yes.

5  Q.   How big is your property?

6  A.   Almost two acres.

7  Q.   Was Mr. Mahler interested in the size of your property?

8  A.   He liked the layout of it, yes.

9  Q.   Why would he be interested in the size of your property?

10       I could probably ask it a different way.  Was there a

11  reason that Mr. Mahler was interested in your property?

12  Because you had a lot of space?

13  A.   Yes.

14  Q.   And what did he -- what did he do because you had so much

15  space?

16  A.   He began storing stuff at our place.

17  Q.   What kind of stuff did he start storing there?

18  A.   Originally, it was food and, like, water barrels and

19  things like that.  You know, bringing water barrels out to fill

20  up with water.

21  Q.   Food and water barrels.  Were there any other supplies

22  that he brought out?

23  A.   Not in the beginning, no.

24  Q.   Also, in the beginning, did he store anything else on your

25  property, that you can remember?

C. Daggett - D

1  A.    There was some military vehicles.

2  Q.    You said "some."  How many are you talking about?

3  A.    Two.  There were -- at one point, there was three.  The

4  third one didn't stay there long.  There was two of them there

5  long term.

6  Q.    And you mentioned these -- the food, the water, the

7  supplies.  Where did he keep these supplies?

8  A.    In our garage.

9  Q.    Was there anywhere else on your property that you kept

10 them?

11 A.    Well, the military vehicles were out in the driveway.

12 Q.    And what did you think at first when Mr. Mahler wanted to

13 start storing these supplies on your property?

14 A.    At first I thought it was -- for lack of a better word, a

15 hobby sort of thing.  I mean, out in that area, it's not

16 uncommon for people to stock up and want to have extras on

17 their property.

18 Q.    Have you ever had an emergency in the past where it

19 probably would have been helpful?

20 A.    There was a time we went over a week without electricity.

21 It was a very icy winter.  And because of the way the

22 powerlines were at the time, we were the last one on the line.

23 If anybody was going to be without power, it was going to be

24 us.  It was not uncommon to go a couple of days without

25 electricity.  The worst was the ice storm.  That one was over a

C. Daggett - D

1  week.

2  Q.    Did Mr. Mahler ever tell you why he needed to store the

3  trucks and supplies on your property versus his property?

4  A.    He quite oftentimes said he didn't have room, with the way

5  his property was set up, to store it securely.

6  Q.    What about the trucks?

7  A.    The trucks?  It was because he told us his wife did not

8  know how many of them he purchased.  He kept one on his

9  property.  The rest were on ours because he was trying to not

10 let her know how much money he had invested in those was what I

11 was told by him.

12 Q.    Mr. Mahler told you that himself?

13 A.    Yes.

14 Q.    In addition to these trucks and the food and the supplies,

15 did Mr. Mahler ask you to store anything else on your property?

16 A.    Yes.

17 Q.    And what was that?

18 A.    He had a gun safe and some weapons and some ammunition and

19 other supplies like that.  Crossbows or compound bows and the

20 arrows that go in those.

21 Q.    Do you remember when he first brought those guns and

22 related items over?

23 A.    The safe came over first, and that would have been late

24 fall or early winter of 2012.

25 Q.    Were you ever present when Mr. Mahler brought the guns

C. Daggett - D

1    over?

2    A.    I was present when he arrived with the guns, yes.

3    Q.    Tell us about that.

4    A.    He pulled in, in his Montero, and he backed it up to our

5    garage.  They opened up the back, and in the back was a layer

6    of blankets and a layer of guns and a layer of blankets.  You

7    know, to keep the guns safe and from scratching each other up.

8    And at that point I got my daughter, and she and I went grocery

9    shopping or something.  That was the extent of me seeing that

10   load of guns that filled up the safe.

11   Q.    You mentioned he had a Montero.  Was it actually a

12   different kind of a car?  A Kia, perhaps?

13   A.    It was a foreign SUV.

14   Q.    Kia Sorento?

15   A.    There we go.  A Sorento sounds much more familiar.

16   Q.    Is that it?  Okay.

17         So you saw the guns arrive.  Was anyone else there with

18   you when the guns arrived?

19   A.    Yes.

20   Q.    Who else was there?

21   A.    Bill was there, my son Thomas was there, and Mr. Mahler

22   was there.

23   Q.    You mentioned that you and your daughter left.  Did Bill

24   stay?

25   A.    Yes.

C. Daggett - D

1    Q.   Did Mr. Mahler ever tell you why he needed to store the

2    guns at your house?

3    A.   Where the safe had been located was at his stepson's

4    house, and they were getting foreclosed on, so he needed a

5    place to keep the safe because he didn't have room in any of

6    his sheds or on his property.  Then the guns had to go

7    somewhere, so they came over and got put in the safe.

8    Q.   Let's talk about those -- the safes where the guns were

9    located.  Were any of those safes yours?

10   A.   No.

11   Q.   And how many safes did he have in your garage?

12   A.   There was one gun safe that was a secure gun safe.  You

13   know, it was -- you know, the kind with a lock and a

14   combination.

15   Q.   How tall was that, that you're talking about?

16   A.   I would say the size of about a refrigerator.  Maybe a

17   short refrigerator, but that's a good estimate.

18   Q.   And what was another safe like?

19   A.   There was one that was like a cabinet.  Almost like an

20   office filing cabinet, but instead of drawers, it had a

21   cabinet.  And that was laid on its back.

22   Q.   Like a low cabinet?

23   A.   Yeah.  Like you took a standup cabinet and laid it on its

24   back, where the door opened from the top.

25   Q.   Did it have locks on it?

C. Daggett - D

1   A.    Honestly, I don't remember.

2   Q.    And then what was the other safe like?

3   A.    It was a Knaack toolbox, like a big contractors-type

4   toolbox that they would have in the back of a full-sized

5   pickup.

6   Q.    You said "Knaack."  Is that spelled K-n-a-a-c-k?

7   A.    Correct.

8   Q.    I'm going to show you what's been marked as Government's

9   Exhibit 81-2.  It should show up on your screen up there.  So

10  go ahead and just take a quick look at that.

11        Okay.  Did you see it on the screen?

12        Okay.  Connie, what are you looking at here?  What is

13  this?

14  A.    I am looking at as if you were to walk out the house door

15  and just step into the man door of the garage.  Towards the

16  window, looking at the woodshed there, just to the right of the

17  window, is the safe -- the actual safe.

18  Q.    Whose garage is this?

19  A.    It was mine and Bill's.

20  Q.    And does this picture fairly and accurately represent your

21  garage as you remember it --

22  A.    Yes.

23  Q.    -- in early 2016?

24  A.    Yes.

25  Q.    Is does?

C. Daggett - D

1        MS. WIGHT:  Your Honor, the government would offer

2   Exhibit 82-2 and wishes to publish it to the jury.

3        MR. WARREN:  No objection.

4        THE COURT:  It will be received, and you can show it

5   to the jury.  Is it up?

6        MS. WIGHT:  Yes.

7   BY MS. WIGHT: (Continuing)

8   Q.   So, Connie, you were mentioning that you can see the safe

9   in this photo.  If you are able to -- we haven't -- I'll direct

10  your attention -- did we properly highlight the safe for you?

11  Is this the tall safe?

12  A.   Yes.  It's the big dark gray thing right there next to the

13  right of the white dresser.  It has the blanket on top of it.

14  Q.   Is this sometimes referred to as the Liberty Safe?

15  A.   Yes.

16  Q.   Do you see the low cabinet footlocker in this photograph?

17  A.   Yes.

18  Q.   Where is that located?  Can you describe that for us?

19  A.   It's what the dresser is sitting on.  If you notice the

20  legs of the dresser are sitting on top of something, that's the

21  cabinet.

22  Q.   That brown-colored box under there?

23  A.   Yes.  Yes.

24  Q.   And then I think, if we zoom out, are you able to see the

25  Knaack toolbox you were talking about?

C. Daggett - D

1  A.   Yes.

2  Q.   And where is that located?

3  A.   By the white water barrels there, just behind those is --

4  looks like a red barbecue.  It's behind that.  You can see the

5  "K" that starts the name, and then it looks like it's blocked

6  off by something.  But that's the Knaack toolbox.  It's got the

7  white handle.

8  Q.   Yes.  Do you know if that was a locking box?

9  A.   It did have, yes.

10  Q.   So, Connie, I'm going to show you now -- let's start with

11  Government's Exhibit 84-1.

12      So, first, Connie, I just want you to take a look at this

13  picture, and just generally, before we admit it, can you

14  generally tell us what this is, without going into too much

15  detail?

16  A.   That's the Knaack toolbox that Bob brought over.

17  Q.   The one that you were just telling us about?

18  A.   Yes.

19  Q.   And are you familiar with that item?

20  A.   Yes.

21  Q.   And is this a fair and accurate representation of the

22  Knaack toolbox that you had in your garage in 2016?

23  A.   Yes.

24          MS. WIGHT:  The government offers Exhibit 84-1.

25          THE COURT:  Any objection?

C. Daggett - D

1          MR. WARREN:  No.

2          MS. WIGHT:  Before we continue on, can we take a look

3     at 88-1?

4      Your Honor, none of these exhibits are admitted.  Should I

5     state on the record it's not admitted yet?

6          THE COURT:  If they weren't preadmitted, then you

7     need to move for them.

8          MS. WIGHT:  Yes.  We will continue to do so.  We

9     don't have any preadmitted exhibits, Your Honor.

10          THE COURT:  The trouble is then you shouldn't publish

11     them to the jury until they're admitted.

12          MS. WIGHT:  That is correct.

13          THE COURT:  My guess is they've been going up

14     automatically.  So they shouldn't go up until they're admitted.

15          MS. WIGHT:  Is that correct?  Are you guys actually

16     seeing them?

17          THE COURT:  Yes.

18          MS. WIGHT:  Oh, do I have control of that?

19      Oh, we can't --

20          THE COURT:  Ms. Kramer can control that.

21          MS. WIGHT:  So we will actually --

22          THE COURT:  Before they're admitted and she's

23     identifying them, the jury shouldn't see them.

24          MS. WIGHT:  Yes.

25          THE COURT:  Once they're admitted, then they can be

C. Daggett - D

1  published to the jury.

2          MS. WIGHT:  That's correct.  I wasn't sure.  So we

3  can show them to just Ms. Daggett?

4          THE COURT:  Yes.

5          MS. WIGHT:  Okay.  I'll make sure to acknowledge that

6  before so you guys know.  Thank you.

7  BY MS. WIGHT: (Continuing)

8  Q.   We will go ahead and look at 88-1.

9      So, again, this is a preadmitted -- not admitted exhibit.

10  This is 88-1.  Please take a look at this, Connie.

11  A.   Is there a way to adjust my monitor?  The light glare on

12  it makes it difficult to see.

13  Q.   It looks like it's tilted funny.

14  A.   Much better.  Thank you.  Thank you so much.

15  Q.   You got a good view of it?  Okay.

16      Again, I think we're on 88-1.

17  A.   Uh-huh.

18  Q.   Please take a look at this photo.  And just generally,

19  before -- well, just you looking at it, can you tell us what

20  this is a picture of?

21  A.   It's a picture of the cabinet that Mr. Mahler brought

22  over.

23  Q.   Are you familiar with this item?

24  A.   Yes.

25  Q.   And is this a fair and accurate representation of the low

C. Daggett - D

1  cabinet that was in your garage in 2016?

2  A.    Yes.

3              MS. WIGHT:  The government offers Exhibit 88-1.

4              MR. WARREN:  No objection.

5              THE COURT:  Received.  It may be published.

6  BY MS. WIGHT: (Continuing)

7  Q.    Looking at this photograph, Connie, do you notice if

8  there's a lock on this thing, just by looking at the picture?

9  A.    It does look like there's a combination lock on it, just

10  by looking at the picture.

11  Q.    Zoom in.  Is that a combination lock or just a keylock?

12  A.    Oh, just a keylock.

13  Q.    Thank you.

14      I'm now going to show you Exhibit 89-1.  This one is also

15  not admitted.  I apologize.  Please take a look at it.

16  A.    Okay.

17  Q.    What are we looking at in that picture?

18  A.    That's what we called the Liberty Safe.

19  Q.    You're familiar with this item?

20  A.    Yes.

21  Q.    And does this photo fairly and accurately represent what

22  the Liberty Safe looked like in your garage in 2016?

23  A.    Yes.

24              MS. WIGHT:  The government offers 89-1.

25              MR. WARREN:  No objection.

C. Daggett - D

1      THE COURT:  It will be received.

2  You may publish it.

3  BY MS. WIGHT: (Continuing)

4  Q.  And what type of lock does this safe have on it?

5  A.  It had both a combination and a key.

6  Q.  You mentioned -- so that safe is almost as tall as we are.

7  It's about four feet tall; is that correct?

8  A.  Yes.

9  Q.  So let's just talk for a minute about these three

10  containers.  Did you and Bill have keys to access these storage

11  containers?

12  A.  Bill did, yes.  There was only one given to us.  We both

13  didn't have one.

14  Q.  You and Bill, together, had the keys to them?

15  A.  Yes.

16  Q.  Did you also have the combination to that Liberty Safe?

17  A.  Yes.

18  Q.  Did you personally ever look inside any of these safes?

19  A.  The cabinet and the Liberty Safe?  No.

20  Q.  So the one that you did look in was the Knaack toolbox?

21  A.  The Knaack box, yes.

22  Q.  And tell us why you looked in there.

23  A.  I was looking to make room in my garage.  I do canning,

24  and I had no space in my garage to put my canned goods.  So I

25  was looking to take some of the stuff that Mr. Mahler had

C. Daggett - D

1  brought over and condense it.  And the Knaack toolbox was the
2  easiest to get to, so I just opened that up to put some other
3  stuff inside of there to make room for what I was canning.
4  Q.   When you opened it up, were you able to see anything
5  inside?
6  A.   Yes.
7  Q.   What did you see?
8  A.   I saw handguns.  I saw compound bows, crossbows.  I'm not
9  sure what the difference is.  Some sort of bow.  And then the
10  bolts for the bows.
11  Q.   Ms. Daggett, I do want to turn now to a different topic.
12  I want to talk about when you were interacting with Mr. Mahler
13  outside of your home.
14      Did Mr. Mahler live in Molalla?
15  A.   No.
16  Q.   Where did he live?
17  A.   He lived in Silverton.
18  Q.   Did you ever go to Silverton?
19  A.   Yes.
20  Q.   And why?
21  A.   I was there every day.
22  Q.   Where did you work?
23  A.   Victory Prints.
24  Q.   And what's Victory Prints?
25  A.   It's a screen printing and embroidery shop.

C. Daggett - D

1  Q.   And who worked there with you?

2  A.   Bill and I.

3  Q.   Did Mr. Mahler ever go to visit you at your print shop?

4  A.   Yes.

5  Q.   Why would he come by?

6  A.   Originally, he did business with us.  He was the president

7  of a table tennis club, and he would come in and get shirts for

8  their tournaments was how the relationship started.  And, you

9  know, he and -- he would come in, and we would talk.  He and

10 Bill would talk.  We clicked and became friends.

11 Q.   You said "table tennis."  Do you mean "ping pong"?

12 A.   Yes.

13 Q.   So you also said originally that's what he came by for.

14 A.   Yes.

15 Q.   What do you mean?

16 A.   After becoming friends and, you know, then he would bring

17 by food to have us take out to our house to store, canned goods

18 and stuff.  He would pick it up from wherever he picked it up

19 from, and he would stop by our office and bring it there, and

20 we would take it from there to home and unload it.

21 Q.   To add to the emergency supplies?

22 A.   Yes.

23 Q.   Was there ever a time that Mr. Mahler stored any stuff at

24 your print shop?

25 A.   Yes.

C. Daggett - D

1   Q.   Was it just temporarily stored there?

2   A.   It was -- that was the assumption, yes.

3   Q.   And what was it that he stored there?

4   A.   There was a batch of ammunition that had been delivered

5   there.

6   Q.   And you said a batch?

7   A.   Yes.

8   Q.   About how much is a batch of ammunition, do you think?

9   A.   If memory serves, it was, like, 12 or 14 boxes.  I'm not

10  positive.  It was a long time ago, but it was a load.

11  Q.   Do you have any idea what the approximate value of that

12  batch of ammunition was?

13  A.   About $5,000.

14  Q.   How did that batch of ammunition get to your business?

15  A.   It was delivered by FedEx.

16  Q.   And who was there when it arrived?

17  A.   Me.

18  Q.   Who knew it was coming?

19  A.   Bill, Mr. Mahler, and myself.

20  Q.   And how did you know it was coming and arriving that day?

21  A.   Because I knew that I had to receive it.  He -- Mr. Mahler

22  wasn't going to be available.  Again, if memory serves, he had

23  a table tennis thing going on, or something, that day, and he

24  could not be there to accept delivery.

25  Q.   So who told -- so Bob told you it was coming?  Is that how

C. Daggett - D

1  you knew it was coming that day?

2  A.   I forget whether it was Bob or whether it was Bill; but,

3  yes, between the three of us, it was communicated to me,

4  "You're going have to receive this today."

5  Q.   So when $5,000 worth of ammunition arrived, who actually

6  received it and reviewed the invoice?

7  A.   That was me.

8  Q.   And what did you do?  Who did you contact when that

9  delivery arrived?

10  A.   It was short by a box or two, so I called Mr. Mahler to

11  let him know that the delivery was short.

12  Q.   You called Bob?

13  A.   Yes.

14  Q.   Did those two packages ever arrive?

15  A.   The following day, yes.

16  Q.   What did you do with these 12 boxes of ammunition when

17  they arrived at your business?

18  A.   I moved them into the pressroom.  You know, out of the

19  lobby area; out of sight.

20  Q.   Were they pretty heavy?

21  A.   Yes.

22  Q.   And how long did these boxes stay at your business?

23  A.   They stayed there for a few weeks before we moved them out

24  to the house.

25  Q.   Did you have any concerns about the ammunition at your

C. Daggett - D

1  business?

2  A.    As with any pressroom environment, my concern was a fire.

3  Q.    So what happens when -- who actually came and picked up

4  the ammunition?

5  A.    We just loaded it up into the back of the pickup -- Bill

6  and I.

7  Q.    Did Mr. Mahler ever come and talk to you about that

8  ammunition?

9  A.    Oh, yeah.  He had stopped by.  He had seen it there.  You

10  know, first, there was the discrepancy between the amount of

11  boxes that were delivered.  Because I did not have tracking, I

12  couldn't get ahold of FedEx myself.  It wasn't my transaction.

13      So to make sure that the remaining boxes weren't just

14  lost, I contacted him.  So, yes, I did know that they would be

15  arriving the next day.  He came out, and he and Bill discussed

16  the ammunition.

17  Q.    Do you know where they brought it?

18  A.    I took it into the warehouse, and then Bill and I unloaded

19  it from the warehouse into the truck to take it to our house.

20  It didn't ever go a third place after that.

21  Q.    Okay.

22  A.    Or in between that.

23  Q.    I just wanted to go back.  You mentioned that

24  eventually -- did Mr. Mahler actually come to your shop to talk

25  about the ammunition?

C. Daggett - D

1  A.    Yes.

2  Q.    And what did he talk about with you?

3  A.    He just talked about -- well, the first day he talked

4  about the missing box.  We sat down and we -- he had me run a

5  tape of what the price per bullet was, as opposed to the case

6  price.  You know, we figured out what the price was once

7  freight was added in.  Just talking about the cost of the -- I

8  guess, essentially a receiving process.  Here is what we got.

9  Yes, it is all here.  Here is what we paid for it.  It's this

10 much per round.  Freight adds that much.

11 Q.    Did he go over calculations with you for the total cost?

12 A.    Yes.  Yes, he sat across my desk from me.  He had his

13 piece of paper, his notes, and, you know, he wrote down what I

14 was running on the adding machine.

15 Q.    What was your understanding of who owned that ammunition?

16 A.    My understanding was Mr. Mahler owned the ammunition.

17 Q.    And what was your understanding of whose money it was that

18 purchased that ammunition?

19 A.    It was Mr. Mahler's.

20 Q.    Okay.  Connie, you mentioned that this ammunition went

21 back to your house.  You had already had the trucks at your

22 house.  You told us about the supplies.  What was the long-term

23 plan with all this stuff at your house?

24 A.    That was where I started getting frustrated, was I did not

25 have a long-term plan, and my garage was not my own.

C. Daggett - D

1    Q.    Did you guys ever make a plan with Mr. Mahler?

2    A.    There was quite a few times that, between Bill and I, we

3    told him enough is enough.   Stuff needs to quit coming over.

4    We don't have any more room.

5    Q.    Did you ever try to make an arrangement so that he could

6    actually pay for the space or something like that?

7    A.    There was a couple of times he mentioned paying rent; but

8    it wasn't a matter of receiving rent, it was getting the stuff

9    out of there.   It was reclaiming my garage, my canning area.

10   My daughter rides horses; a place to put the tack.   It was a

11   space thing.   It wasn't about receiving money.

12   Q.    Did he ever pay you any money for that space, though?

13   A.    No.

14   Q.    You also said initially you didn't mind stockpiling some

15   of these supplies.   Did your opinion really start to change?

16   A.    Yes.   To me, there's a difference between being prepared

17   for two or three weeks of inclement weather or being unable to

18   get out of the house and literally not having any room on any

19   of the shelves in your garage.   There's a big difference

20   between storing and stockpiling.

21   Q.    Did you have any specific concerns?

22   A.    The ammunition was.   The ammunition was in my garage.

23   Again, a house fire.   If something were to happen, it's

24   farmland and it gets dry.   We were back up against some forest

25   land.   My worst fear, over and over again, was a house fire.

C. Daggett - D

1  Q.   How did the growing stockpile affect your relationship

2  with your husband?

3  A.    It became tense.  I wanted it out of there.  I wanted it

4  out of there, or at least to have a plan or for it to quit

5  coming in -- for more of it to quit coming in.  I just wanted

6  some answers.  I know both Bill and I mentioned to Bob it has

7  to stop.  And then a week later he would show up with another

8  case of chili.  So we would bring it home, and then Bill and I

9  would get into some heated arguments about it.

10  Q.   You mentioned chili or canned food.  Earlier on, did you

11  ever talk to Bob about what types of food would be good to

12  store in the --

13  A.   I know I talked about canning a lot because it's what I

14  did.  You know, we talked about what lasts the longest.  We

15  talked about expiration dates and would you feed your family

16  something after it expired, things like that.

17  Q.   So this was causing stress on your relationship.  What did

18  you and Bob do?

19  A.    Bill and I?

20  Q.   Or Bill.  Yeah, what did you and Bill do?  I apologize.

21  A.    Bill loaded up the food into the back of the pickup and

22  took one full load and one partial load back to Bob's house.

23  Q.   Do you remember if that was the time when Mr. Mahler was

24  actually on vacation?

25  A.    Yes, he was.

C. Daggett - D

1  Q.    He was.  And how did you get into his house?

2  A.    My sister-in-law was there.  She was -- she was house

3  sitting for them.  House sitting and pet sitting.

4  Q.    And she let you into the house?

5  A.    Yes, she let us in the gate so that Bill could make it

6  back to the shed and unload the stuff.  We didn't just want to

7  dump it.  He stacked it up against a wall and made sure it was

8  out of the weather.

9  Q.    What type of things did you guys drop off?

10  A.    Quite honestly, I don't remember.  He probably just took

11  one shelf and emptied it.  It was, you know, chilis, tomato

12  sauce, soups, vegetables, things like that.

13  Q.    Do you have any knowledge whether or not you brought guns

14  that day?

15  A.    Did Bill bring guns back that day?

16  Q.    Uh-huh.

17  A.    No.  There were no guns that took place that day.

18  Q.    So around this time when you're starting to ask Bob to

19  take his stuff back, were you working with Mr. Mahler on any

20  other sort of projects?

21  A.    Not that I know of, no.  Trying to get him to get the

22  trucks back, trying to get him to make a plan as to getting the

23  safe and the ammunition out of our house, but there was nothing

24  concrete.

25  Q.    And --

C. Daggett - D

1  A.    Every time we thought we had a plan, it got bumped back.

2  There was -- he had a busy schedule and could never make it

3  over to actually accomplish that.

4  Q.    Was Bill still -- Mr. Mahler still a friend at this time?

5  A.    I was very, very frustrated with him, and I was very, very

6  frustrated with my husband.  I guess I would have to ask you to

7  define "friend."

8        No, he didn't follow my wishes.  I really felt betrayed

9  and undermined.  He knew I was tired of his stuff in the

10  garage.  He knew I was worried about the ammunition in the

11  garage, and I truly felt like I had been brushed off and

12  ignored.

13  Q.    Were you having any other disagreements with Mr. Mahler at

14  that time?

15  A.    At the time that the food went back?  No, no.

16  Q.    What about later?

17  A.    Later?  Yes.

18  Q.    And what was that?

19  A.    There was a book he had written that he asked me to

20  proofread.  I proofread it.  I made the corrections on my

21  computer.  Because of whatever glitches, whenever he tried to

22  open it up on his computer, it did not save the spacing

23  changes.  In particular, the double space after a period

24  between the next letter, it kept getting rid of those.  So he

25  would bring it back to me and have me do it again.  I would do

C. Daggett - D

1  that.  He would take it and, again, whatever glitch happened,

2  it wasn't keeping the corrections I made.

3  Q.   Did you have an arrangement with Mr. Mahler?

4  A.   He was going to pay me a dollar per page to proofread the

5  book.

6  Q.   And this led to a disagreement just because it wasn't

7  working out, or what was it?

8  A.    No, it was -- after spending the better part of a year on

9  it, reading this, proofreading it four different times, then

10 finally telling him, "It's not going to work.  My computer is

11 not talking to your computer," you know, he mentioned me

12 wanting to -- me to write a paragraph about myself for the

13 credits portion of the book to put me in the credits, and I

14 told him I don't want to be.  It's just not who I am.  It had

15 nothing to do with that book, in particular.  It's that I would

16 never, ever put my name anywhere.  It's just not me.

17 Q.   And what happened?

18 A.   I found out that he had published the book, that it was

19 available online.  Number one, I had never been paid; number

20 two, there I was in there.

21 Q.   So you were --

22 A.   My name was in there.

23 Q.   You were angry?

24 A.   Yes.  Very.  Again, I felt like he gave me absolutely no

25 credit for my wishes for what I had to say.

C. Daggett - D

1  Q.   Now, prior to that event, I mean, you were working on

2  Mr. Mahler's book?

3  A.   Uh-huh.

4  Q.   Had you done any research on Mr. Mahler himself?

5  A.   No.  Not until after I heard the book was published.

6  Q.   And what happened when you did research on Mr. Mahler?

7  A.   When I talked -- typed in "Robert Mahler," I found out

8  that he had a felony conviction.

9  Q.   And what did you do when you found out?

10  A.   I went to Bill, and I was furious.  I was furious.

11  Q.   What did you and Bill decide to do?

12  A.   We decided to call and turn him in because there was no

13  other way to get that -- those weapons and that ammunition out

14  of my garage.

15  Q.   Did you spend some time trying to decide what to do?

16  A.   Yes.  Yes.

17  Q.   And during that time, what did you -- what did you

18  consider?

19  A.   We seriously considered loading them up and taking them

20  back to his house -- the way we had the food.  Just knock,

21  knock, "Here we are, Bob.  Take it.  I don't care whether you

22  have room for it or not."

23  Q.   Why did you finally decide to call the police?

24  A.   I have family who is in law enforcement, and when I told

25  him that that was my plan, I found out that for me to turn

C. Daggett - D/X

1  weapons over to someone that I'm aware is a felon makes me a

2  felon.  It would have put my family in jeopardy.  It would have

3  put my business, my property, and me in jeopardy.

4         MS. WIGHT:  Connie, I have no further questions.

5         THE COURT:  Go ahead.

6

7                    CROSS-EXAMINATION

8  BY MR. WARREN:

9  Q.   Good afternoon, Ms. Daggett.

10 A.   Hello.

11 Q.   On January 19, 2016, you recall calling Special Agent

12 Amanda Johnson about this issue?

13 A.   Yes.

14 Q.   And isn't it true that right at that same time that --

15 that's why you took the items back to Mr. Mahler's home --

16 because he was on vacation?

17 A.   No.  That happened -- we took the canned goods back before

18 I called Amanda.  The canned goods I took back -- it was

19 canning season.  It would have been fall of 2015.

20 Q.   Do you recall talking to Special Agent Amanda Johnson,

21 telling her you just took the items back to Mr. Mahler's house?

22 A.   The items that we had just taken back to Mr. Mahler's

23 house --

24 Q.   Yes.

25 A.   -- would have been the military trucks, not the food.

1  Q.   Do you recall having a conversation with Special Agent

2  Amanda Johnson about taking those items back in January of

3  2016?

4  A.   No, I don't.

5  Q.   Okay.  In that call, you told Special Agent Amanda Johnson

6  that you had been storing firearms at your residence for

7  Mr. Mahler; is that right?

8  A.   Yes.

9  Q.   And that you lived at 1046 -- 10456 Comer Creek Drive,

10 Molalla, Oregon?

11 A.   Yes.

12 Q.   Now, when you were describing that, you were describing

13 this is kind of a remote area.  But there are small properties

14 close by; right?

15 A.   I don't remember saying that specifically; but that's an

16 accurate description of our property, yes.

17 Q.   And there are paved roads around; right?

18 A.   There are paved roads around, yes.

19 Q.   Okay.

20 A.   We did not live on a paved road; but, yes, there are paved

21 roads around.

22 Q.   Okay.  And isn't it true that you said you had been

23 storing items at your residence for Mr. Mahler for a couple of

24 years?

25 A.   I don't remember if I said exactly that; but, there again,

C. Daggett - X

1   that is a true portrayal of the situation.

2          MR. WARREN:  Okay.  Your Honor, may I approach the

3   witness?

4          THE COURT:  Yes.  You don't have to ask.

5          MR. WARREN:  Oh, thank you.

6   BY MR. WARREN: (Continuing)

7   Q.   Ms. Daggett, can you see this little timeline?

8   A.   Yes.

9   Q.   Okay.  So is it fair to say that the items arrived in your

10  garage in about sometime in 2014?

11  A.   It started fall of 2013.  No.  In fact, probably even

12  earlier than that.

13  Q.   Okay.

14  A.   So 2013 at some point.

15  Q.   Okay.  So is it fair to -- if I put "C.D." right there and

16  sometime in the fall of 2013?

17  A.   To the best of my recollection, yes, that is fair.

18  Q.   Okay.  And before that, you allegedly were storing items

19  at Victory Prints for Mr. Mahler; is that true?

20  A.   No.

21  Q.   Okay.  You never stored things at Victory Prints for

22  Mr. Mahler?

23  A.   T-shirts.  Canned goods and the like?  Actual dried goods,

24  storage stuff?  No.  Not until the load of ammo came in.

25  Q.   Would you give Mr. Mahler lists of items to purchase for

C. Daggett - X

1   food and medical needs?

2   A.   No.  Not -- no.  I never gave him lists of purchase -- of

3   things to purchase.

4        Now, when we would speak --

5   Q.   Yes.

6   A.   -- especially as it pertained to canning and stocking up,

7   yes, there was lists of -- of foodstuffs made then.

8   Q.   I would like to show you a list of some foodstuffs, and

9   tell me if you recognize it.

10  A.   To me, quite honestly, this looks like a canning list.  It

11  looks like a list that I would make before I went to Costco.

12  Q.   Thank you.  Is that your handwriting?

13  A.   Yes, that is.

14            MR. WARREN:  Okay.  I would offer to admit this into

15  evidence.

16            THE COURT:  Any objection?

17            MS. WIGHT:  No objection, Your Honor.

18  BY MR. WARREN: (Continuing)

19  Q.   I would like to show you another list.

20  A.   Yes.

21  Q.   Do you recognize that list?

22  A.   Yes, I do.

23  Q.   Is it in your handwriting?

24  A.   Yes, it is.

25            MR. WARREN:  I would like to admit Exhibit No. 106

357

C. Daggett - X

1  into evidence as well.

2          THE COURT:  Show it to Counsel.

3          MR. WARREN:  She has copies.

4          MS. WIGHT:  I have no objection to 106 either,

5  Your Honor.

6          THE COURT:  It will be received.

7  BY MR. WARREN:  (Continuing)

8  Q.    Okay.  So this list says "fish antibiotics"?

9  A.    Yes.

10  Q.    And this is in your handwriting?

11  A.    Yes.

12  Q.    What were you telling Mr. Mahler with these two exhibits?

13  A.    We were talking about farm animals.

14  Q.    Okay.

15  A.    He was looking at getting some Dexter cows and having them

16  bred.  I had done sheep for years.  I had had steers.

17  Mr. Mahler used to call veterinarians for his animals, and

18  that's fine.  I tended to go a lesser route, and I would go to

19  Wilco and get my antibiotics.  I would give all my animals

20  their shots themselves.  When it came to an ewe that had a

21  difficult birth, I would stitch her up myself.  I would -- and,

22  regularly, Bob and I talked about the difference between

23  veterinary care and home care and where would you go to get

24  those sorts of things.  They're all available at Wilco.

25  Q.    So when you wrote those lists for Mr. Mahler, he actually

C. Daggett - X

1  came back with those lists filled in?

2  A.   No.  No.  He never got me penicillin.  He never got me

3  suture kits for my lambs.  No, he did not come back with those

4  lists filled in.

5              MR. WARREN:  Could you put Government's

6  Exhibit 81-002 that has been admitted back?

7  BY MR. WARREN: (Continuing)

8  Q.   Do you recognize this exhibit?

9  A.   Yes, I do.

10  Q.   Do you see in the middle there are some white cans, and

11  then off to the side there's some container storage boxes?

12  A.   The gray totes?

13  Q.   Yes.  The gray totes.

14  A.   Yes.  Yes.

15  Q.   What are those gray totes?

16  A.   Rice, beans, salt, flour, clothing, sleeping bags, toilet

17  paper.

18  Q.   Those are the things that were -- made it on your list?

19  A.   No, those weren't on my list.

20  Q.   Okay.

21  A.   There were flak vests in some of them.  There were --

22  those are the things that memory serves.  Those were the things

23  that I was trying to move out of my way on my shelves to make

24  room for my canning stuff.

25  Q.   So you don't recall telling Special Agent Amanda Johnson

C. Daggett - X

1   that you took some of those medical supplies and put them in

2   that toolbox that you were removing things -- rearranging items

3   to?

4   A.   That conversation that I had with Ms. Johnson in January

5   of 2016 was well over two years ago.  I don't remember verbatim

6   what I said.  I do remember I referred to those as "emergency

7   supplies," not "medical supplies."

8   Q.   I see.

9   A.   To me there's a difference between an emergency supply and

10  a medical supply.  I referred to all of that there.  The

11  stock-up food, the jugs of water I kept on my floor, they were

12  emergency supplies.

13  Q.   Is it fair to say that after these items arrived in your

14  garage in 2013, Mr. Mahler never accessed those items again?

15  A.   No, I don't think it's fair to say that.  He was over

16  there with Bill more than once.

17      What do you mean by "access"?  Did he come in and take

18  possession of them and take them back to his house?  I would

19  need to know what you meant by "access."

20  Q.   I mean take possession of them.

21  A.   No, he never unloaded them -- or unloaded them from our

22  garage back to his vehicle and took them back to his house

23  willingly.

24  Q.   He never had a key to your house?

25  A.   No, he did not.

C. Daggett - X

1    Q.    He didn't have a garage door opener to your garage?

2    A.    You didn't need one; but, no, he did not.

3    Q.    Okay.  In your first conversation in January of 2016 with

4    Special Agent Amanda Johnson, you did say you were upset over a

5    disagreement you had with Mr. Mahler; isn't that true?

6    A.    No.  I -- I do not remember saying that in our first phone

7    call.

8    Q.    Have you ever seen a report that Special Agent Amanda

9    Johnson wrote to you -- wrote regarding her first interview

10   with you?

11   A.    Not that I can recollect, but the first time I met with

12   Amanda was several years ago.

13   Q.    Okay.  So you don't recall telling Ms. Amanda --

14   Special Agent Amanda Johnson that you had a disagreement with

15   Mr. Mahler over a book that he had written and asked you to

16   proofread?  In your first conversation with her.

17   A.    I don't remember that.  It could have happened, but I

18   don't remember.  It was a long time ago.

19   Q.    Okay.  And you --

20   A.    It was a conversation that was hard to have.  It was a

21   hard phone call to make.

22   Q.    And you also don't recall ever seeing a report that she

23   authored regarding your first conversation?

24   A.    No, I don't.

25   Q.    Okay.  But there was a disagreement in January of 2016,

C. Daggett - X

1   right, with the fact that you were upset that he hadn't paid

2   you for proofreading a book he authored?

3   A.   No.   I was upset that he would not aid us in getting any

4   of this stuff out of our house.

5   Q.   Well --

6   A.   And I was upset about that long before I found out that he

7   had published my name is his book against my will.

8   Q.   Well, would you -- well, in subsequent interviews, you

9   didn't mention that you were upset that he didn't pay you money

10  for proofreading?

11  A.   In subsequent interviews and --

12  Q.   With Special Agent Amanda Johnson.

13  A.   Right.   When being asked what is the series of events that

14  led up to this -- "Why didn't you give the guns back to

15  Mr. Mahler?" -- I could not give the guns back to Mr. Mahler

16  because I had found out he was a felon, and I wasn't willing to

17  put myself in that jeopardy, and he was never honest with me

18  when he moved the guns into my house about his past and his

19  conviction.   I was upset with Mr. Mahler about that.   The book

20  just --

21  Q.   Okay.   But if you made mention of that to Special Agent

22  Amanda Johnson, you don't remember that today.   Is that fair?

23  A.   I just don't remember it being part of our first

24  conversation.

25  Q.   And you don't remember it being a part of any conversation

C. Daggett - X

1  you had with Special Agent Amanda Johnson?

2  A.   I just said, yes, further on down the road, when she was

3  trying to put together a timeline of things and "When did you

4  find out and how did you find out Mr. Mahler was a felon?"

5       Well, I found out because of this book.  I found out it

6  had been published.  I went online to see if my name was in it,

7  and that was when I found out he was a felon.

8  Q.   Well, have you ever made a contrary statement to

9  Special Agent Amanda Johnson that you just found out in January

10 of 2016?

11 A.   Not that I'm aware of.  All of the dates -- it was so long

12 ago.  What happened in December or November or January, all of

13 that is a little fuzzy.

14      And the original phone call, like I said, it was kind of a

15 difficult phone call to make.  It wasn't -- I didn't know what

16 was going to happen.

17 Q.   Okay.  Do you recall telling Special Agent Amanda Johnson

18 in a subsequent interview that you found out that Mr. Mahler

19 had a prior record sometime in August -- late August of 2015?

20 A.   It would have been late August -- August or September is

21 when I would have found out, yes.

22 Q.   Mr. Mahler paid you $300 up front for proofreading his

23 manuscript; isn't that true?

24 A.   No, that is not true.  In fact, Mr. Mahler's line was

25 always "I never pay anybody up front."

C. Daggett - X

1  Q.   During the holidays, isn't it true you demanded that

2  Mr. Mahler pay you money?

3  A.   I never demanded money from Mr. Mahler, period.

4  Q.   Didn't you complain to him about him not paying you for

5  reading the manuscript and text messages to him around the

6  holidays?

7  A.   When I found out my name had been published in the book,

8  we exchanged some text messages.  And during that text message,

9  yes, I probably did point out to him I spent better part of a

10  year, if not more than that, going over this thing over and

11  over and over again, and I was never paid.

12  Q.   Originally, didn't you tell him you were going to complete

13  review of the manuscript in 30 days?

14  A.   No.  I owned a business.  I had children in school.  I

15  volunteered with the schools.  I was in 4-H.  I don't see how I

16  could have.  I never would have committed to 30 days.  I know

17  how my time was spent better than that.

18  Q.   On January 19, 2016, you knew that Mr. Mahler and his

19  wife, Kristine, were on a cruise in Florida; isn't that true?

20  A.   I don't remember the dates.  I can't answer that question,

21  no.

22  Q.   Do you know they went on a vacation in January of 2016 to

23  Florida?

24  A.   No.  It seems like January of 2016 was when I first

25  decided to call ATF.

C. Daggett - X

1   Q.   But you knew he was out of town when you called; isn't

2   that true?

3   A.   No.  I did not know he was out of town when I called, no.

4   Q.   Do you recall, in your first interview, telling

5   Special Agent Amanda Johnson you had spoken to Mr. Mahler on

6   the previous Saturday that he was out of town?

7   A.   No, I don't remember saying that.  If he was out of town,

8   I don't know how I was supposed to have spoken to him.

9   Q.   One of the things that you said that you saw in the

10  toolbox were bow and arrows; is that correct?

11  A.   Yes.  Some sort of bow and the arrows that go with those.

12  Q.   The only way you would see that is that you would have had

13  to have went into the toolbox yourself?

14  A.   Yes, I had to open it to see that.

15  Q.   In your -- in your interviews with Special Agent

16  Amanda Johnson in the beginning, you didn't tell her that you

17  had keys and combinations to the safe; right?

18  A.   I don't remember exactly.

19  Q.   But you did have keys and combinations to the safes and

20  toolbox; correct?

21  A.   Me personally?  No, I did not.  Yes, the house had a key

22  to the safe.  My ex-husband had the combination written down

23  somewhere, yes.

24  Q.   And you took the key to the toolbox and turned it open and

25  went into the contents?

C. Daggett - X

1  A.    Yes, I did.

2  Q.    You led Special Agent Amanda Johnson and others to believe

3  that Mr. Mahler was going to come and take his property or

4  items out of your garage?

5  A.    Is that a question?

6  Q.    Yes.  Did you or didn't you?

7  A.    No, I did not.

8  Q.    Why did they put -- why did they put a surveillance camera

9  up in your garage?

10        MS. WIGHT:  Objection.  Calls for speculation by the

11  witness.

12        THE COURT:  Sustained.

13  BY MR. WARREN: (Continuing)

14  Q.    Did they put a surveillance camera up in your garage?

15  A.    Yes.

16  Q.    And it was up there for two weeks?

17  A.    Yes.

18  Q.    It was for the purpose of trying to find Mr. Mahler on the

19  surveillance camera?

20  A.    I don't know.  I wasn't an ATF officer.  I just allowed

21  them access to my garage, and I had them get that stuff out of

22  my garage.

23  Q.    And you told the folks of the jury about the AM General

24  truck that Mr. Mahler kept on your property?

25  A.    The military vehicles?

C. Daggett - X

1   Q.    Yes.

2   A.    Okay.  Originally, there was three of them.  He wanted to

3   buy them at auction and turn around and sell them for a profit,

4   so he had my husband, who, because he had a CDL -- my

5   ex-husband, he went down with him and helped pick them up.  He

6   took one to his property because, according to what he told me

7   at the time in his own words, his wife did not know how much

8   money he had spent on them and he didn't want her to.  So

9   that -- the idea was a quick turnaround.  It was to buy them,

10  immediately turn them around and sell them, and he would split

11  the profit with us.

12      So we had three of them on our property originally, and he

13  had one on his property.  Then they were blocking our access to

14  the woodshed.  So one of them -- another one of them got

15  removed from our property.  He took it to another friend's

16  house somewhere.  The other two stayed on our property.

17      Anytime there was a potential buyer, anytime someone

18  showed interest in them, the price he was asking for them was

19  several thousand more than you could have bought one from a

20  dealership.  There's several dealerships around here that sell

21  them.  There's some in The Dalles.  I believe there's a couple

22  here in Portland.  And there was no offer that was okay to sell

23  them, so they just continued to stay in our driveway.  And

24  there's still one there because it wouldn't drive to make it

25  back to his house the day Bill loaded up the stuff and --

C. Daggett - X

1   loaded up the military vehicles and took them back to Bob's.

2   Q.   Wasn't one of the -- isn't there an emergency response

3   team in Mt. Angel?

4   A.   I have no idea.

5   Q.   Isn't that one of the reasons why the vehicle was there

6   was because of the emergency response team?

7   A.   No.  No.

8   Q.   Okay.

9   A.   I was never in contact with any emergency response team

10  who asked to park vehicles in my driveway, and we're not even

11  in Mt. Angel.  We're in Molalla.  Clackamas County.

12  Q.   Molalla wanted an emergency response team too?

13  A.   That's beyond my knowledge.

14  Q.   Well --

15  A.   They were there to sell was all I was ever told.  We were

16  going to sell them and split the proceeds.

17  Q.   So the trailer with all the food in it was also there just

18  for sale?

19  A.   No.  The trailer with all the food, it was part of Bob's

20  stock-up stuff.

21  Q.   And you gave him a list of food items to purchase that

22  ended up in that trailer?

23  A.   No.

24  Q.   So you just gave him a list of food items?

25  A.   I honestly don't know if he came up with that list.  I

C. Daggett - X

1   don't know if it was gathered up in the course of us sitting --

2   he would regularly come into my shop.  He would have me take

3   notes, like when he was picking out T-shirts, as an awful lot

4   of customers do.  You know, I would be taking notes on material

5   weight, material content, price of this kind versus that kind,

6   what logos I still needed for him for his sponsor backs and the

7   like.  You know, there was -- if I had a picture of my desk at

8   Victory Prints, there was notes all over that thing.  I have no

9   idea where he came up with the grocery list.

10      As far as the medical list, that had to do with animals.

11  Q.   I would like to show you two exhibits that are marked as

12  Defendants Exhibit 104 and 103.  Do you recognize these?

13  A.   Yes.  Those are my work orders.

14  Q.   Okay.  Are they in your handwriting?

15  A.   Yes.

16           MR. WARREN:  Thank you.  I move to admit these work

17  orders into evidence.

18           THE COURT:  Counsel?

19           MS. WIGHT:  No objection, Your Honor.

20           MR. WARREN:  Thank you.

21           THE COURT:  They are received.

22           MR. WARREN:  They're marked on the back, Your Honor.

23  BY MR. WARREN: (Continuing)

24  Q.   In your first interview with Special Agent Amanda Johnson,

25  you told her that you had an agreement with Mr. Mahler that he

C. Daggett - X

1  could store items at your residence; is that correct?

2  A.    Yes.

3  Q.    The agreement wasn't in writing; is that true?

4  A.    True.

5  Q.    The agreement did not allow Mr. Mahler to access your

6  residence anytime he wanted; correct?

7  A.    I can't say.  No, no one would have been allowed to access

8  our residence whenever they wanted any more than I would have

9  been allowed to access Mr. Mahler's residence.

10  Q.    Mr. Mahler didn't have a key to your residence?

11  A.    No.

12  Q.    I'd like to clarify a family relationship.  Special Agent

13  Adam Sully is your brother; correct?

14  A.    Correct.  Yes, sir.

15  Q.    I'm sorry.  We spoke at the same time.

16  A.    Yes.

17  Q.    And your maiden name is Sully?

18  A.    No.

19  Q.    What is your maiden name?

20  A.    Garcia.

21  Q.    Okay.  And Special Agent Adam Sully's wife is Kara?

22  A.    Yes.

23  Q.    Mr. Mahler's wife, Kristine, is Kara's mother?

24  A.    Yes.

25  Q.    So that's a family relationship?

C. Daggett - X

1   A.    Yes.

2   Q.    You didn't tell Special Agent Amanda Johnson about your

3   brother and Kara; is that true?  In your first interview.

4   A.    Like I've said before, I don't remember that initial phone

5   call.  It was a stressful phone call to make.  I don't remember

6   exactly what I did or didn't tell her, other than I have a

7   batch of stuff on my property that I cannot give back to the

8   person who owns it without putting myself in jeopardy.

9   Q.    A couple of days later, on January 22, 2016, Special Agent

10  Amanda Johnson came to your business at Victory Prints; is that

11  true?

12  A.    I don't remember the exact date; but, yes, it was shortly

13  after the phone call she came to our business.

14  Q.    You did tell her that ten years earlier that Mr. Mahler

15  was a customer of Victory Prints too; is that correct?

16  A.    I remember telling her that he was a customer.  I cannot

17  give you an estimate of the date.  I don't know how long he had

18  been coming in for shirts.

19  Q.    And you don't recall telling Special Agent Amanda Johnson

20  that you returned those items that we're talking about to his

21  residence after January 19 of 2016 while he and his wife were

22  out of town?

23  A.    No.  No, I don't remember saying -- I'm not even quite

24  sure I understand your question exactly.

25  Q.    Okay.  Let me say it again.  Did you tell Special Agent

C. Daggett - X

1    Amanda Johnson that you returned food items to Mr. Mahler's

2    residence after you had a conversation with her a few days

3    before?

4    A.    I remember discussing with Amanda that we had returned the

5    food items and that, yes, Bob was on vacation when we returned

6    the food items.  But that was not in January of 2016 that we

7    returned the food items.

8    Q.    Okay.  You placed the items in his barn shop?

9    A.    Yes.

10   Q.    He didn't know about it?  Did Mr. Mahler know about it?

11   A.    I am not sure whether or not he was aware of it.  I did

12   not make the trip over there.  I don't know if my sister-in-law

13   called him.  I don't know if Bill called him.  All I know was I

14   was at a point where I needed room in my garage and told my

15   husband this stuff has to go.

16   Q.    Did you tell him that you put the food items in his barn?

17   A.    No, I did not.  At that point I was more or less done

18   speaking to Bob.  He was better friends with my husband than

19   with me, and I let Bill take care of it.

20   Q.    In better times, before all of this, you would visit

21   Mr. Mahler at his residence on occasion?

22   A.    Yes.  There was one Thanksgiving.  I believe it was

23   Thanksgiving of 2011.  And then there was another time we went

24   over there for a spaghetti dinner.  I don't remember.  That

25   would have been probably 2012, 2013.  And we watched a

C. Daggett - X

1    Super Bowl there once.

2    Q.    Well, back to the time when you did go to Mr. Mahler's

3    home to deliver the food items, Kara Sully was there?  She was

4    there?

5    A.    I was not on that trip to return the food items, but that

6    was my understanding, yes.

7    Q.    She has a key to the residence?

8    A.    Yes.

9    Q.    She can go in there any time she likes?

10   A.    To the best of my knowledge, yes.  At least especially

11   when she's housesitting for them they've allowed her access.

12   They have given her the keys.

13   Q.    Now I would like to go back to before that time.  You

14   never saw a firearm at defendant's residence; isn't that true?

15   A.    No, I never saw a firearm in the kitchen or the living

16   room, and that was pretty much the extent of where I went in

17   the house.

18   Q.    And you told Special Agent Amanda Johnson that you never

19   saw a firearm at Mr. Mahler's residence?

20   A.    No, I never did.

21   Q.    You told Special Agent Amanda Johnson that occasionally

22   Mr. Mahler would take your family to dinner?

23   A.    Yes.

24   Q.    Occasionally, Mr. Mahler would buy little gifts for your

25   children?

C. Daggett - X

1   A.    For my son, yes.

2   Q.    And in January of 2016, you did tell Special Agent Johnson

3   that Mr. Mahler had not even been to your residence for over a

4   year?

5   A.    It had probably been around that.  I don't remember

6   telling her that, but that is a fair estimation.

7   Q.    You would allow your children to wash vehicles for

8   Mr. Mahler at his residence?

9   A.    Yes.

10  Q.    You know Mr. Mahler had about 12 different vehicles; is

11  that correct?

12  A.    I knew he had at least four or five.

13  Q.    Well, we spoke of four military trucks; right?

14  A.    Yes.  Those weren't the vehicles my son was washing.

15  Q.    I'm sorry.  I didn't mean to confuse that.

16        Well, you know he had a Chrysler Concorde.  Did you know

17  he had a Chrysler?

18  A.    No.  I'm sorry.  Cars really aren't my thing.  I know he

19  had a Mustang.  I know he had his daily driver, the little SUV

20  thing.  I know he had a pickup that he used to haul a trailer

21  with.  I really didn't pay a whole lot of attention.  Vehicles

22  just aren't my thing.

23  Q.    Okay.

24  A.    I don't memorize what kind of cars people drive or how

25  many they have.

C. Daggett - X

1  Q.    Okay.  So you do remember admitting -- adding items to the

2  toolbox when you were being interviewed with Special Agent

3  Amanda Johnson?

4  A.    Yes, I do remember adding items to the toolbox.

5  Q.    Okay.  Some of those items you said were medical items; is

6  that true?

7  A.    Emergency.

8  Q.    Okay.  I'm sorry?

9  A.    Emergency.  Not medical.  Emergency.

10  Q.    Okay.  I'm sorry.

11        Do you recall telling Special Agent Amanda Johnson that

12  you opened the toolbox Thanksgiving of 2015?

13  A.    That would have been right around canning season.  You

14  know, it would have been when I was looking to put stuff away

15  and -- so, yeah, that would make sense, that that is when I

16  opened it up trying to make room.

17  Q.    So now I would like to go to February 3rd of 2016 when the

18  special agents actually served you with a search warrant for

19  those safes in that toolbox.  Do you recall that day?

20  A.    Yes.

21  Q.    You provided the keys and the combination necessary to

22  access the safes and the toolbox; isn't that true?

23  A.    Me or Bill?

24  Q.    You.

25  A.    I might have found the black book that had the combination

C. Daggett - X

1   written in it; but, no, I did not hand them the key.  Bill had

2   the key.

3   Q.   Do you recall after the search of your present -- of your

4   garage that Special Agent Amanda Johnson contacted you again in

5   February 2016?

6   A.   There were several meetings.  I don't remember the dates.

7   I just -- there were several meetings with Amanda Johnson.

8   Q.   And she asked you specifically did you remove and add

9   things to the toolbox?

10  A.   Right.

11  Q.   Do you recall that conversation?

12  A.   Yes.

13  Q.   And you told her you didn't remove anything; you just

14  added?

15  A.   Yeah.  Shifted and added.

16  Q.   Okay.  One moment, please, Your Honor.

17       Well, when you did open the toolbox, how did you have the

18  keys?

19  A.   On the side of our cabinets in the kitchen was a key ring

20  with seldom-used keys; one to the barn door, which we never

21  locked; there was the key to the padlock that was on the Knaack

22  box; there was a key to two different file cabinets we had in

23  our bedroom.  There was just seldom-used keys that you don't

24  want to lug around on your day-to-day key ring was hanging up

25  on a cabinet in our kitchen.  I went in and grabbed that and

C. Daggett - ReD

1    unlocked the padlock and shifted stuff around, trying to make

2    room to put some other stuff in there.

3            MR. WARREN:  Thank you.  No further questions.

4            THE COURT:  Anything further?

5            MS. WIGHT:  Just one quick question.

6

7                          REDIRECT EXAMINATION

8    BY MS. WIGHT:

9    Q.    Just one quick question.  So did you have multiple -- on

10   calls -- you were asked about the calls you had with

11   Special Agent Johnson.  Did you have multiple calls with

12   Special Agent Johnson?

13   A.    Oh, yes, yes.

14   Q.    Do you remember everything you said in every call and in

15   which call you said it?

16   A.    No.  No.  It was -- it was a long time ago.  And, quite

17   honestly, like I said over and over again, the first couple of

18   those conversations were very stressful.  It was a stressful

19   time between my ex-husband and I.  It was a stressful time

20   because this was family of a sort, worrying about the

21   repercussions from family because of the decision I made.  It

22   was -- it was a stressful time.  So, no, I don't remember each

23   and every one of them or what was said on each one.

24   Q.    And my last question for you is you were asked on

25   cross-examination about your access to these boxes.

C. Daggett - ReD

1  A.    Uh-huh.

2  Q.    Was it ever your understanding that Mr. Mahler had given

3  you everything in those boxes, that that stuff now belonged to

4  you?

5  A.    Oh, lordy, no.  No, not at all.

6            MS. WIGHT:  No further questions, Your Honor.

7            THE COURT:  May this witness be excused?

8            MR. WARREN:  Yes.

9            MS. WIGHT:  Yes, Your Honor.

10            THE COURT:  You're free to go.  Thank you.  You may

11  stand down.

12       Would it be convenient to take a break for the jury?

13  Would you like a -- yes?  All right.  Again, don't talk about

14  this matter.  We'll take a brief five- or ten-minute break.  Go

15  with Ms. Kramer, and we'll call you right back.

16                      (Jury not present.)

17            THE COURT:  Before anyone goes very far, how are we

18  doing on time?

19            MS. WIGHT:  Let's see.  It's 3:45.  I'm not sure how

20  long we anticipate cross for Mr. Daggett, but --

21            THE COURT:  So you have Mr. Daggett next?

22            MS. WIGHT:  Yes.  Mr. Daggett is next, and then we

23  have our first ATF agent and numerous firearms with the first

24  agent.  Probably, I don't know, 10, 15 exhibits maybe.

25            THE COURT:  So it's a quarter to 4:00.  I just want

C. Daggett - ReD

1  to be mindful of the time.  It's over here.

2          MR. WARREN:  Your Honor, something is happening I'm a

3  little concerned with.

4          THE COURT:  Yes.

5          MR. WARREN:  Ms. Wight is referring to people by

6  first names.  If that's what -- the way you want us to proceed,

7  I'm happy to do that, but it was kind of unusual for me.  I've

8  never done that before, and I've gotten chewed for it, so I

9  wanted to bring -- seek your attention and see how we should

10  deal with that.

11          THE COURT:  I heard that.  I just -- I want to get

12  through this case, and if that's easy, it's -- it's customary

13  to use "Mr." and "Mrs." and their last names, but --

14          MS. WIGHT:  Your Honor, the only witnesses I use.  It

15  was an intentional thing that I used Bob's first name instead

16  of "Mr. Mahler" with Connie and Bill because every time I

17  talked with them and talk about Mr. Mahler --

18          THE COURT:  I think he's referring to the fact you

19  were calling Connie "Connie."

20          MS. WIGHT:  Got it.  The witnesses.

21          THE COURT:  I --

22          UNIDENTIFIED WOMAN:  And Agent Johnson, Amanda.

23          MS. WIGHT:  I will try to control the use of first

24  names.

25          THE COURT:  Thank you.  I'm not -- again, people move

C. Daggett - ReD

1   around the courtroom.  I'm much more worried about getting the

2   work done.  I'm about substance not form.

3              MR. WARREN:  Thank you, Your Honor.

4              THE COURT:  You're welcome.

5       Five or ten minutes, and you think you'll -- excuse me.

6   Do you think you'll finish with Mr. Daggett today, then?

7              MS. WIGHT:  We will finish with Mr. Daggett, I'm

8   pretty sure.  Depends on cross.  We don't have very long

9   direct.  We may not be able to finish with the first ATF agent,

10  though.

11             THE COURT:  Okay.

12             MR. WARREN:  Can we have an additional five minutes

13  to take the dog to the park and use the restroom?

14             THE COURT:  That's fine.

15             THE DEFENDANT:  Thank you, Your Honor.

16             MR. WARREN:  Your Honor, just -- I don't want to --

17  my cross of Mr. Daggett is probably not as long as

18  Mrs. Daggett, so I'm not sure.

19             THE COURT:  Well, good.  We might get done, and then

20  I can have a chance to talk to the jury about schedules for

21  tomorrow.  He's scheduled as a 30-minute witness, so this

22  should work out.

23             MS. WIGHT:  For Mr. Daggett?

24             THE COURT:  You have him listed as a 30-minute

25  witness.

W. Daggett - D

1           MS. WIGHT:  I believe that's correct for the

2    government's portion of the direct examination.

3           THE COURT:  But his will be shorter, he said.

4           MS. WIGHT:  I don't recall if I called him

5    "Mr. Daggett."  I would like to prepare him for that.

6           THE COURT:  Just tell him you're going to call him

7    "Mr. Daggett."

8           MS. WIGHT:  Okay.

9           DEPUTY COURTROOM CLERK:  Court is in recess.

10                    (Recess taken.)

11                    (Jury present.)

12           DEPUTY COURTROOM CLERK:  All rise.

13           THE COURT:  Somebody close the doors back there.

14    Call your next.

15           MS. WIGHT:  The government calls William Daggett.

16           THE COURT:  Come forward and be sworn.

17           DEPUTY COURTROOM CLERK:  Up here, please.  Please

18    raise your right hand.

19

20                    WILLIAM ALAN DAGGETT,

21    called as a witness in behalf of the Plaintiff, being first

22    duly sworn, is examined and testified as follows:

23

24           THE WITNESS:  Yes, I do.

25           DEPUTY COURTROOM CLERK:  Please have a seat.  State

W. Daggett - D

1    your name and spell your name for the record.

2              THE WITNESS:  William Alan Daggett D-a-g-g-e-t-t.

3              THE COURT REPORTER:  Could you spell Alan, too,

4    please.

5              THE WITNESS:  A-l-a-n.

6

7                        DIRECT EXAMINATION

8    BY MS. WIGHT:

9    Q.    Good afternoon, Mr. Daggett.

10   A.    Good afternoon.

11   Q.    Please tell the Court and the jury where you live.

12   A.    Where I live?  I live down by Molalla.  Up Rosewood.

13   Rosewood Way.

14   Q.    What do you do for a living?

15   A.    Now I drive a mixer truck, a concrete mixer truck,

16   delivering concrete.

17   Q.    How long have you been doing that?

18   A.    Since February.

19   Q.    How long have you lived in Molalla?

20   A.    Close to 15 years.

21   Q.    Do you still live in the same home that you shared with

22   your ex-wife, Ms. Connie Daggett?

23   A.    Yes, I do.

24   Q.    Mr. Daggett, do you know the defendant in this case,

25   Robert Mahler?

W. Daggett - D

1   A.    Yes.

2   Q.    And how do you know him?

3   A.    How do I know him?  Well, I don't know.  We became

4   friends.  He used to come in and print shirts at our old print

5   shop.  We owned Victory Prints in Silverton.

6   Q.    Did you ever socialize with Mr. Mahler?

7   A.    I think we became friends after that and went to dinner a

8   few times and --

9   Q.    Was there a time that you ever considered Mr. Mahler a

10  good friend?

11  A.    Yes.

12  Q.    Do you remember why you and Mr. Mahler started becoming

13  friends?

14  A.    Not really.  You know he came into the shop, and we sat

15  down and started talking and just ended up becoming friends.

16  Q.    Did you ever start hanging out more often?

17  A.    What's that now?

18  Q.    Did you ever start hanging out more often and socializing

19  more often than just occasionally at your shop?

20  A.    Yeah.  We would go out to dinner every now and again

21  together, you know.

22  Q.    Do you remember a time when Mr. Mahler and you went and

23  picked up some trucks?

24  A.    Yeah.

25  Q.    Can you tell us about that?

W. Daggett - D

1    A.    Army trucks?

2    Q.    Yes.

3    A.    Yeah.  We went up to Lewis McChord and drove trucks on --

4    that he bid on through an auction.  I think four of them --

5    three of them.  Three of them the first trip and then -- I

6    think two of them the first trip and two of them on the second

7    trip.

8    Q.    What did you do with those trucks?

9    A.    Three of them ended up at my house for a while, and one of

10   them went over to his house, which left two in my driveway for

11   quite some time.  Probably a better part of five years, four

12   years.  One of them is still in my driveway.

13   Q.    What was the plan with these trucks?

14   A.    I think to sell them and make a little bit of money.

15   Q.    Did you ever sell the trucks?

16   A.    No.  Not that I'm aware of.  None of them has been sold.

17   Q.    So around the time that you brought those trucks to your

18   house, was Mr. Mahler storing anything else on your property?

19   A.    Yeah, I am not real sure what happened first and second,

20   you know, but I know it all ended up over there.  We have a

21   fifth wheel trailer over there that has a lot of food and stuff

22   stocked in it.

23   Q.    Is that your fifth wheel trailer?

24   A.    No.  It's Bob's.

25   Q.    It has food?  What else is in that trailer?

W. Daggett - D

1   A.    Well, canned food, flour, rice, beans, toilet paper.

2   Q.    Why did you have that trailer full of supplies?

3   A.    Stocking up, I guess, for if things went bad.

4   Q.    And were you okay with this supply trailer being on your

5   property?

6   A.    You know, at first, yeah.  Then it got out of hand.

7   Q.    Why do you think Mr. Mahler wanted to store these supplies

8   on your property versus his own?

9   A.    Well, I think the plan was back then to come out to my

10  house if something went bad, you know.  I think the threat back

11  then was North Korea, a nuclear attack, that kind of thing,

12  so --

13  Q.    And your house is better than his?  Why do you think?

14  A.    Well, he was more in town than I was.  I was more out of

15  town.

16  Q.    So the location?

17  A.    Yeah.

18  Q.    So you mentioned the trucks and this other trailer stored

19  on your property.  Did he ever ask you to store anything else

20  on the property?

21  A.    As far as vehicles or --

22  Q.    Besides the vehicles.

23  A.    Besides the vehicles.  I have in my garage totes filled

24  with, like, cold-weather gear that came from the auctions, a

25  safe, and his guns and ammo.

W. Daggett - D

1    Q.   Is it just one safe or how many safes are there?

2    A.   Well, there's a Liberty Safe and then there's a -- I guess

3    you can call it a metal gun cabinet-type box.

4    Q.   Is it a low cabinet that is on the ground?

5    A.   Yeah.  And then like a construction toolbox that you see

6    on construction sites.

7    Q.   Would that be a Knaack toolbox?  Is that what you're

8    referring to?

9    A.   Yeah.  Yeah.

10   Q.   Who do those storage containers belong to?

11   A.   Bob.

12   Q.   How do you know?

13   A.   How do I know?  Because he brought them over.

14   Q.   Bob is the one who brought those over?

15   A.   Yeah.

16   Q.   And why did Mr. Mahler bring those storage containers to

17   your house?

18   A.   To store -- store up things.

19   Q.   What type of things?

20   A.   Well, those in the garage were for the guns and ammo, and

21   the totes, the plastic totes, were for, like I said,

22   cold-weather gear and pants and boots and -- I don't even know

23   what's in them anymore.  I think some medical supplies.

24   Q.   Did Mr. Mahler ever tell you why he wanted to store the

25   safes and guns at your house versus his house?

W. Daggett - D

1   A.    I don't think he had room over there is what he said, you

2   know.   I think the safe came over.   It was stored at a

3   gentleman named Kyle's house, and they were going to foreclose

4   on it is what I was told.   So we went over and got the safe and

5   brought it to my house.

6   Q.    And you mentioned that there were guns stored in those

7   safes.   Were the guns in there initially?

8   A.    No, they came later.

9   Q.    And where did those guns come from?

10  A.    I don't know where Bob got them from, but they came out of

11  his car at my house.

12  Q.    Yeah, how did they get to your house?

13  A.    In Bob's car.   In the Sorento.

14  Q.    Do you remember the time when he brought them over?

15  A.    Yeah.

16  Q.    Tell us about that.

17  A.    Well, he showed up there and backed up to the garage, and

18  they were in the back with the seat down there, and the -- with

19  blankets, wrapped up in blankets.   I don't remember how many at

20  a time, but it seems like there was around, you know, ten-ish

21  each time he came over.   And we would unload them and look at

22  them and put them in the safe.

23  Q.    Was it just one load of guns that he brought?

24  A.    No.   A couple of times, it seems like.

25  Q.    Was it your understanding that Mr. Mahler was giving these

W. Daggett - D

1  guns to you?

2  A.    No.  If he was giving them to me, I would still have them.

3  No, they weren't mine.

4  Q.    Mr. Daggett, do you own guns of your own?

5  A.    Yes, I do.

6  Q.    Where do you store those?

7  A.    Mine are stored in a gun cabinet in my bedroom.

8  Q.    Have you ever stored any of your firearms in Mr. Mahler's

9  safes?

10 A.    No.  Absolutely not.

11 Q.    Have you ever opened up or gotten into Mr. Mahler's safes?

12 A.    No.  Not without him.

13 Q.    Have you ever taken anything from those safes?

14 A.    No.

15 Q.    In addition to the firearms and the safes, what other type

16 of things were stored in there?  Did you ever see anything

17 else?

18 A.    Seems like there was magazines for the ammunition,

19 magazine pouches, different accessories for the guns.

20 Q.    Can you tell us, just generally, what type of guns were

21 stored in there -- the ones that you saw?

22 A.    Oh, boy.  There were long rifles.  Seems like there was a

23 shotgun or two and then some AR-style rifles.  And I think the

24 handguns were more in that Knaack box, if memory serves me.  I

25 think the safe was all full of the long guns.

W. Daggett - D

1  Q.   Do you believe that you were there every time Mr. Mahler

2  brought the guns to put in the safe?

3  A.   Oh, yeah.  I know I was.

4  Q.   Just using your best guess, how many firearms do you think

5  he brought to your house?

6  A.   Boy, I forget now.  I would have to say at least 20.  At

7  least.  You know, and that's just a guess.

8  Q.   Is that your best guess?

9  A.   Yeah.  I don't remember, but I would say, you know, at

10  least 20.

11  Q.   What's your best guess on the number of rounds of

12  ammunition?

13  A.   I don't know.  I know it was a few.

14  Q.   It was just a few, Mr. Daggett?

15  A.   You know, a few thousand.

16  Q.   A few thousand?

17  A.   Yeah.

18  Q.   Are you familiar with any large purchases of ammunition

19  that was brought to your house?

20  A.   Yes.

21  Q.   And what was the value of that ammunition?

22  A.   Well, the one purchase I was in on was, I think, a tad

23  over $5,000.

24  Q.   And you said that was a purchase that you were in on.  Who

25  had the money to pay for that purchase?

W. Daggett - D

1   A.    Bob did.

2   Q.    So how were you in on it?

3   A.    Well, what happened was he had purchased too much.   He

4   didn't want to send up a red flag, so he asked me if I could do

5   it.   I went over and got the cashier's check, or I think it was

6   the cashier's check, over at the bank for him.

7   Q.    Did he give you the money to get the cashier's check?

8   A.    Yes.

9   Q.    Did he say why he couldn't get the cashier's check

10  himself?

11  A.    He had a doctor's appointment.   He was going up to

12  Portland for his knees or hips or something, and he had a

13  doctor's appointment, so I said I would do it for him.

14  Q.    Where did Mr. Mahler have the ammunition sent?

15  A.    To our business, Victory Prints, in Silverton.

16  Q.    And whose name did he order that ammunition purchase

17  under?

18  A.    Whose name did he order?

19  Q.    Did he order it under his name?

20  A.    Well, I think it was under mine.

21          MS. WIGHT:   No further questions, Your Honor.

22          MR. WARREN:   Thank you, Your Honor.

23

24  ///

25  ///

W. Daggett - X

1                    CROSS-EXAMINATION

2  BY MR. WARREN:

3  Q.    Good afternoon, Mr. Daggett.

4  A.    Hello.

5  Q.    Do you recall speaking with Special Agent Amanda Johnson

6  about this case?

7  A.    Yes.

8  Q.    Do you recall telling her that the safes and the firearms

9  arrived at your property approximately two years earlier than

10 the date of when you were interviewing with her?

11 A.    You know, that seems about right.  I don't know.

12 Q.    And is it fair to say that once those safes arrived at

13 your place, that neither you nor Mr. Mahler ever accessed those

14 safes again?

15 A.    When they arrived?

16 Q.    Yeah.  Once they arrived, and everything, you guys never

17 went back and -- I mean, once it was there, you never went and

18 opened it again when Mr. Mahler wasn't there; is that correct?

19 A.    No, I never did, no.

20 Q.    And Mr. Mahler never came over again and opened them up

21 again and looked through them?

22 A.    Not without me, no.

23 Q.    Well, do you recall telling Special Agent Amanda Johnson

24 that once they got there, Mr. Mahler and you both never opened

25 them again?  They were just there; is that true?

W. Daggett - X

1    A.    I don't remember telling her that, no.  It seems like it

2    took more than one -- you know, two or three trips to get the

3    firearms in them.

4    Q.    When the firearms were in them is what I'm saying.  Now

5    they're in there.  Did you ever go back in there again?

6    A.    No.

7    Q.    Did Mr. Mahler ever go in there again?

8    A.    Not that I know of.  I --

9    Q.    Okay.  So we got a little timeline here.  Do you see this?

10   So around January 19 of 2016 is when your wife contacted

11   Amanda Johnson?

12   A.    Okay.

13   Q.    I mean -- yeah, Special Agent Amanda Johnson.  I'm sorry.

14        So would two years be back somewhere around here?  Is that

15   fair to say?

16   A.    Yeah.  I guess so.  Yeah.

17   Q.    Okay.  I don't want to put words in your mouth, so is it

18   okay if I say "Bill Daggett" to represent two years earlier

19   than when you first contacted Special Agent Amanda Johnson?  Is

20   that fair?

21   A.    I don't understand what you're saying.  Two years earlier?

22   Q.    Well, in an interview with her -- what I'm saying is you

23   told Special Agent Amanda Johnson the safes, the guns,

24   everything arrived at your house two years before she

25   interviewed you about the case.  Does that make sense?

W. Daggett - X

1   A.   Okay.

2   Q.   Okay.  So I'm just trying to go back two years on the

3   timeline.

4   A.   Okay.

5   Q.   So I'm asking you is that fair?

6   A.   I don't understand.  What do you mean is it fair?

7   Q.   Well, I mean, is two years from January 19, 2016, so

8   January 19 of 2014, is that fair?

9   A.   Is that two years?

10  Q.   Yeah.

11  A.   Yeah.  I guess that's two years, yeah.

12  Q.   That's all I'm trying to say.

13  A.   Okay.  Yeah.

14  Q.   All right.  Somebody else said a little bit longer, but

15  that's not important.

16       Mr. Daggett, you mentioned four AM General military

17  vehicles.  Do you know about those?

18  A.   Yes.

19  Q.   They're cargo trucks?

20  A.   Well, I imagine so.  A deuce and a half or six-bys,

21  whatever the military calls them.  They're five-ton trucks.

22  Q.   Thank you.  You drove them to Oregon, after they were

23  purchased at Fort Lewis, for Mr. Mahler?

24  A.   Yeah, I drove a couple of them down, yes.

25  Q.   Okay.  I would like to show you some documents.  Do you

W. Daggett - X

1  recognize these four certificate of titles?  I can see you

2  don't have your glasses.

3  A.    You can see that.

4  Q.    Well --

5  A.    No, I don't recognize them at all.

6  Q.    Okay.  Well, this one says a 1983 AM General.  Cargo truck

7  is the body style.

8  A.    Uh-huh.

9  Q.    And it says April 12 of 2013.

10 A.    Okay.

11 Q.    Is that about right?  Would that be a fair and accurate

12 description?

13 A.    Of when we got them?

14 Q.    Yes.

15 A.    Yeah, they have been on my property for quite some time.

16 I'm down to one left, so, you know --

17 Q.    Yes.

18 A.    I would say -- I'm not real good at dates, but it seems

19 like they have been there since about 2013 or something around

20 there, you know.

21 Q.    Okay.  And these are certificates of title.  Is this the

22 right kind of truck?  1983 AM General?

23 A.    '86.

24 Q.    Well, this one is an '83.

25 A.    I would say so, yeah.  You know, I would call them a

W. Daggett - X

1   six-by or --

2   Q.   And you drove them.  I mean, the purchase prices are on

3   here too.  Like he purchased them for, like, 1,200 bucks.  Two

4   of them.  Let's see what this one is?

5   A.   I had no idea what he purchased them for.

6   Q.   Yeah.  1,340.  So is this a fair and accurate copy of the

7   certificate of title to those trucks that Mr. Mahler purchased

8   from the United States Government that you drove down here

9   from --

10  A.   I couldn't tell you if that's --

11          MS. WIGHT:  Your Honor --

12          THE WITNESS:  -- fair.

13          MS. WIGHT:  -- I'll just object to the witness having

14  to answer the question.  Although, I don't object to the

15  exhibit itself.

16          MR. WARREN:  Okay.  I move to admit the exhibits,

17  Your Honor, and they're already numbered.

18          THE COURT:  Any objections?

19          MS. WIGHT:  No, Your Honor.

20          THE COURT:  They will be received.  They're marked.

21  BY MR. WARREN: (Continuing)

22  Q.   Mr. Daggett, now you recall being interviewed by

23  Special Agent Amanda Johnson at your business location, Victory

24  Prints, in Silverton, Oregon?

25  A.   Yeah, I -- I do.  It's back aways.

W. Daggett - X

1    Q.    Victory Prints was a former business that you and

2    Ms. Connie Daggett owned?

3    A.    Yes.

4    Q.    And maybe as long back as ten years ago Mr. Mahler was a

5    client or a customer of Victory Prints?

6    A.    Yeah.  I'm not sure if it was ten years ago or not, but

7    it's been a while.

8    Q.    Okay.  Mr. Mahler was friends, not only of you, but of

9    your family?

10   A.    Yes.

11   Q.    Your wife, Ms. Daggett, was related -- well, was the

12   sister of Special Agent Adam Sully?

13   A.    Yes.

14   Q.    Special Agent Adam Sully is married to Kara?

15   A.    Uh-huh.

16   Q.    Kara's mother's name is Kristine?

17   A.    Yeah.  Kris, I guess, yeah.

18   Q.    And Kris is Mr. Mahler's wife?

19   A.    Yes.

20   Q.    Mr. Mahler and Kristine would go to dinner, family

21   dinners, with you and your family?

22   A.    Again, we didn't make very many family dinners.  You know,

23   I know we went to Bob's house for a Thanksgiving dinner once.

24   Q.    Okay.

25   A.    You know, but I didn't -- I wasn't at very many of the

W. Daggett - X

1  dinners for Christmases, or anything like that, with Bob or

2  Kris.

3  Q.    Okay.  You know that Mr. Mahler owns about 13 different

4  vehicles?

5  A.    No.  I knew he owned a few, you know.

6  Q.    Well, we got the four AM General trucks.  You knew about

7  those?

8  A.    Yes.

9  Q.    Did you know that he owned a Mustang?

10  A.    Yes.

11  Q.    His wife drives an ML350 Mercedes.  Do you know Kristine

12  drives the 350?

13  A.    No.

14  Q.    You don't know that?

15  A.    I didn't pay much attention to that.

16  Q.    How about the Ford F-250 truck?

17  A.    I knew that because we got hay a couple of times using

18  that.

19  Q.    How about a Chevy flatbed?

20  A.    Yeah, I knew he had that.  Same thing there.  We got hay

21  on that.

22  Q.    How about a Chrysler car?

23  A.    A Chrysler car?  I don't recall.

24  Q.    Okay.  How about a GMC Caballero.  It's an older one.  You

25  might remember it.

W. Daggett - X

1   A.    Oh, I remember him talking about it.

2   Q.    Okay.  So you know pretty much nine of the 13 vehicles

3   that he owns.  You know -- have personal knowledge of it?

4   A.    Okay.

5   Q.    And the Kia Sorento?

6   A.    And the Sorento, yeah.

7   Q.    Okay.  The reason you were driving those AM General trucks

8   is because you have a commercial driver's license?

9   A.    Yes.

10  Q.    Do you know about the emergency response teams in

11  Mt. Angel and Silverton?

12  A.    Yeah.  We did shirts for them, I believe.

13  Q.    Tell me about those.  Were they there in case of emergency

14  to help residents of the area?

15  A.    Boy, I don't know.  I think so, yeah.

16  Q.    Okay.  Well, what else do you know about them?

17  A.    Not much.  We printed their shirts.  We did shirts for

18  them, I believe.

19  Q.    So you know that Mt. Angel has an emergency response team?

20  You do know that?

21  A.    Well, I know they had one when we owned Victory Prints.  I

22  know we did some shirts for them.

23  Q.    How about Silverton?  Did they have one too?

24  A.    I don't know.  I couldn't tell you.  I don't know if it's

25  the same.  They're a mile or two apart.

W. Daggett - X

1   Q.   Okay.  You said one of the reasons for these emergency

2   responses was -- or maybe -- I don't want to put words in your

3   mouth.  Is one of the reasons for emergency response in case of

4   catastrophes?  Is that the reason for it?

5   A.   I would guess so.

6   Q.   Okay.  Do you know if your wife encouraged Mr. Mahler --

7   well, your former wife, Connie Daggett, would encourage

8   Mr. Mahler to buy food items in case of catastrophe?

9   A.   No.  I don't think we encouraged Bob to do anything.

10  Q.   Okay.  Well, is that why food items were at your home?

11  A.   Is that why they were there?

12  Q.   Yeah.  Why were food items at your home?

13  A.   To stock up.  In case something went bad, Bob had a place

14  to go.

15  Q.   Was there a period of time also that you were without

16  power for a week or two during inclement weather?

17  A.   You know, it seems like our power goes out from time to

18  time.  I don't remember it being out for a week or two, though.

19  Q.   Okay.

20  A.   Maybe for a half a day.

21  Q.   Did you also -- your family also stock up on medical

22  items?

23  A.   Just what was in some of that stuff Bob brought over.

24  Q.   Okay.  Do you know if your wife would write a list to him

25  to --

W. Daggett - X

1   A.    Say that again.  I didn't hear you.

2   Q.    Did you know if Ms. Connie Daggett would write a list of

3   medical items for Mr. Mahler to purchase?

4   A.    Not that I know of.

5   Q.    So were the food items and medical items that Mr. Mahler

6   brought to your residence, were they only stored in the camper

7   trailer on your property?

8   A.    No.

9   Q.    Where else were they stored?

10  A.    In my garage.

11  Q.    Why weren't they just stored in the camper trailer?

12  A.    It's full.

13  Q.    With regard to the safes and the toolbox in the garage,

14  you had the keys to the safe and the toolbox; isn't that true?

15  A.    Bob gave me one copy.

16  Q.    Okay.  And did you keep that right in your kitchen?

17  A.    No.

18  Q.    Where did you keep it?

19  A.    They were locked up.

20  Q.    The keys were locked up?

21  A.    Yeah.

22  Q.    Where were they locked up at?

23  A.    In my gun cabinet.

24  Q.    Okay.  So in order for Connie Daggett to go and get the

25  key to go into the toolbox, she would have to go unlock your

W. Daggett - X

1  gun cabinet to get the keys?

2  A.    I don't know.  I imagine.

3  Q.    So they just weren't hanging in the kitchen on a key ring?

4  A.    Not that I recall.  They shouldn't have been.

5  Q.    You are aware that Connie Daggett at least would go and

6  put items into the toolbox; isn't that true?

7  A.    Into the toolbox?

8  Q.    Yeah.  The Knaack toolbox that we were talking about on

9  direct examination with Ms. Natalie Wight.  You said one of

10  the --

11  A.    The Knaack box?

12  Q.    Yeah.

13  A.    Yeah.

14  Q.    You know that Connie Daggett went into that box and put

15  items in there; isn't that true?

16  A.    I couldn't tell you.  I don't think she did, but she might

17  have.

18        What kind of items?

19  Q.    Well, I don't know.  She said that you helped her

20  rearrange items in that Knaack toolbox.  Isn't that true?

21            MS. WIGHT:  Your Honor, I object to the suggestion.

22  Is that -- are you trying to recount her testimony from today?

23            MR. WARREN:  Yes.

24            MS. WIGHT:  Hang on a second.

25            THE COURT:  Rephrase your question and ask this

W. Daggett - X

1  question.

2         MR. WARREN:  Yes.

3  BY MR. WARREN: (Continuing)

4  Q.   If Ms. Connie Daggett said you helped her rearrange things

5  in the Knaack toolbox, is that true?

6  A.   Yeah, I don't recall.

7  Q.   In January of 2016, when you know Mr. Mahler was out of

8  town on vacation, you took items over to his barn and delivered

9  them there; isn't that true?

10  A.   Yeah.  I don't remember what month it was, but I did take

11  over some items.

12  Q.   Was Kara Sully there to let you in?

13  A.   Yes.

14  Q.   Were you with your wife, Connie Daggett?

15  A.   No.

16  Q.   Do you recall telling Special Agent Amanda Johnson that in

17  January of that year, while Mr. Mahler was out of town, you

18  took items over to his residence and left them there?

19  A.   Do I recall telling her that?

20  Q.   Yes.

21  A.   Not really.

22  Q.   But you do recall putting the items in the barn shop of

23  Mr. Mahler's property?

24  A.   No.  They went outside next to his Mustang in the carport,

25  and it was all canned food.

W. Daggett - X

1    Q.   When you were invited to Mr. Mahler's residence, you never

2    saw a firearm at his residence; correct?

3    A.   I don't think I seen a firearm, no.

4    Q.   And you recall telling Special Agent Amanda Johnson that

5    you never saw Mr. Mahler with a firearm in his residence;

6    right?

7    A.   Do I remember telling her that?

8    Q.   Yes.

9    A.   No, I don't recall.

10   Q.   You don't -- do you recall having an interview with

11   Special Agent Amanda Johnson?

12   A.   Yeah.

13   Q.   Okay.  But you don't recall any of the content of it?

14   A.   Well, some of it I do, yes.  It's been a long time, you

15   know.  I remember -- well, never mind.

16   Q.   Do you recall telling Special Agent Amanda Johnson that

17   Mr. Mahler would buy gifts for your children?

18   A.   Yeah.

19   Q.   Okay.  But you don't recall telling Special Agent Amanda

20   Johnson that Mr. Mahler would take the Daggett family out to

21   dinner?

22   A.   Do I recall telling her that?

23   Q.   Yes.

24   A.   Out to dinner?

25   Q.   Yes.  Dinner.

W. Daggett - X

1   A.   Yeah, he took us out to dinner several times.

2   Q.   Oh.  Now, back in March of 2014, you had a pallet of

3   ammunition shipped to Victory Prints?

4   A.   Yes.  Somewhere around there.  I don't know the exact

5   date, but it seems like it was around 2014.

6   Q.   Do you recall speaking to Special Agent Amanda Johnson

7   about that transaction?

8   A.   Vaguely, yeah.

9   Q.   Okay.  On January 27th of 2016 do you recall the ATF

10  coming to your garage to set up a surveillance camera?

11  A.   Yes.

12  Q.   You met them in the driveway?

13  A.   I don't know.  Probably.  I don't know.  Or the door.

14  Q.   Did you walk them into the garage?

15  A.   Yeah.  I imagine so.

16  Q.   You told them that the safes and firearms had arrived two

17  years earlier?

18  A.   Excuse me?

19  Q.   You told the ATF agents that the safes and ammo had

20  arrived two years earlier.  Do you recall saying that?

21  A.   I don't know if I told them two years.  I probably said a

22  couple of years or a year or -- you know, I'm not real good at

23  remembering exact dates, so -- I know they had been there a

24  while.

25  Q.   And do you recall telling the ATF agents that once the

W. Daggett - X

1  safes and toolbox arrived there, you and Mr. Mahler never

2  disturbed them again?

3  A.    So once they arrived there, we never disturbed them again?

4  Q.    Right.  Once the safes and firearms were there.

5  A.    All the firearms were there?

6  Q.    Yes.

7  A.    Once all the firearms were there, there was no reason to

8  disturb them again, I guess.  You know, they just sat there.

9  Q.    Okay.  Do you recall telling the ATF that only your wife

10  and you have keys to your house?

11  A.    I don't recall telling them that, but that's probably a

12  true statement right there.

13  Q.    Is it a true statement that Mr. Mahler was not allowed at

14  your residence unless you or your wife were there?

15  A.    Yes.  I guess.  I don't know.

16  Q.    Is it a true statement that when you leave the doors -- I

17  mean, when you leave your house, the doors and everything is

18  locked?

19  A.    Yes.

20  Q.    Was it true at the time, in 2016, that even your children

21  didn't have keys to your residence?

22  A.    That's pretty close.  You know, I just recently, a couple

23  of years ago, gave my son a key because we all -- about the

24  time I sold my business is when they needed keys.  Other than

25  that, we rode to school together and dropped them off, opened

W. Daggett - X/ReD

1  our shop up, picked them up after school, and they came home

2  with us.

3  Q.    So it's fair to say that you would have told the ATF that

4  in 2016 your children didn't have keys to your residence?

5  A.    Probably close to that, yeah.

6           MR. WARREN:  One moment, Your Honor.

7  BY MR. WARREN: (Continuing)

8  Q.    I want to just ask one last question about the community

9  emergency response team.  Isn't it your understanding that they

10  were trying to establish one in Molalla?

11  A.    I never knew about that.

12  Q.    Okay.

13  A.    That I can recall, anyway.  I know we did the Mt. Angel

14  shirts.

15  Q.    And it wasn't your understanding that the trucks were for

16  the community emergency response team?

17  A.    No.

18           MR. WARREN:  Okay.  All right.  No further questions.

19           THE COURT:  Anything further?

20

21                    REDIRECT EXAMINATION

22  BY MS. WIGHT:

23  Q.    Just a couple, Your Honor.  Regarding your garage access

24  that you were asked about on cross-examination, how do you get

25  in in your garage?  Is there a key?

W. Daggett - ReD

1   A.    No.  I have to go inside and open it.

2   Q.    Is there a garage door clicker?

3   A.    Yeah.  They don't work.

4   Q.    So there is, but they just don't work?

5   A.    Yeah, they don't work.

6   Q.    Can you describe what you mean by you have to go inside

7   and open it?

8   A.    You have to go inside, and there's a little slider that

9   slides over and locks, but you can't open that or close that

10  from outside.  You have to actually go in the front door, go

11  out in the garage, open that, and open the door.

12  Q.    I also want to ask you about -- you were asked on

13  cross-examination about dropping off some of the stuff back at

14  Mr. Mahler's residence.

15        Do you remember what you dropped off; what types of

16  things?

17  A.    Canned goods from the shelves of my garage.

18  Q.    Did you bring any guns with you on that trip to drop off?

19  A.    No.

20  Q.    On cross-examination you were also asked about going over

21  to Mr. Mahler's residence.  When you were at Mr. Mahler's

22  residence, did you ever go into his bedroom?

23  A.    Well, we never even went in the house.  We just went out

24  there beside his shop and stacked up the canned goods.

25  Q.    And then what about on previous occasions when you had

W. Daggett - ReD

1    dinner?  Did you go to his bedroom then?

2    A.    I went to his office in the back there with him.

3    Q.    But never the bedroom?

4    A.    Not that I remember, no.

5    Q.    And then also, finally, you were asked on

6    cross-examination about this pallet of ammunition that was

7    purchased.

8    A.    Uh-huh.

9    Q.    I believe they said -- on cross-examination, Mr. Warren

10   asked that you had that pallet of ammunition shipped.  Is that

11   a correct statement by Mr. Warren?

12   A.    No.  I -- I said it was okay to have it shipped there, and

13   I went over and got the cashier's check.

14   Q.    Who selected that ammunition for purchase?

15   A.    Bob did.

16   Q.    And who paid the money for that purchase?

17   A.    Bob.

18   Q.    Who called in that purchase?

19   A.    Bob.

20              MS. WIGHT:  No further questions, Your Honor.

21              THE COURT:  May this witness be excused?

22              MR. WARREN:  Yes.

23              MS. WIGHT:  Yes, Your Honor.

24              THE COURT:  Stand down.  Thank you.

25              THE WITNESS:  That's it?

1            THE COURT:  That's it.

2            MS. WIGHT:  Your Honor, would you like us to begin

3    our first agent?

4            THE COURT:  So how long with the agent?

5            MS. WIGHT:  It's going to be a while.  He's got six

6    firearms and a lot of exhibits to admit.  So we would probably

7    just start him today and maybe not even get to a firearm.

8            THE COURT:  I don't think we're going to start with

9    him today.  We'll start in the morning with him.  I'll talk to

10   the jury about our schedule.

11       So we'll recess at 5:00 today.  Not everybody that's come

12   in probably expected that.  Did you have a chance to think

13   about starting time tomorrow?  What would work best for

14   everybody?  I've sort of done a little schedule, and I think

15   West Linn -- Forest Grove and West Linn and Sherwood are -- and

16   maybe Hillsboro, those are our folks who are not in Portland

17   proper.  I know the traffic because I come up here -- I

18   actually live in Eugene and come up here a great deal.  So the

19   mornings, I know, are really difficult to get into town.  So

20   what would be the best time?  When would you -- would it be

21   easier for you to be here in the morning to start?

22           A JUROR:  With traffic, earlier or later?  Later?

23           A JUROR:  It's really bad no matter what.

24           THE COURT:  Pardon me?

25           A JUROR:  It's really bad no matter what.

```
 1              THE COURT:  I know.  Actually, I've done this for
 2    20-plus years, trying to figure out when the exact moment is to
 3    come into town when you can avoid traffic.  I used to know
 4    that.
 5              A JUROR:  I live in McMinnville.  8:00 is fine with
 6    me.
 7              THE COURT:  Say that again.
 8              A JUROR:  I live clear out in McMinnville.  I have to
 9    drop my husband off to work before I can head out, so 8:00
10    worked great for me today.
11              THE COURT:  8:00 worked for you?  To be here by 8:00?
12    So if we -- so that's one to get here by 8:00, and we can start
13    8:15, 8:30.
14              A JUROR:  I'm from Hillsboro.  I rode MAX.  It
15    doesn't matter to me.
16              A JUROR:  I'm Sherwood.  8:00 is fine for me.
17              THE COURT:  That's fine.  We'll be here and start at
18    8:00.  Is that agreeable?
19         Okay.  If you'll be here by 8:00, we'll be ready to go.
20    And then we'll -- we may run a little longer tomorrow.  Would
21    that be a problem for anybody if we get ahead tomorrow
22    afternoon?  I just want to get through our witnesses.  I don't
23    want to inconvenience anybody.  If we go past 5:00, will that
24    be a problem?
25         All right.  So I'll caution you again.  Please don't
```

1  discuss this case with anyone.  Put it out of your mind.  Have

2  a great evening.  Report back.  I'll see you here at

3  8:00 tomorrow morning.  And if you have any questions or

4  there's any follow-up, please just feel free to talk to

5  Ms. Kramer, and she'll talk to me.  All right?  Have a good

6  evening.

7                          (Jury not present.)

8            THE COURT:  So I want to just -- while we have a few

9  minutes, to see if we can move along tomorrow, 1 through 80

10 were preadmitted.  It's only the exhibits after 80 that weren't

11 admitted.  That's my understanding.  There were no objections

12 to Government's Exhibits 1 through 80.

13           MS. WIGHT:  I just -- we had a meeting with

14 Mr. Warren at that time.  I believe he said we need to

15 establish foundation for all the exhibits, but if I

16 misunderstood, I'll gladly --

17           MR. WARREN:  It wasn't for all the exhibits.  We did

18 admit certain exhibits.  I would have to look at them again,

19 but we did because that's the reason for --

20           THE COURT:  What our recollection is is 1 through 80,

21 and it was only the exhibits after 80 that were a problem.

22           MS. WIGHT:  Okay.  So the photos?

23           MR. WARREN:  Yeah, all the photos.  Let's look

24 through the exhibits.

25       Your Honor, could we take a moment?

1          THE COURT:  Yes.

2          MR. WARREN:  Yeah, 1 through 80.

3          MS. WIGHT:  Wait, wait, wait.  81 are additional

4    exhibits.  They are just photos, for the most part.  Pictures

5    of the toolbox and the safe.  At the end, I do have certified

6    documents.  Maybe those?

7          MR. WARREN:  You're right.  Your Honor, we stipulated

8    to 1 through 80.

9          MS. WIGHT:  Everything, Your Honor, today was

10   post-80.

11         THE COURT:  We only need to address -- so where are

12   we with exhibits past 80?

13         MR. WARREN:  There's about --

14         MS. WIGHT:  There's a total of 90 exhibits on the

15   list.

16         THE COURT:  So just very few.

17         MR. WARREN:  Yes.

18         THE COURT:  All right.  I just want to clear that up

19   because that was my recollection.

20         MS. WIGHT:  I would love to hand these to the

21   witnesses.

22         THE COURT:  Pardon me?

23         MS. WIGHT:  I can hand these to the witness and talk

24   about --

25         MR. WARREN:  Yes.

```
 1              MS. WIGHT:  That sounds fabulous.

 2              THE COURT:  Only the ones you have not admitted.  We

 3   have --

 4              MR. WARREN:  81 through 98.

 5              THE COURT:  Can't talk when I talk, otherwise she

 6   will kill me.  She's been here very gracious all day today.

 7         There's just probably a handful because you -- I presume

 8   some of those exhibits were after 80.

 9              MS. WIGHT:  That's correct.  There's about 18 more

10   exhibits.  Mostly photographs after Exhibit 80.

11              THE COURT:  Okay.  So in the morning you have an ATF

12   agent.  You're going through the ATF agents with all the -- how

13   long do you think?

14              MS. WIGHT:  We also might have a surprise -- not a

15   surprise guest, but Curtis's scheduled is a little bit

16   inflexible.  So if he gets here, we may have to squeeze him in.

17   He's very quick.  We expect him to be 15 minutes or less.

18              THE COURT:  That's never a problem for me.

19         Is it a problem for you?

20              MR. WARREN:  I'm ready.

21              THE COURT:  All right.

22              MS. WIGHT:  The agents we expect to go no more than

23   an hour or less if we -- now that everything is preadmitted

24   and -- including the firearms?  So okay.

25              THE COURT:  You're objecting?  You're not objecting?
```

1          MR. WARREN:  I have not objected to anything 1

2  through 80.  Those are the firearms.

3          THE COURT:  What is after 80 that is --

4          MS. WIGHT:  Just additional exhibits that I pulled

5  together while I was preparing the witness.

6          THE COURT:  So maybe the two of you could talk about

7  those and maybe when you come in in the morning, we can see

8  which ones are really objectionable.  Would you mind doing

9  that?

10          MR. WARREN:  We've been talking all weekend.  I don't

11  see why not.

12          MS. WIGHT:  I've got one page, Your Honor, to look

13  at.

14          THE COURT:  You don't have to do it right now.  If

15  you want to do it back and forth and if there are ones you

16  object to, that's fine.

17          MR. WARREN:  Well, if I can get a copy of this, I can

18  report in the morning.

19          THE COURT:  All right.

20          MR. WARREN:  I believe you sent me these over the

21  weekend.

22          MS. WIGHT:  You do you have all those exhibits?

23          MR. WARREN:  So I have them.  So I can look at them.

24          THE COURT:  Why don't you take a look at them and

25  we'll take it up first thing in the morning and see what are

1    the ones we have to worry about.

2              MS. WIGHT:  Okay.

3              THE COURT:  Is there anything else we can do this

4    evening?

5              MR. WARREN:  No, Your Honor.

6              MS. WIGHT:  Your Honor, we're beginning at 8:00?

7              THE COURT:  I'm going to assume they'll be here.  We

8    will start as soon as we know we have 14 people here.  It

9    should be shortly thereafter.  They looked eager.

10        All right.  See you in the morning.  Have a good evening.

11             DEPUTY COURTROOM CLERK:  Court is in recess.

12                   (Trial Day 1 was adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3        United States of America v. Robert Evans Mahler

4                      3:16-cr-00105-AA-1

5                         TRIAL DAY 1

6                      September 17, 2018

7

8            I certify, by signing below, that the foregoing is a

9    true and correct transcript of the record, taken by

10   stenographic means, of the proceedings in the above-entitled

11   cause.  A transcript without an original signature, conformed

12   signature, or digitally signed signature is not certified.

13

14   /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
     _____
15
     Official Court Reporter        Signature Date: 11/25/19
16   Oregon CSR No. 98-0346         CSR Expiration Date:  9/30/20

17

18

19

20

21

22

23

24

25