1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3                  PORTLAND DIVISION

4
   UNITED STATES OF AMERICA,        )
5                                    )
                      Plaintiff,  )  Case No. 3:16-cr-00105-AA-1
6                                    )
                v.                   )
7                                    )  September 18, 2018
   ROBERT EVANS MAHLER,             )
8                                    )
                      Defendant.  )  Portland, Oregon
9  _____)

10

11

12

13                   TRIAL DAY 2

14            TRANSCRIPT OF PROCEEDINGS

15        BEFORE THE HONORABLE ANN L. AIKEN

16        UNITED STATES DISTRICT COURT JUDGE

17

18

19

20

21

22

23

24

25

1                              APPEARANCES

2    FOR THE PLAINTIFF:
                              NATALIE K. WIGHT
3                             U.S. Attorney's Office
                              1000 SW Third Avenue
4                             Suite 600
                              Portland, OR 97204
5
     FOR THE DEFENDANT:
6                             ERNEST WARREN, JR.
                              ALICIA HERCHER
7                             VERA WARREN
                              Warren & Sugarman
8                             838 SW First Avenue
                              Suite 500
9                             Portland, OR 97204

10

11

12

13

14

15   COURT REPORTER:    Jill L. Jessup, CSR, RMR, RDR, CRR
                        United States District Courthouse
16                      1000 SW Third Avenue, Room 301
                        Portland, OR 97204
17                      (503)326-8191

18

19                              *   *   *

20

21

22

23

24

25

```
1                           INDEX

2   PLAINTIFF'S WITNESSES:                      PAGE:

3    CURTIS LEROY ALLEN, JR.

4    Direct Examination by Ms. Wight            142

5    Cross-Examination by Mr. Warren            147

6    Redirect Examination by Ms. Wight          152

7    Recross-Examination by Mr. Warren          153

8    NATHAN ALAN MILLER

9    Direct Examination by Ms. Wight            154

10   Cross-Examination by Mr. Warren            173

11   Redirect Examination by Ms. Wight          178

12   RYAN HULTGREN

13   Direct Examination by Ms. Wight            180

14   Cross-Examination by Mr. Warren            201

15   WILLIAM ALAN DAGGETT

16   Direct Examination by Ms. Wight            210

17   Cross-Examination by Mr. Warren            214

18   KARL DEERING

19   Direct Examination by Ms. Wight            223

20   Cross-Examination by Mr. Warren            234

21   ROLAND JACOBS

22   Direct Examination by Ms. Wight            244

23   Cross-Examination by Mr. Warren            260

24

25
```

```
 1                              INDEX

 2                          (Continuing)

 3   PLAINTIFF'S WITNESSES:                        PAGE:

 4    MICHAEL MCNALL

 5    Direct Examination by Ms. Wight             267

 6    Cross-Examination by Mr. Warren             273

 7    LELAND STICE

 8    Direct Examination by Ms. Wight             276

 9    Cross-Examination by Mr. Warren             282

10    AMANDA JOHNSON

11    Direct Examination by Ms. Wight             288

12    Cross-Examination by Mr. Warren             296

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    TRANSCRIPT OF PROCEEDINGS
2                        (September 28, 2018)
3   (In open court:)
4            THE COURT:  Do we have an update on the stipulations
5   on the exhibits?
6            MS. WIGHT:  Yes.  We were able to resolve that
7   yesterday.  We stipulated to everything except for -- I believe
8   it's Exhibit 98.
9            THE COURT:  Okay.
10           MS. WIGHT:  And then --
11           THE COURT:  Wait.  So agreed, Counsel?
12           MR. WARREN:  Yes.
13           THE COURT:  All but 98.  And that's the photograph of
14  the dog sale contract.
15       We'll take up the other matter.  I know the Daggett
16  notes -- you wanted a chance to look those over and think about
17  them, so we'll just take that up at a break.
18           MR. WARREN:  Okay.
19           THE COURT:  So we're ready.  Why don't you get your
20  witness so we're set to go and have the jury back.
21           MS. WIGHT:  We'll start with Mr. Allen today,
22  Your Honor.
23           THE COURT:  Allen?
24           MS. WIGHT:  Mr. Allen.  Curtis Allen.
25           THE COURT:  Okay.  Please be seated.
```

```
 1                        (Jury present.)
 2            THE COURT:  Good morning.
 3            THE JURY:  Good morning.
 4            THE COURT:  Counsel, call your next.
 5            MS. WIGHT:  Government calls Curtis Allen.
 6            THE COURT:  Please come forward and be sworn.
 7            DEPUTY COURTROOM CLERK:  Please raise your right
 8  hand.
 9
10                   CURTIS LEROY ALLEN, JR.,
11  called as a witness in behalf of the Plaintiff, being first
12  duly sworn, is examined and testified as follows:
13
14            THE WITNESS:  I do.
15            DEPUTY COURTROOM CLERK:  Thank you.  Please be
16  seated.  State your full name and spell it for the record,
17  please.
18            THE WITNESS:  Curtis Leroy Allen, Jr.  Just my last
19  name?
20            DEPUTY COURTROOM CLERK:  Your full name, please.
21            THE WITNESS:  My full name?
22            DEPUTY COURTROOM CLERK:  Yes.
23            THE WITNESS:  C-u-r-t-i-s.  L-e-r-o-y.  A-l-l-e-n.
24
25  ///
```

Allen - D

1          DIRECT EXAMINATION

2   BY MS. WIGHT:

3   Q.   Good morning, Mr. Allen.

4   A.   Good morning.

5   Q.   Can you please tell the Court and the jury what you do for

6   a living?

7   A.   I'm a barber.

8   Q.   Do you have a barbershop?

9   A.   I am the owner and operator of Curt's Barbershop.

10  Q.   Where is that shop located?

11  A.   306 North First Street, Silverton.

12  Q.   Mr. Allen, is it true that you did not want to come to

13  court today?

14  A.   Absolutely true.

15  Q.   Were you required to be here because the government sent

16  you a subpoena?

17  A.   Absolutely.

18  Q.   We thank you for coming.  We know it can be an

19  inconvenience, so I will try to keep this short today.

20       Do you know the defendant in this case --

21  Mr. Robert Mahler?

22  A.   I do.

23  Q.   How do you know him?

24  A.   I met him through my buddy Kyle because he married Kyle's

25  mom.

Allen - D

1  Q.   Have you ever spent time with your buddy Kyle and

2  Mr. Mahler?

3  A.   Yeah.  We first got to know each other by playing ping

4  pong, and I have gone to their house and helped build a fence

5  and, throughout time, gained a relationship, and we had gone

6  shooting together and --

7  Q.   Mr. Allen, you mentioned that you did go shooting

8  together.  Do you remember where you would go shoot?

9  A.   At my house on Powers Creek Loop Road.

10  Q.   So have you actually seen Mr. Mahler with a firearm?

11  A.   Yes.

12  Q.   Was he shooting his own gun at your house?

13  A.   Yes.

14  Q.   Do you remember at all how long ago that was that you went

15  shooting together?

16  A.   At least over ten years ago.

17  Q.   Would you say that it was prior to the year 2000?

18  A.   No.

19  Q.   So after the year 2000 but over ten years ago about?

20  A.   Yes.

21  Q.   Okay.  Has there ever been any other occasion where you've

22  actually personally seen Mr. Mahler with a gun?

23  A.   I sold him a model 1911 .45.

24  Q.   Let's talk about the details of that sale.  Can you tell

25  us a little bit about that sale?

Allen - D

1  A.    I bought this weapon from Dan's Pawnshop, and upon getting

2  the weapon, I shot it a couple of times, and it was an older

3  gun.  It reminded me of a previous gun that I had.  It felt

4  very unsafe.  So at that point I decided I would like to sell

5  the gun, and then Mr. Mahler said that he would be interested

6  in buying it from me.

7  Q.    Did he end up buying it from you?

8  A.    Yes.

9  Q.    Do you remember how much he paid for the gun?

10  A.    I believe the bill of sale said $250.

11  Q.    Did Mr. Mahler provide you with a bill of sale for that

12  transaction?

13  A.    Yes, he did.

14  Q.    I'm going to turn your attention to Government's

15  Exhibit 76.  It's preadmitted.  Please take a look at that.

16        Mr. Allen, do you recognize this?

17  A.    I do.

18  Q.    What is it?

19  A.    That is the bill of sale that he handed me.

20  Q.    And what did you do with this when you were interviewed

21  for this investigation?

22  A.    What did I do with it as to what?

23  Q.    With this document.

24  A.    Because I saved it all these years or --

25  Q.    Exactly.  So you saved it all these years?

Allen - D

1  A.    Yeah.  Any time I ever sold anything, a car, you know,

2  bill of sale just for my own protection or whatever, I felt

3  like I should save stuff like that.  So I just kept onto it.

4  Q.    Was there anything unusual about the sale to Mr. Mahler?

5  A.    When he came out of the house, I read the bill of sale.

6  Instead of saying "Bob Mahler" on it, it said "Alex Mahler."

7  When I asked why, he said he was buying the gun for his

8  brother.

9  Q.    You mentioned that you had originally purchased that gun

10  from Dan's Pawnshop?

11  A.    Correct.

12  Q.    What did you call the gun again?  A 1911?

13  A.    Right.

14  Q.    Is there another name that it goes by?

15  A.    I believe the name is a Thompson Auto-Ordnance.

16  Q.    So Dan's Pawnshop, would that be a business sale or a

17  private sale?

18  A.    Business.

19  Q.    Do you remember if at that time you had to fill out one of

20  those firearms transaction records?

21  A.    Yes.  It's required by law to do so.

22  Q.    Are you familiar with those types of documents?

23  A.    Yes.

24  Q.    You've purchased other firearms?

25  A.    Yes.

Allen - D

1   Q.   And do you have to include your name and signature on that

2   document?

3   A.   You do.

4   Q.   I'm going to go ahead and show you what's been preadmitted

5   as Government's Exhibit 75-1.  It's a couple of pages.  So

6   we'll just have you take a look at it.

7        So go ahead back to page 1.  Mr. Allen, can you read for

8   us whose name is on that document?

9   A.   That is my name.

10  Q.   And whose address is on there?

11  A.   That is my current address where I lived at the time.

12  Q.   If we go back down, can you see on the bottom of the page

13  the date of the sale?

14  A.   April 14, 2006.

15  Q.   And then on the last page -- oh, is it the second page?

16  You're right.  Second page.  Oh, the very bottom.  Can you see

17  on the bottom -- it's very hard to read -- what firearm is

18  listed there that was sold, as best you can?

19  A.   Yes, I can.

20  Q.   What's the type of firearm?  What does it say?  What's

21  your guess?

22  A.   It says Auto-Ordnance, Auto, and then the serial number.

23  Q.   Is that AOC8059.  Did I read that correctly?

24  A.   Yes.

25  Q.   And what caliber does it list it as?

Allen - D/X

1   A.    .45.

2   Q.    Thank you, Mr. Allen.

3        Do you remember after you bought this gun from Dan's

4   Pawnshop, how long about it was before you sold it to

5   Mr. Mahler?

6   A.    To my best recollection, I would say it was in the year.

7   Because I shot it and it made me feel uncomfortable.  It was an

8   older gun, and I just didn't want to deal with it anymore.

9   Q.    So within a year?  Less than a year?

10  A.    I would say so.

11           MS. WIGHT:  Thank you, Mr. Allen.  No further

12  questions.

13           THE COURT:  Mr. Warren?

14

15                   CROSS-EXAMINATION

16  BY MR. WARREN:

17  Q.    Good morning, Mr. Allen.

18  A.    Good morning.

19  Q.    We have a little time chart up here.  Do you see it right

20  here?  You walked past it.  So is it fair to say that sometime

21  in 2006 is when this activity that you described on the witness

22  stand happened with Mr. Mahler?

23  A.    Which activity would that be?

24  Q.    Well, we got these documents regarding the sale of a gun.

25  A.    I bought the gun in 2006, as the document states.

Allen - X

1  Q.   So you would have sold the gun to Mr. Mahler in 2006?

2  A.   I said that I think that it was within a year.  I did not

3  give the date of the year that I thought it was.

4  Q.   Well, would it be 2006 or 2007?

5  A.   It could have been either.

6  Q.   Okay.  Fair enough.

7       So is that accurate, if I say 2006/2007?

8  A.   I would say somewhere -- to my best recollection, that

9  would be about when it was sold.

10 Q.   Since that time, have you ever seen Mr. Mahler with a

11 firearm after 2006/2007?

12 A.   Yes.  We shot together.

13 Q.   And when was that?

14 A.   I'm not too sure of the exact date on that.

15 Q.   Was it 2007?

16 A.   I'm not positive.

17 Q.   How about 2008?

18 A.   Not positive.

19 Q.   2009?

20 A.   I would say it's before that, to my recollection, because

21 at that point we just had stopped communication with one

22 another.

23 Q.   So is it fair to say 2009 -- that was the last time you

24 and him had any firearm activity together?

25 A.   I would say prior to 2008, probably.  That would be my

Allen - X

1  guess.

2  Q.   Okay.  Fair enough.  So if I put "2008" right here on this

3  board, you wouldn't disagree with that?

4  A.   I would say that that is close to about what I think it

5  might have been.  I'm not sure.  It's been a long time ago, and

6  I think it's been at least a decade before I had any

7  conversation with him, period.

8  Q.   Okay.  So it's been ten years since you even talked to him

9  again?

10  A.   Correct.

11  Q.   Okay.  2008.  Can we agree on that?  2008?

12  A.   I'll agree.  I think it's around that time period.  I will

13  not say that it was exactly 2008.

14  Q.   Okay.  Now, I want to talk to you -- March 28, 2016, you

15  met with ATF; isn't that true?

16  A.   True.

17  Q.   You --

18  A.   If that's what the document states is when they met me.  I

19  don't know the exact date.

20  Q.   Okay.  So if the document states March 28 of 2016, that

21  would be accurate?

22  A.   If you would show me the document, I could verify.

23  Q.   Okay.  Excuse me one moment.

24       Showing you a document right here called Report of

25  Investigation, is that your name:  Curtis Allen Jr.?

Allen - X

1   A.    Correct.

2   Q.    On March 28, 2016, Bureau of Alcohol, Tobacco & Firearms,

3   would that be accurate?

4   A.    If that's what they say about me, then, yeah.

5   Q.    During that conversation, you talked about Mr. Mahler;

6   isn't that true?

7   A.    Correct.

8   Q.    At that time you told them that you had shot with

9   Mr. Mahler several years before that interview?

10  A.    Correct.

11  Q.    And you said that you had sold him a firearm maybe several

12  years before that interview?

13  A.    Correct.

14  Q.    You advised the ATF agents that you had a friend named

15  Brandon who had a, quote, "falling out" with Mr. Mahler.  Do

16  you remember that?

17  A.    I do.

18  Q.    Without Mr. Mahler's permission, you had taken Brandon to

19  Mr. Mahler's house to try to clear things up; is that correct?

20  A.    That is not correct.

21        At the time I just came to his house, and Brandon was in

22  my car.  I did not realize that they had any issues with one

23  another.

24  Q.    Well, you know that -- you didn't tell the agents that

25  Brandon had been recently released from prison for drug

Allen - X

1   dealing; isn't that true?

2   A.   Not true, to my knowledge.

3   Q.   So you're going to say that you didn't know that Brandon

4   was just released from prison?

5   A.   True.  I did not know that.

6   Q.   Did you learn that subsequently to taking him to

7   Mr. Mahler's house?

8   A.   No.  This is the first I've ever heard of that at this

9   moment.

10  Q.   What is Brandon's last name?

11  A.   Smisek.

12  Q.   How do you spell that?

13  A.   S-m-i-s-e-k.

14  Q.   S-m-i-s-c-k?

15  A.   S-e-k.

16  Q.   S-e-k.

17       Then sometime after that at your barbershop, you and

18  Mr. Mahler had a little discussion; isn't that right?

19  A.   Correct.

20  Q.   And you felt disrespected by the words that he said?

21  A.   Correct.

22  Q.   You kicked him out of the barbershop?

23  A.   Correct.

24  Q.   That's the last time you guys talked to each other?

25  A.   Correct.

Allen - X/ReD

1  Q.   During the disagreement you had with Mr. Mahler, you told

2  him you would smash his face; isn't that true?

3  A.   That's not how I worded it.

4  Q.   How did you word it?

5  A.   I said, "Mr. Mahler, you angered me so much in the way

6  that you talked to me at your home that I felt like punching

7  you in the nose."

8  Q.   And Mr. Mahler said, "You shouldn't talk to people like

9  that.  You have your family to protect."  Isn't that true?

10 A.   That's not how he said it.

11 Q.   Well, how did he say it?

12 A.   He said, "You're lucky that you didn't do that because I

13 would hate for you not to be able to take care of your family

14 again."

15 Q.   And at the time he didn't know that you had had a tragic

16 loss in your family; isn't that true?

17 A.   I'm not positive if he knew that or not.

18         MR. WARREN:  Okay.  Thank you.  No further questions.

19         MS. WIGHT:  Just real quick.

20

21                  REDIRECT EXAMINATION

22 BY MS. WIGHT:

23 Q.   On cross-examination, you were asked whether or not that

24 was the last interaction you had with Mr. Mahler after he --

25 you kicked him out of the barbershop.  Was there any other --

Allen - ReD/ReX

1  do you want to clarify that?  Was there another interaction you

2  had with him?

3  A.    Do you mean on the same day?

4  Q.    Oh, yes, I do.  I wasn't sure if you wanted to clarify the

5  details.

6  A.    He later returned to the barbershop that day and tried to

7  hand me a white envelope, which I would not accept because I

8  had already told him not to come around my property ever again.

9              MS. WIGHT:  Thank you, Mr. Allen.  No further

10  questions.

11             MR. WARREN:  Can I follow up on that point?

12             THE COURT:  Yes.  But this is only because it's a new

13  point raised, because there is no recross.

14             MR. WARREN:  Thank you.  Thank you.

15

16                      RECROSS-EXAMINATION

17  BY MR. WARREN:

18  Q.    So the reason he handed you that envelope was to say he

19  was sorry; isn't that right?

20  A.    I think he was trying to save face in what he already said

21  to me in the barbershop, because it was pretty extreme.

22             MR. WARREN:  Thank you.  No further questions.

23             THE COURT:  May this witness be excused?

24             MS. WIGHT:  Yes, Your Honor.

25             THE COURT:  Mr. Warren?

Miller - D

```
 1              MR. WARREN:  Yes.
 2              THE COURT:  You're free to go.  You may step down.
 3        Call your next.
 4              MS. WIGHT:  Government calls Special Agent
 5   Nathan Miller.
 6              THE COURT:  Please come forward and be sworn.
 7              DEPUTY COURTROOM CLERK:  Please raise your right
 8   hand.
 9
10                     NATHAN ALAN MILLER,
11   called as a witness in behalf of the Plaintiff, being first
12   duly sworn, is examined and testified as follows:
13
14              THE WITNESS:  Yes, I do.
15              DEPUTY COURTROOM CLERK:  Please have a seat.  Please
16   state your full name and spell it for the record.
17              THE WITNESS:  My name is Nathan Alan Miller.  Last
18   M-i-l-l-e-r.
19        Good morning, everyone.
20
21                     DIRECT EXAMINATION
22   BY MS. WIGHT:
23   Q.   Good morning, Agent Miller.  Please tell us where you
24   work.
25   A.   I'm a special agent with the Bureau of Alcohol, Tobacco,
```

Miller - D

1  Firearms & Explosives here in Portland, Oregon.

2  Q.    Is that "ATF" for short?

3  A.    Yes, ma'am.

4  Q.    And how long have you been employed with the ATF?

5  A.    A little over four years now.

6  Q.    Were you employed anywhere else before that?

7  A.    Prior to that, I was employed with Washington County

8  Sheriff's Office.

9  Q.    What ATF office are you assigned to?

10  A.    I'm assigned to the Portland, Oregon, field office, which

11  is located here in the city.

12  Q.    Can you tell us some of your duties that you have as an

13  ATF agent?

14  A.    Yeah.  My primary responsibility as an ATF agent is the

15  enforcement of federal firearms laws and regulations.

16  Q.    As part of your duties as an ATF agent, are you also

17  involved in and participate in the execution of search

18  warrants?

19  A.    Yes, that's correct.

20  Q.    Any idea how many search warrants you've actually

21  participated in?

22  A.    If I had to guess, it would be between 30 and 40.

23  Q.    Were you involved in any search warrants related to the

24  investigation of Defendant Robert Mahler?

25  A.    Yes, I was.

Miller - D

1   Q.   So let's talk about that Mahler investigation.  Do you

2   know who the lead case agent was on that investigation?

3   A.   Yes, I do.  It's my co-worker, Ms. Amanda Johnson.

4   Q.   Is that Ms. Johnson sitting next to me?

5   A.   Yes.

6   Q.   When did you first become involved in that investigation?

7   A.   I became involved in that investigation for the first

8   search warrants that occurred at the Daggett residence.

9   Q.   Did you do any early investigation on the case prior to

10  any search warrants?

11  A.   No, I did not.  I had heard about the case from

12  Ms. Johnson.  We're a small office and tend to know what each

13  other are investigating.  But no actual involvement prior to

14  that search warrant.

15  Q.   So you are familiar with the search warrants, then?

16  A.   Yes, I am.

17  Q.   Do you know how many total were part of that

18  investigation?

19  A.   I believe they were separate search warrants of three at

20  the first -- at the Daggett residence and three at the Mahler

21  residence or area of two different occasions.

22  Q.   Do you know which agent sought to obtain those search

23  warrants?

24  A.   Yes.  That would have been Special Agent Johnson.

25  Q.   All search warrants were obtained by Special Agent

Miller - D

1  Johnson?

2  A.    I believe so, yes.

3  Q.    And were those search warrants executed?

4  A.    Yes, they were.

5  Q.    What days, do you know, were they executed?

6  A.    The first search warrant that was executed at the Daggett

7  residence was on February 3, 2016.

8  Q.    And then do you know the date -- the other date it was

9  executed?

10 A.    The one at the Mahler residence, as well as his person and

11 vehicle, was February 16th, and it went into the 17th.  It was

12 a long night.

13 Q.    Okay.  I want to clarify.  So on February 3rd there were

14 three search warrants?

15 A.    Yes, ma'am.

16 Q.    And what were those three search warrants for?

17 A.    They were for -- I will say they're individual items.  One

18 is a safe.  It was a Liberty Safe.  Another was kind of like a

19 footlocker.  It was also a safe, but not in a traditional

20 style, the turn dial and everything.  The last was a toolbox

21 that had the label "Knaack" on it.

22 Q.    And then for the February 16, 2016, search warrants, what

23 were those specifically for?

24 A.    Those were for the residence, the person, and the vehicle

25 of Mr. Robert Mahler.

Miller - D

1  Q.    So we're going to take these one at a time, and we'll

2  begin with the February 3rd search warrant.  Where did that

3  search warrant take place?

4  A.    So that search warrant took place at the Daggett residence

5  in Molalla, Oregon.  The information that I had was that the

6  Daggetts were cooperating witnesses in the case who had

7  knowledge that Mr. Mahler was a prohibited person and had

8  previously, before knowing that, agreed to allow Mr. Mahler to

9  store firearms at their residence.

10  Q.    You mentioned there were three different items, three

11  different search warrants.  Was there a particular search

12  warrant that you were on?

13  A.    Yes.  So I was there for all of the search; however, I was

14  assigned to the Knaack toolbox; so one specific item I was the

15  evidence technician for and searched.

16  Q.    You were the evidence technician and, like, a searcher or

17  a finder or something?

18  A.    Yes.  So I searched for -- I searched through the toolbox

19  with another agent as the evidence technician.  That means I

20  wrote down everything that we found and kept a log of it that

21  was left at the scene.

22  Q.    So I'm going to take a minute here and I'm going to show

23  you what's been preadmitted as Government's Exhibit 21-1.  And

24  as you described for us, the three different safes -- do you

25  recognize this particular item?

Miller - D

1   A.   Yes, I do.

2   Q.   What are we looking at here?

3   A.   I believe this would have been -- excuse me for not

4   knowing the direction, but as you walked into the garage, on

5   the left-hand wall, this large safe, the gray one, is what we

6   labeled as "Safe 1," the Freedom Safe with the -- what appears

7   to be a turn dial on it.

8   Q.   Is it also the Liberty Safe?  Is that another name for

9   that one?

10  A.   Yes.  And underneath that dresser would be that

11  footlocker, and I believe we labeled that "Safe 2."

12  Q.   I'll direct your attention to preadmitted

13  Government's Exhibit 20-3.  Tell us what is going on here.

14  A.   That would be the Knaack toolbox -- the large brown box

15  kind of in the center of the picture there.

16  Q.   Have you reviewed other photographs that were taken during

17  the investigation in the search of the Knaack toolbox?

18  A.   Yes, I have.  As part of the search warrant practice,

19  photos are taken before and then during the search.  When we

20  find something, we ask for a photo.  A photo is taken, and then

21  we collect the item and log it.

22  Q.   Let's go ahead and turn to Government's Exhibit 20.

23       Is that a picture of the toolbox before it's open?

24  A.   Yes, it is.

25  Q.   How about Government's 24-1?  What is this?

Miller - D

1    A.    That would have been when we first opened the toolbox.

2    Q.    Can you describe what you're -- what we're seeing in this

3    picture?

4    A.    Yeah, I need to adjust the screen a little.  Excuse me.

5          So I can see in here -- we're looking at towels.  It

6    appears to be gun cases, ammunition boxes, plastic Walmart bag.

7    Q.    What was your approach to search?  Did you take everything

8    out and kind of lay it out on the ground?

9    A.    No.  We used kind of a systematic approach where we

10   started -- I started at the top, removed an item.  If it was

11   relevant to the search warrant, it would have been seized,

12   photographed, and then went layer by layer as I went through

13   the box.

14   Q.    Did you actually find any firearms in that box?

15   A.    Yes, I did.

16   Q.    Did you find just one type of firearm?  Was it all pistols

17   in there?

18   A.    No.  There were pistols, rifles, at least one shotgun.

19   Q.    Did you also find ammunition in that box?

20   A.    Yes, ma'am.

21   Q.    Do you have any idea?  Can you approximate?  Do you

22   remember how much you actually found in that toolbox?

23   A.    In excess of 21,000 rounds.

24   Q.    Did you say 21,000 rounds?

25   A.    Yes, I did.

Miller - D

1  Q.   So let's talk about some of those guns that you seized

2  from the toolbox.

3  A.   Okay.

4  Q.   You mentioned that you seized some pistol-type guns.  Did

5  you log them into evidence?

6  A.   Yes, I did.

7           MS. WIGHT:  Your Honor, may I approach?  We are going

8  to start --

9           THE COURT:  You don't need to ask permission to

10  approach.  Just go right ahead.  I don't have a problem.

11      As long as the lawyers are not sitting on the laps of the

12  jury or the witness, move around the courtroom as you would

13  like.  It's just my general rule.

14  BY MS. WIGHT: (Continuing)

15  Q.   I'm going to show you what's preadmitted as

16  Government's Exhibit 18.

17      Does he need gloves?

18      You can just set the boxes behind you if you need space up

19  there.

20  A.   Okay.

21  Q.   Please take a look at that.

22  A.   Okay.

23  Q.   And just what is it and what were you doing up there when

24  you first pulled it out of the box?

25  A.   So this has an ATF evidence tag on it, which is listed

Miller - D

1  below here.  On this tag, it has our item number, their exhibit

2  number, as well as the case number.  The firearm description is

3  on here.  In this case, this is an Auto-Ordnance pistol.  It's

4  a 1911 style pistol with serial number Alpha, Zero, Charlie

5  8059.  And any time I'm handed a firearm, I want to make sure

6  that it is safe.  There's a little zip tie on this side of it,

7  which is our indication that there is not a round chambered in

8  there.  Checking the serial number and the markings on the

9  firearm, making sure they match the tag, is general practice.

10 Q.   So besides that tag and the zip tie, is that gun

11 substantially -- in substantially the same condition it was

12 when you found it?

13 A.   Yes, it appears to be.

14 Q.   So if you can hold onto that for a second, I do want you

15 to also take a look at Government's Exhibit 34-1.

16 A.   Yes.  That's the firearm found in the toolbox.

17 Q.   Is that the same firearm that you're holding now?

18 A.   Yes, ma'am.

19 Q.   I did not write it down just on my notes, although I have

20 it.  Do you have the serial number again on that firearm?

21 A.   Yes, I do.  It's Alpha, Zero, Charlie 8059.

22 Q.   Agent Miller, did you find any other pistols besides that

23 Auto-Ordnance?

24 A.   Yes, I did.

25 Q.   Do you remember at all what those other types of pistols

Miller - D

1   were?

2   A.   Not every single pistol.  I don't remember, no.

3   Q.   Do you remember some of them?

4   A.   Yes, I do.

5   Q.   What types of firearms?  Was there a Colt in there?

6   A.   Yes, there was a Colt and a Sig that I believe have been

7   indicted in this case.

8   Q.   I'm going to switcheroo here.  I'll show you what's

9   preadmitted as Government's Exhibit 6.

10          MS. WIGHT:  Would the Court like the physical

11   evidence up front or keep it in the back with all the other

12   ones?

13          THE COURT:  If we can, keep it all together.  Do you

14   think that whole little table is going to be admitted today?

15          MS. WIGHT:  They're all preadmitted.

16          THE COURT:  They will be available for us to just

17   keep at the end of this session because they will all have been

18   identified and given to the Court?

19          MS. WIGHT:  Yes.

20          THE COURT:  Then it's up to you whether you want to

21   keep them here or up here.  You can just put them on the table

22   over there.  It doesn't matter to me.

23          MS. WIGHT:  Okay.  Maybe I will set them --

24          THE COURT:  If you're going to use it again, you

25   might want it back there; if not, we'll keep it over here.

Miller - D

1        I'll suggest, for ease of everything, I'll say all the

2   exhibits, save except one for the government, have been

3   preadmitted in our earlier pretrial conference.  So the one

4   exhibit that remains to be discussed is still going to be

5   discussed at the time of the receipt of that exhibit or when it

6   becomes relevant.  So you don't need to say "preadmitted."

7   They're all admitted.  Okay?  That's just for your ease.

8        Go ahead.

9   BY MS. WIGHT: (Continuing)

10  Q.   Agent Miller, please take a look at that.

11  A.   Okay.  All right.

12  Q.   What is it?

13  A.   This is going to be a Colt pistol, model Mark IV.  It's a

14  .45 caliber pistol.  And its serial number is Sierra, Sierra

15  22195.

16       Also, noticing on this pistol that there's residue left on

17  here, so I don't know if you guys can see it, but it's like a

18  white, dusty residue.  This is what it looks like after the

19  firearm has been fingerprinted on the lab.  So it will come off

20  on my gloves.

21  Q.   It also has the zip tie on there?

22  A.   Yes, ma'am.  It has a zip tie through the barrel.

23  Q.   And an exhibit tag on there?

24  A.   And it has our exhibit tag, yes.

25  Q.   So besides the exhibit tag and zip tie and the dust, that

Miller - D

1  firearm in essentially in the same condition as when you

2  located it in the toolbox?

3  A.    Yes.

4  Q.    I'll also have you take a look at Exhibit 33-1.

5  A.    That would be the same pistol in the toolbox.  It says

6  Colt Mark IV on the side there in large writing.

7  Q.    Is this the location that you found it in the toolbox on

8  February 3, 2016?

9  A.    Yes, it is.

10  Q.    You mentioned that you also found a Sig.

11  A.    That's correct.

12  Q.    What does "Sig" stand for?

13  A.    It's a shortened phrase for Sig Sauer.  It's a firearms

14  manufacturing company.

15  Q.    I'll show you what's been marked as Government Exhibit 7.

16      I'll take that one back.

17      Go ahead and take a look at that.

18  A.    Okay.  Okay.

19  Q.    What are you looking at there?

20  A.    Same process as before.  I'm looking at the firearm and

21  the serial number, making sure that everything matches.  There

22  is that same white residue on this firearm, so it appears it's

23  been fingerprinted by the lab.

24      Like I discussed before, with the ATF label being on here,

25  as well as the zip tie going through, showing that the firearm

Miller - D

1    is safe.  This firearm is identified as a Sig Sauer pistol.

2    It's a model "P," as in "Paul," 250.  It's a .40 caliber

3    pistol, and the serial number on this is Edward, Adam, King

4    060357.

5    Q.    So apart from all the things that you pointed out before,

6    is that firearm in substantially the same condition as it was

7    in when you recovered it on February 3, 2016?

8    A.    That's correct.  Minus the fingerprint residue and the zip

9    ties.

10   Q.    I'm going to have you take a look at Government's Exhibit

11   30-1.  What is this?

12   A.    That is the same pistol near the barrel.  On the front

13   side there, you can read the P250, which I'm looking at right

14   here.  That's the model number.

15   Q.    This is the location you found it in the Knaack toolbox?

16   A.    Yes, it is.

17   Q.    And in addition to these three pistols, did you find any

18   other rifle-style guns?

19   A.    Yes, I did.

20   Q.    I'm handing you what's been marked as Government's

21   Exhibit 8.  Please take a look at it.

22   A.    I might have to stand up for this.

23           THE COURT:  That's fine.

24           THE WITNESS:  Okay.

25   ///

Miller - D

1   BY MS. WIGHT:  (Continuing)

2   Q.    Agent Miller, we can really see the dust on that.  Is that

3   what we're looking at and why it's all white?

4   A.    Yeah, this is a better representation, because it's a

5   larger firearm, of the residue left on it.  I had to wipe some

6   off to read the markings on the firearm.

7   Q.    What kind of firearm is that?

8   A.    It's a Winchester rifle.  It's a model 100.  This is .308

9   caliber and a serial number on this is 76014.

10  Q.    Does it also have the zip tie on the rifles?

11  A.    It does, and going right through here.

12  Q.    Okay.  And the evidence tag?

13  A.    Yes.

14  Q.    And it's in substantially the same condition as it was

15  when you found it on February 3, 2016?

16  A.    Yes, it is.

17  Q.    Did you find any other rifles that day?

18  A.    I did.  Two other rifles, I believe, were admitted in this

19  case.

20  Q.    I'm handing you what's been marked as Government's

21  Exhibit 9.  Please take a look at it.

22  A.    Okay.

23  Q.    What type of firearm is that?

24  A.    This is a Remington rifle.  It is a model 722.  Its

25  caliber is .257, and the serial number is 354410.

Miller - D

1  Q.   What is that?  What's the thing on top?

2  A.   This is a sight or a scope, so it would magnifying what

3  you were aiming at.

4  Q.   Does that one also have a zip tie and exhibit tag?

5  A.   Yes, it does.

6  Q.   Is it in substantially the same condition it was in, minus

7  that and the dust?

8  A.   Yes.  This also has the fingerprint dust on it, as well,

9  but it is.

10 Q.   That was found in the Knaack toolbox?

11 A.   Yes, it was.

12 Q.   I've got one more.  I'm going to show you Government's

13 Exhibit 10.

14 A.   Okay.

15 Q.   What type of firearm are you looking at?

16 A.   This is a Ruger rifle.  It's a model M77.  It's a 7

17 caliber.  Serial number is 7818623.

18 Q.   Does that one also have a scope sight on top of it?

19 A.   Yes, it does.

20      Excuse me.  I should have said "7 mm."  That's the caliber

21 right there.

22 Q.   Except for all the stuff you noted before, is that in

23 substantially the same condition as when you recovered it on

24 February 3, 2016?

25 A.   Yes, it is.  This also has the white fingerprint residue

Miller - D

1   on it.

2   Q.   I'll also show you Government's Exhibit 31-1.

3        Okay.  What are we looking at here?

4   A.   The top rifle is the Winchester, as found in the box.  The

5   middle rifle is this Ruger that I'm holding in my hands, and

6   the bottom one is the Remington.

7   Q.   We'll go ahead and add that to the evidence table, and

8   then we'll move on.

9   A.   Got it.

10  Q.   Yeah.  Thank you.

11       Okay.  Agent Miller, did you have any other primary

12  responsibilities at that February 3rd search warrant?

13  A.   Well, as the evidence technician, when everything is

14  finished, we go through and double-check all the items that I

15  would have written down on the items seized list, make sure

16  that I've got them all, seal them, and then they get prepared

17  for transport.

18  Q.   Did you also participate in the February 16th warrant?

19  A.   Yes, I did.

20  Q.   And just remind us one more time.  What were those

21  warrants for on the 16th?

22  A.   On the 16th they were for the person of Mr. Robert Mahler.

23  They were for the residence, his residence, and for his

24  vehicle.

25  Q.   And what were your responsibilities on that day?

Miller - D

1   A.   On that day I was assigned as the sketch artist or

2   schematic artist as well as I assisted with the search;

3   however, prior to all of that, I assisted with surveillance.

4   Q.   You assisted with surveillance.  What do you mean?

5   A.   Myself and another agent were observing the residence.  We

6   saw Mr. Mahler leave the residence in a Kia.  We reported that

7   to other agents in the area, as well as local law enforcement,

8   where over the radio I heard a traffic stop had occurred.

9   Q.   Did you do any of the searching at Mr. Mahler's residence?

10  A.   I did.  I did some searching in the office, as well as in

11  the workshop, which was separate from the residence.

12  Q.   And Mr. Mahler's workshop, did you find anything?

13  A.   I did.

14  Q.   What did you find?

15  A.   A large container that was sealed and had ammunition

16  inside of it.

17  Q.   Any idea about how much ammunition was in there?

18  A.   In excess of 3,000 rounds.

19  Q.   Was it all one type of ammunition?

20  A.   No.  It was multiple calibers.

21  Q.   And you also mentioned you were the sketch artist.

22  A.   Yes, I was.

23  Q.   What does that mean?  What are you sketching?

24  A.   Well, in order to better clarify where we're finding

25  items, we do a sketch or a schematic of the residence when

Miller - D

1  we're in it.  There's multiple rooms, so if I say, "I found

2  something in the workshop," for example, you would have a clear

3  idea in trial later on that that's where the workshop was or

4  something.

5  Q.    Like a floor plan?

6  A.    Yeah.  Similar.

7  Q.    Okay.  So 70-1, what is this?

8  A.    That's the floor plan that I did and my signature on it.

9  And note that's not to scale.

10 Q.    It's not to scale?

11 A.    It's my best effort at scale, but not quite there.

12 Q.    Anything else about this sketch that you want to comment

13 on?  Let's see.  It's got your name and your signature.  Is the

14 date of the search warrant correct on this document?

15 A.    That would be when the search warrant ended.  It went from

16 the 16th to the 17th.

17 Q.    Oh, it ended after midnight?

18 A.    Yeah.  It was a long evening.

19 Q.    So are you familiar, then, with the layout of the Mahler

20 residence?

21 A.    Yes, I am.  I should mention another thing I assisted with

22 was helping clear the residence.  After the traffic stop had

23 occurred or I had heard the traffic stop occurred,

24 Ms. Kristine Yates arrived at the residence.

25 Q.    Who's Ms. Kristine Yates?

Miller - D

1   A.    She was identified as Mr. Mahler's wife at the time.

2   Myself and another agent stopped Ms. Yates before entering the

3   property and informed her of the search warrant, and she

4   offered to let us into the house, as well as expressed concern

5   to get the dog out of the house.  So I communicated that

6   information to my boss, and we waited for a couple more agents.

7   She unlocked the doors, retrieved the dog, and we cleared the

8   residence for any threats.

9         And while we were in there --

10  Q.    What does clearing the residence mean?  What does that

11  actually involve?

12  A.    It's officer safety.  So as we're entering the residence,

13  we're making sure that nobody is hiding in there that might be

14  intending to hurt us.  It literally just means looking for

15  bodies of people or anywhere that a person could hide.

16  Q.    Were you able to search every single room?

17  A.    We were not.

18  Q.    Why not?

19  A.    As we went through the main door, which on the sketch of

20  the residence, dead center -- can they see the cursor?

21  Q.    We might be able to zoom in a little bit on the house

22  part.

23        MS. WIGHT:  Can we see Agent Miller's cursor or no?

24  I might --

25        THE WITNESS:  Oh no, I might have broke it.  Sorry.

Miller - D/X

1   BY MS. WIGHT: (Continuing)

2   Q.   I think we were going to zoom in --

3   A.   If you don't mind, I think I can do this.  That would be

4   the entrance right there (indicating.)

5   Q.   To the home?

6   A.   Yes.

7   Q.   You mentioned you were not able to check every room.

8   A.   Correct.  As we entered the residence, we could not access

9   the study, which is on the bottom, as well as this bedroom up

10  top in the northeast and southeast corners.  They were locked.

11  Q.   What was your understanding of what was in those rooms?

12  A.   As we were -- counted the locked doors, we called back to

13  Ms. Yates, who stated that those rooms were her husband's and

14  she did not have access to them.

15          MS. WIGHT:  No further questions.

16          THE COURT:  Okay.  Cross?

17          MR. WARREN:  Thank you.

18

19                  CROSS-EXAMINATION

20  BY MR. WARREN:

21  Q.   Thank you.  I would like to stay there.  Maybe keep that

22  exhibit up.

23      So you were talking with Mr. Mahler's wife when you helped

24  execute the search warrant for Mr. Mahler?

25  A.   Yes, I spoke with her.

Miller - X

1    Q.    And you were at their residence together?

2    A.    Yes, sir.

3    Q.    Were you a special agent -- oh, I don't see who was the

4    author of this, but --

5    A.    Would that be Special Agent Jacobs?

6    Q.    Yes.  Were you with him?

7    A.    Yes, I was.

8    Q.    Okay.  And he and Special -- and so you both were talking

9    to Ms. Yates, who was surprised; is that correct?

10   A.    Yes, she was.

11   Q.    She had just came from a birthday party?

12   A.    I don't recall.

13   Q.    Oh, okay.

14   A.    To clarify my conversation with her, it was brief.  I

15   stepped back maybe five feet to call my boss and inform her

16   that we had contacted Ms. Yates and asked permission to go to

17   the house with her.

18   Q.    Okay.  Fair enough.

19        And you searched the workshop area yourself; is that

20   correct?

21   A.    No.  Well, not myself; but I was in there, yes, with other

22   agents.

23   Q.    Okay.  So you and other agents searched the workshop area?

24   A.    Yes, sir.

25   Q.    Finding a container of ammunition?

Miller - X

1    A.    Yes, sir.

2    Q.    Not finding any firearms?

3    A.    I don't believe any were found.  I joined towards the end

4    of the search after I finished my sketch.

5    Q.    I see.

6    A.    So if I recall correctly, the search had started at the

7    entrance on the west side.  By the time I got there, I was

8    helping with that east wall at the end, and that's where I

9    found that ammunition.

10   Q.    Okay.  Well, you don't recall any firearms being found in

11   the shop?

12   A.    No, I do not.

13   Q.    Okay.  Shortly after your search, were you made aware that

14   firearms were found in that shop?

15   A.    Yeah.  I was told by Special Agent Johnson.

16   Q.    And Mr. Mahler voluntarily called the authorities and told

17   them about those firearms; correct?

18   A.    That's correct.  I think it went through Pretrial, if I

19   remember correctly; but, yes, he initiated it.

20   Q.    That's correct.  It went through U.S. Pretrial Services.

21            MR. WARREN:  Could we have Government Exhibit 24?

22   BY MR. WARREN: (Continuing)

23   Q.    So did you read the affidavit for the search warrant to

24   search this toolbox?

25   A.    Yes, sir.

Miller - X

1    Q.    One of the things -- and an affidavit was based on the

2    statements that Connie Daggett had made to Special Agent

3    Amanda Johnson?

4    A.    That was my understanding -- that the Daggetts had

5    cooperated in this.

6    Q.    One of the things you were looking for in this toolbox

7    were bow and arrows; is that correct?

8    A.    I don't remember a bow and arrow being on the items to be

9    seized, but there was one in that toolbox.

10   Q.    There was a bow and arrow in that toolbox?

11   A.    I believe so, yes.

12   Q.    Was it listed in the property anywhere?

13   A.    No.  Because we did not seize it.

14   Q.    Oh, okay.  As we looked through all these photos, we saw

15   no bow and arrow.

16   A.    Okay.

17   Q.    So you're saying there was a bow and arrow in there, but

18   it wasn't listed on the property receipt?

19   A.    No.  It wouldn't be listed unless we seized it.

20   Q.    So we have no proof, other than your word, that there was

21   a bow and arrow in there?

22   A.    That would be correct.  As well as other agents on the

23   scene.

24   Q.    Okay.  And so, to go back, this was February 3, 2016?

25   A.    Yes, sir.

Miller - X

1  Q.   And when you -- you arrive about 10:00 a.m. at the

2  Daggett's residence?

3  A.   That sounds correct.  Yes, sir.

4  Q.   You understand them to be cooperating persons in this

5  case?

6  A.   That was my understanding.  This was not a "we need to

7  search the residence for bodies to clear."  They met us

8  outside, or at least one of them did.

9  Q.   And did Ms. Daggett give you the key to this box?

10 A.   Not me directly, but I know that there were keys on scene.

11 I don't recall who they came from.

12 Q.   But you got the key to the Knaack toolbox?

13 A.   I did not open it, but the key was put in there by another

14 agent.

15 Q.   Oh, I see.  Okay.

16      So another agent opened it, but you searched it?

17 A.   That's correct.

18 Q.   Okay.  Were you aware that Ms. Daggett had put items in

19 and out of this toolbox?

20 A.   It was my understanding that the toolbox and the items

21 were Mr. Mahler's and things had not changed places, or things

22 had not gone in and out of them.

23 Q.   Okay.  Are you aware that Connie Daggett gave the other

24 agent the keys?

25 A.   I believe it came from Connie; but, again, I didn't see if

Miller - X/ReD

1  it was Connie or Bill that gave them.  I know that keys were

2  provided.

3  Q.    Okay.  On your direct examination, you refer to a room

4  being Mr. Mahler's bedroom.

5  A.    That's --

6  Q.    That was locked?

7  A.    That's correct.

8  Q.    Well, that's really a spare bedroom.  Would you agree?

9  A.    From what we were told by Ms. Yates at the scene, she

10  stated that was his bedroom and his office.

11  Q.    I see.  So did you understand that Mr. and Mrs. Mahler

12  don't share their bedroom or --

13  A.    I don't know if they share a bedroom.  I don't know about

14  their relationship, but it seemed that she didn't have access

15  to those and that they were his.  I didn't participate in her

16  interview.

17  Q.    Oh, I see.

18  A.    Yeah.  She called out to us when I said the doors are

19  locked, and she said they're his.

20            MR. WARREN:  Okay.  Thank you.  No further questions.

21            MS. WIGHT:  Just one quick question.

22

23                    REDIRECT EXAMINATION

24  BY MS. WIGHT:

25  Q.    Agent Miller, why wouldn't you seize that bow and arrow?

Miller - ReD

1    A.    To my recollection, it was not on the search warrant, and

2    he's not prohibited from having a bow and arrow.

3              MS. WIGHT:   No further questions.

4              THE COURT:   May this witness be excused?

5              MS. WIGHT:   Yes, Your Honor.

6              MR. WARREN:   Yes.

7              THE COURT:   You're free to go.   Thank you.

8         Call your next.

9              MS. WIGHT:   Government calls Special Agent

10   Ryan Hultgren.

11             THE COURT:   Please come forward and be sworn.

12             DEPUTY COURTROOM CLERK:   Please raise your right

13   hand.

14

15                    RYAN HULTGREN,

16   called as a witness in behalf of the Plaintiff, being first

17   duly sworn, is examined and testified as follows:

18

19             THE WITNESS:   I do.

20             DEPUTY COURTROOM CLERK:   Thank you.   Please have a

21   seat.   State your full name and spell it for the record.

22             THE WITNESS:   Special Agent Ryan Hultgren,

23   H-u-l-t-g-r-e-n.

24

25   ///

Hultgren - D

1                         DIRECT EXAMINATION

2    BY MS. WIGHT:

3    Q.   Good morning, Agent Hultgren.

4    A.   Good morning.

5    Q.   Where are you employed?

6    A.   I'm employed with the Bureau of Alcohol, Tobacco, Firearms

7    & Explosives.

8    Q.   And that's ATF?

9    A.   That's correct.

10   Q.   How long have you been an ATF special agent?

11   A.   Since March of 2014.

12   Q.   And what office are you assigned to?

13   A.   I'm assigned to the Chicago Crime Gun Strike Force in the

14   Chicago field division.

15   Q.   Were you assigned anywhere before Chicago?

16   A.   I was.  I was assigned to the Portland field office here

17   in Portland, Oregon.

18   Q.   And when did you transfer?

19   A.   In May of 2017.

20   Q.   As part of your duties as an ATF agent in the Portland

21   office, did you participate in any search warrants?

22   A.   I did.

23   Q.   And have you participated in a lot of search warrants

24   during your career?

25   A.   Yes, I have.

Hultgren - D

1  Q.   And were you involved in particular search warrants
2  related to the investigation of Robert Mahler?
3  A.   Yes, I was.
4  Q.   Let's go ahead and talk about that.  Are you familiar with
5  the search warrants in that investigation?
6  A.   Yes, I am.
7  Q.   What day of the search warrant executions did you
8  participate in?
9  A.   February 3rd and February 16th of 2016.
10 Q.   So you participated in both warrants?
11 A.   I did.
12 Q.   Let's go ahead and start with February 3, 2016.
13 A.   Okay.
14 Q.   Let's go ahead and start with February 3, 2016.  What
15 search warrants were happening there?
16 A.   We executed on that day three search warrants for
17 containers belonging to Robert Mahler at the garage of the
18 Daggetts.
19 Q.   And what was your primary role during that search?
20 A.   I was the photographer and evidence custodian for what we
21 titled Safe 2.
22 Q.   Is Safe 2 also known as the low footlocker cabinet?
23 A.   Yes, that's correct.
24 Q.   You said you were the evidence custodian for that safe and
25 the photographer?

Hultgren - D

1    A.    That's correct.

2    Q.    Can you tell us a little bit about what that entails?

3    A.    Sure.  So as a photographer, your role and responsibility

4    is to document the scene both before and after, also during the

5    execution of the warrant.  So we would go in initially upon the

6    scene being cleared and take photographs to document what the

7    scene actually looks like so you can refer back at a later

8    time.

9         And then at the conclusion of the warrant, again, you

10   document the scene just to make sure you kind of document how

11   the scene looks afterwards.  You didn't destroy anything or

12   mess anything up, and you can go back and take a look and see

13   what you had there.

14   Q.    Agent Hultgren, I'm going to ask you to slow down just a

15   little bit, just so we can keep up, and I'll try to do the

16   same.

17        But it sounds like you took photographs of everything, not

18   just footlocker 2?

19   A.    That's correct.

20   Q.    Did you take photographs of the Liberty Safe before and

21   after it was opened?

22   A.    Yes, we did.

23   Q.    Did you also take a photograph of the keys and combination

24   that were used to open the Liberty Safe?

25   A.    Yes, I did.

Hultgren - D

1    Q.    Have you reviewed those photos?

2    A.    I have.

3          MS. WIGHT:  Can you please pull up Government's

4    Exhibit 21-1.

5    BY MS. WIGHT: (Continuing)

6    Q.    What's in this photograph?

7    A.    This is a photograph of the unopened Liberty Safe in

8    the -- in the garage of the Daggetts.

9          MS. WIGHT:  Please pull up Government's Exhibit 19-3.

10   BY MS. WIGHT: (Continuing)

11   Q.    What are we looking at here?

12   A.    Again, this is the Liberty Safe.  And in this photograph,

13   the execution -- or the warrant has been executed, and the safe

14   is now opened.

15   Q.    And can you tell us what we can see just by looking at

16   this photograph?

17   A.    Yes.  You have some cases that would hold long guns, long

18   firearms.  You also have a multitude of what are called

19   load-bearing vests, which would contain, you know, pistol

20   holsters and ammunition magazines, things of that nature, and

21   it's very full.

22         MS. WIGHT:  Let's turn to Government Exhibit 22-2.

23   BY MS. WIGHT: (Continuing)

24   Q.    What's this a photograph of?

25   A.    This is a photograph of a set of keys and a combination to

Hultgren - D

1   a safe.

2   Q.   And what's your understanding of what those items are?

3   A.   Used to open the safes there at the garage.

4   Q.   Were you actually present when some of the items were

5   pulled out of that Liberty Safe?

6   A.   Yes, I was.

7   Q.   And were you aware that any firearms were pulled out of

8   that safe?

9   A.   I'm aware of that.

10  Q.   Did you photograph those firearms?

11  A.   Yes, I did.

12  Q.   Have you reviewed those photos?

13  A.   I have.

14  Q.   Have you also reviewed some of the firearms that were

15  pulled out of that safe?

16  A.   Yes, I have.

17  Q.   Agent Hultgren, I'm going to hand you what's been marked

18  as Government's Exhibit 1 and some gloves.

19       Take your time and please take a look at that.

20       Have you taken a look at it?

21  A.   I have.

22  Q.   What do you have there?

23  A.   This is a Walther P22, .22 caliber pistol, with a serial

24  number of L186856.

25  Q.   Again, I'll ask you to slow down just a little bit when

Hultgren - D

1  you're giving numbers.  We'll make sure that the court reporter

2  can catch them.

3  A.    Okay.

4  Q.    Can you describe what the item looks like?

5  A.    Yes.  This is a small black .22 caliber pistol.  It's a

6  hammer cock pistol with a safety.

7  Q.    Why were you wearing your gloves for that one?

8  A.    It has residue from forensic testing that's been conducted

9  on the firearm.

10  Q.    Does that one also have one of those zip tie things?

11  A.    It does.  That is denoting the firearm is safe.

12  Q.    And an exhibit tag?

13  A.    Yes, that's correct.

14  Q.    And with all those things, is it substantially in the same

15  condition as it was when you photographed it on February 3,

16  2016?

17  A.    Yes, it is.

18  Q.    Agent Hultgren, I'm also going to have you look at

19  Government Exhibit 26-1 on your screen.  What is this?

20  A.    This is the photograph of the pistol I'm holding here in

21  my hands.  That was taken on the night of the search warrant or

22  the day of the search warrant.

23  Q.    What's different about it in the photograph?

24  A.    That's an -- it's located in the box at that time which it

25  was found in.  There's no evidence tag at the time.  There's

Hultgren - D

1    also no zip tie, and none of the forensic residue is located on

2    the firearm.

3    Q.    Were there any other firearms that were taken out of

4    Liberty Safe that you photographed?

5    A.    Yes, there were.

6    Q.    I'm going to show you what's been marked as Government's

7    Exhibit No. 2.  What is that?

8    A.    This is an FEG model.  It's a pistol with FP9.

9    9 caliber -- or 9 mm.  Serial number of F39412.

10   Q.    Can you describe what type of firearm that is?  Is it a --

11   A.    It's a pistol.

12   Q.    It's a pistol.

13         And does it also have one of those zip ties on it?

14   A.    It does have a zip tie with the evidence tag, and this one

15   also has the DNA -- I'm sorry, fingerprint testing residue on

16   it.

17   Q.    Is it in substantially the same condition as it was in

18   when you photographed it on February 3, 2016?

19   A.    It is.

20   Q.    Just a moment.

21         Just to explain a little more -- you are a photographer.

22   Can you just tell us what the process that you worked with --

23   the other agents who were pulling these out of the safe?

24   A.    Yeah.  So, typically, as the photographer, your role is

25   to, once an item is found -- and this is once the warrant is

Hultgren - D

1    actually being executed -- once an item is found, the person

2    who found it will call the photographer over, and you will

3    photograph the item as they found it in place.

4        So in this -- in this instance, where it was found in the

5    safe, you take a photograph and then pull it out to take a

6    closer photo of the -- of the firearm.

7        In this case, we had a lot of firearms coming out, a lot

8    of ammunition being recovered.  So that did not happen for

9    every single photograph.  But, typically, there is a photograph

10   of at least -- in the -- in the container it was found in or

11   the location it was found in in the safe.

12   Q.   Did you go over and verify the item and item number with

13   that agent?

14   A.   Yes, you would.  The search warrant item number.  So that

15   from my records it would be able to be matched up to them.

16   Q.   When you say your records, what sort of record do you keep

17   as a photographer?

18   A.   I create a photo log, and that's going to document the

19   search warrant item number for the specific item.  It's going

20   to document the photo number.  So one through however many -- a

21   thousand.  And then it's going to document where it was found

22   and, at times, by who it was found.

23   Q.   All right.  We'll get back to Exhibit 2 here.  We're also

24   going to pull up Exhibits 27-1.  Can you take a look at this?

25   What are we looking at here?

Hultgren - D

1    A.    This is the -- this is the FEG in the -- in the bag it was

2    found with the -- with the -- I believe there's a holster in

3    that photograph as well.

4    Q.    Maybe if we pull 27-2, it's a better picture.

5    A.    Yes.  So, again, that's the FEG that came out of the bag

6    and the pistols that were contained within.

7    Q.    And what's different there?

8    A.    The magazines.  Sorry.

9    Q.    Oh, magazines?

10   A.    Yes.

11   Q.    Are those magazines loaded?

12   A.    They are.

13   Q.    What's different about the gun in this photograph than the

14   firearm in your hand?

15   A.    Again, no evidence tag, no zip tie, and no forensic

16   testing residue, and it is contained within a holster in this

17   photograph.

18   Q.    Were there any other pistols that you photographed that

19   were seized from that Liberty Safe?

20   A.    Yes, there were.

21   Q.    I'm going to show you what's been marked as Government's

22   Exhibit No. 3.

23         What is that?

24   A.    This is a Glock, model 21, .45 caliber pistol, with a

25   serial number of BGX455US.

Hultgren - D

1   Q.   And was this one of the firearms that you found or that

2   were -- that were found in the safe that you took a photograph

3   of?

4   A.   Yes, it is.

5   Q.   And is it in substantially the same condition it was in

6   when you photographed it after being pulled from the Liberty

7   Safe?

8   A.   It is.

9   Q.   It also has the zip tie and the residue and the exhibit

10  tag?

11  A.   That's correct.

12          MS. WIGHT:  Can we pull up Exhibit 28-1?

13  BY MS. WIGHT: (Continuing)

14  Q.   What are we looking at in Exhibit 28-1?

15  A.   This is the previously mentioned Glock 21 here, with a

16  loaded magazine.  It's in the box.  Most likely a Glock pistol

17  box is what it looks like.  It also has a holster with it.

18  Q.   Is this what the firearm looked like when you took the

19  photograph of it when it was pulled from the Liberty Safe?

20  A.   Yes, it is.

21  Q.   Were there any other pistols that you took photographs of

22  from the Liberty Safe?

23  A.   Yes, there were.

24  Q.   I'm going to show you what's been marked as Government's

25  Exhibit 4.  Please take a look at that and tell us what it is.

Hultgren - D

1    A.    This is a Sig Sauer, model SP2430, .40 caliber pistol,

2    with a serial number of SP0017865.

3    Q.    Was this firearm pulled from the Liberty Safe and

4    photographed by you?

5    A.    Yes, it was.

6    Q.    And it's in substantially the same condition it was in

7    when you took that photograph?

8    A.    Yes, it is.

9              MS. WIGHT:  Can we pull up 32-1?

10   BY MS. WIGHT: (Continuing)

11   Q.    What are we looking at here?

12   A.    So this is a photograph as the Sig Sauer is located in

13   what I previously described as a load-bearing vest.  So as you

14   can see, it has the pistol area for the pistol there.  Just a

15   holster.  Yep.  And then also that would contain a location for

16   ammunition magazines.

17             MS. WIGHT:  Do we have 32-2?

18   BY MS. WIGHT: (Continuing)

19   Q.    What is 32-2?

20   A.    That is an additional picture, more of a closeup of this

21   Sig Sauer pistol, with the magazine that was located with the

22   firearm.

23   Q.    Okay.  Agent Hultgren, in addition to these pistols, were

24   there any rifles that were removed from the Liberty Safe that

25   you photographed?

Hultgren - D

1    A.    There were.

2    Q.    I'm going to show you what's been marked as Government's

3    Exhibit 5.  This one, you may need to stand up for it.

4          What is that?

5    A.    This is a Winchester, model 74 rifle.  It's a .22 caliber.

6    The serial number is 101360.

7    Q.    Can you just describe for us the style of this gun?

8    A.    This is a -- this is just a long rifle, bolt action, or

9    actually -- it's not bolt action, actually.

10   Q.    Does it have -- is that a scope attached to the top of it?

11   A.    Yeah, this is a scope attached to it.  No magazine

12   located.  So it would probably just be one round individually

13   or maybe there's a magazine for multiple rounds to be fed.

14   Q.    And was that one of the firearms that was pulled from the

15   Liberty Safe that you took a photograph of?

16   A.    Yes, it was.

17   Q.    And it has the zip tie and the dust?

18   A.    It does.

19   Q.    Is it in substantially the same condition, otherwise,

20   that -- of when you took the photo on February 3, 2016?

21   A.    Yes, it is.

22   Q.    I'll have you take a look now on your screen of

23   Exhibit 37-1.  And what's this showing?

24   A.    That is a photograph of this Winchester, model 74.

25   Q.    Now, tell us a little bit about this photograph.

Hultgren - D

1  A.   So as we talked about a little bit before, the goal is to

2  take a photograph of all the firearms or all the evidence items

3  located as they're found.   In this case, it looks like the

4  firearm was already placed into a box and tagged.   So what that

5  tells me is I was probably, at that moment, counting ammunition

6  or doing something along those lines and wasn't able to get the

7  gun with where it was actually located in the safe.

8  Q.   And why is it zip-tied up in multiple locations?

9  A.   So the reason for the zip ties, as they are there, is to

10  keep the firearm in place in this box and to keep it from

11  moving around.   What we're trying to do there is preserve any

12  forensic evidence, DNA or prints, things like that.

13       Also, this isn't the strongest box.   It's going to keep

14  things from falling out.

15  Q.   Okay.   I am going to ask Agent Johnson to grab this real

16  quick.

17       Okay.   So in addition to being the photographer on the

18  February 3rd search warrant, you said you were also the

19  evidence custodian.   And that was for the footlocker cabinet?

20  A.   Yes.   Correct.

21  Q.   Did you have any photographs that were taken of the

22  footlocker both before and after it was open?

23  A.   I did.

24  Q.   We're going to pull up Exhibits 23-1, and tell us what

25  we're looking at there.

Hultgren - D

1   A.   So this is the container that we titled Safe 2.  We were

2   discussing it as the footlocker here, and it's currently

3   unopened at this time.

4   Q.   Does this actually have locks on it somewhere?

5   A.   It does.  So it has two locks.  Kind of the closest to you

6   at the top and the bottom.

7   Q.   Those little circle silver things?

8   A.   That's correct.

9   Q.   And how about Exhibit 23-2?  What is this photograph of?

10  A.   So that is the same footlocker container, and it's now

11  opened.  So the warrant has been executed.  In that photograph,

12  you have several pistol -- several pistol holsters and just a

13  multitude of ammunition boxes located there.

14  Q.   Is there actually ammunition in those boxes?

15  A.   There is.

16  Q.   Do you know if there are any firearms found in that

17  footlocker?

18  A.   I do not believe there were.

19  Q.   But in addition to that ammunition in the photograph, did

20  you take photographs of anything else that was inside of that

21  cabinet?

22  A.   I did.

23  Q.   What other types of things did you photograph?

24  A.   So there were -- the ammunition boxes, as they came out,

25  several of the -- several of the boxes had some initials

Hultgren - D

1   located on them, and it was also a shipping label that was

2   photographed.

3            MS. WIGHT:  Can we pull up Exhibit 38-1?

4   BY MS. WIGHT: (Continuing)

5   Q.   What is this an exhibit of?

6   A.   So this is the shipping label I just described.  On it

7   it's addressed to a Bob Mahler at Center 50+, 2615 Portland

8   Road Northeast, Salem, Oregon.

9   Q.   In addition to the Liberty Safe, the footlocker, you also

10  took photographs of the stuff that came out of the toolbox?

11  A.   Correct.

12  Q.   Did you take photographs of the firearms that were seized

13  from the toolbox?

14  A.   I did.

15  Q.   Did you take photographs of the magazines and the ammo

16  seized from the toolbox?

17  A.   I did.

18  Q.   We're going to take a look at Government's Exhibit 36-2.

19       What is this?

20  A.   So these were the -- the boxes of ammunition with the

21  initials "RM" located on them.

22  Q.   So your understanding is these boxes had ammunition

23  inside?

24  A.   That is my understanding.

25  Q.   Okay.  Agent Hultgren, we're going to actually turn your

Hultgren - D

1  attention now to February 3rd, and we'll move to February 16th.

2  A.    Okay.

3  Q.    Do you remember what February 16th -- what the search

4  warrants were looking for on that day?

5  A.    Yeah.  So we had three federal search warrants.  One for

6  the residence of Mr. Mahler, one for his person, and one for

7  his Kia Sorento SUV.

8  Q.    And what was your role during those warrants?

9  A.    I was the evidence custodian for the overall execution of

10  all three warrants, and I searched the Kia Sorento.

11  Q.    So you collected the evidence for all three of those

12  warrants?

13  A.    That's correct.

14  Q.    And then you said you also were a searcher at the car?

15  A.    That's correct.

16  Q.    Let's actually start with the car.

17        Okay.  You said it was a Kia Sorento.  Can you describe

18  what that looks like?  What kind of car is that?

19  A.    A smaller SUV.  Four doors with a rear-opening hatch.

20  Q.    Tell us your process.  How did you begin your search of

21  that vehicle?

22  A.    So I had several agents assisting me.  We -- the

23  photographs were taken of the vehicle before the search, and

24  then we -- we began the search of the vehicle.  The back part

25  of the vehicle contained a multitude of items.  It was kind of

Hultgren - D

1  packed to the top.  We removed all those items, searched them
2  individually, and continued on to the -- to kind of the
3  compartments at the bottom of the -- underneath where you would
4  store your spare tire or your jack, your car jack.
5  Q.   What did you find?
6  A.   So in that -- in that storage area with -- underneath the
7  floor mats, we located a -- I located a black bag.  Inside it
8  contained a Glock firearm, a Glock pistol.
9  Q.   Do you remember if that Glock pistol was loaded?
10 A.   It was, with a full magazine.
11 Q.   Were there any other magazines with it?
12 A.   There were five additional magazines.
13 Q.   And were some of those magazines also loaded?
14 A.   Yes, they were.
15 Q.   Do you know if photographs were taken of this car and the
16 gun during that search?
17 A.   There were photographs taken.
18 Q.   Let's take a look at these photographs.  Let's look at
19 63-1.  What is this?
20 A.   So that is the -- that's the Kia Sorento with the back
21 trunk opened and pretty much all the items I described -- just
22 a multitude of items being in the back there.
23 Q.   Let's turn now to 64-1.  What is -- what do we see here?
24 A.   So here we have the first mat.  It's just the soft mat is
25 lift up -- lifted up, which revealed an additional hard mat

Hultgren - D

1   below that.

2   Q.    Can you read the license plate number in this photograph?

3   A.    I can.  It's 169 FAF Oregon tag.

4   Q.    Who is standing in that picture?  Is that you?

5   A.    That is me.

6   Q.    Can we turn to page 65-1?  What do we see here?

7   A.    Now, that hard mat has been lifted.  You have the

8   vehicle's jack on the right and on the left you have that black

9   bag described, which contains the Glock pistol and the

10  ammunition magazines.

11  Q.    And 66-1?

12  A.    And this is the Glock 21 with a holster and three

13  magazines with one magazine inserted -- inserted in the gun.

14  Q.    And, finally, 66-2.  What is in this photograph?

15  A.    The firearms have now been made safe by me.  You have four

16  magazines to the right of the gun, and you have several other

17  magazines to the -- to the left.

18  Q.    What do you mean "made safe"?

19  A.    I removed the magazine, which contained ammunition, and

20  locked the slide to the rear.

21  Q.    I'm now going to show you what's been marked as

22  Government's Exhibit 6.

23        Please take a look at that.  Hold on.  We might have a

24  correction on the exhibit number.

25        We're going to correct that.  It's not 6.  It's

Hultgren - D

1  Government's Exhibit 11.  Thank you.

2      What is this?

3  A.   So this is the Glock 21, .45 caliber pistol, with the

4  serial number LSE281, which I have just described.

5  Q.   Is this a firearm that you found in the vehicle belonging

6  to Robert Mahler?

7  A.   Yes, it is.

8  Q.   And was that on February 16, 2016?

9  A.   Yes, it was.

10 Q.   And is that firearm in substantially the same condition it

11 was in when you found it on February 16, 2016?

12 A.   It is.

13 Q.   Okay.  Agent Hultgren, you mentioned you were the

14 custodian for all the evidence that was seized from the warrant

15 on February -- or February 16, 2016.  Did that include all the

16 items from the residence as well as the vehicle?

17 A.   It did.

18 Q.   And did you review your evidence log that you created at

19 the warrant execution?

20 A.   Yes, I did.

21 Q.   Do you remember if there were any guns found at the house?

22 A.   There were firearms located.

23 Q.   Do you remember if there was any ammunition found at the

24 house?

25 A.   There was ammunition located as well.

Hultgren - D

1   Q.   Do you remember if there were any keys found?

2   A.   Yes, there were keys.

3   Q.   Was that one of the items you were actually searching for

4   in the search warrant?

5   A.   It was.

6   Q.   And why would you be looking for keys?

7   A.   Based on the warrant executed on February 3rd, we were

8   looking for keys that would open those safes and those

9   containers to prove dominion over those items.

10  Q.   And there were keys found in the residence?

11  A.   Yes, there were.

12  Q.   Did you log those keys in evidence?

13  A.   I did.

14  Q.   And were any of those particular keys actually labeled

15  with where they -- what they opened?

16  A.   Yes, they were.

17  Q.   Do you remember what that label was on that key chain?

18  A.   There was one, in particular, that was labeled "Liberty

19  Safe."

20  Q.   Do you remember where that key was found, according to

21  your log?

22  A.   I believe it was the top dresser drawer inside

23  Mr. Mahler's office.

24  Q.   Let's take a look at Government's Exhibit 61-2.

25       Can you tell us what's in this exhibit?

1    A.    Yes.   So this is the closeup photo of the key I just

2    described with "Liberty Safe" written on it.

3    Q.    And this is the key that you logged into evidence from

4    Robert Mahler's residence?

5    A.    It is.

6          MS. WIGHT:   Your Honor, I'm going to hand

7    Agent Hultgren Government's Exhibit 99.   This would be an

8    additional exhibit that has not been preadmitted, but we have

9    shown it to Counsel.

10          MR. WARREN:   I believe he's laid a proper foundation

11    for it, Your Honor.

12    BY MS. WIGHT: (Continuing)

13    Q.    This is Government's Exhibit 99.   Take a look at that,

14    please.

15          What is that?

16    A.    This is a key that is labeled "Liberty Safe," exactly as

17    shown in this photograph.   "Liberty Safe" on both sides.

18    Q.    Is that the key that you logged into evidence from the

19    Mahler residence on February 16, 2016?

20    A.    Yes, it is.

21    Q.    And is it in substantially the same condition it was in

22    when you logged it into evidence?

23    A.    Yes, it is.

24          MS. WIGHT:   The government offers Exhibit 99.

25          MR. WARREN:   No objection.

Hultgren - X

1          THE COURT:  It will be received.  We can have it

2  marked.

3          MS. WIGHT:  No further questions.

4          THE COURT:  Mr. Warren, questions?

5          MR. WARREN:  Yes.

6

7                      CROSS-EXAMINATION

8  BY MR. WARREN:

9  Q.    Agent Hultgren, I would like to first go with you back to

10  February 3, 2016, when you arrived at the Daggetts' residence

11  at about 10:00 a.m.

12  A.    That sounds about correct.

13  Q.    Were you involved in the reading of the search warrant, or

14  was that Special Agent Amanda Johnson?

15  A.    I do not have that information.

16  Q.    But you are aware that a search warrant was read on

17  February 3, 2016, at the Daggetts' property?

18  A.    That would be standard procedure for us to advise whoever

19  is there of the warrant and provide them with copies.

20  Q.    You were given the keys and the combination to the Liberty

21  Safe at that time?

22  A.    I was not, myself.

23  Q.    Oh, okay.  Who opened the Liberty Safe?

24  A.    I do not recall.

25  Q.    So when you got there, you opened the -- it was already

Hultgren - X

1   opened, and you just inventoried it?

2   A.    No.  As described, as previously stated, by myself, I took

3   photographs of the safes and containers before they were

4   opened.  And upon them being opened, I took additional

5   photographs.  I did not necessarily observe the actual opening

6   of the containers.

7   Q.    Okay.  And you showed us a label with Bob Mahler's name on

8   it from a box?

9   A.    That's correct.

10  Q.    Did you see the date on that box, the date on that label?

11  A.    I did not.

12           MR. WARREN:  Okay.  Can we pull that back up, please?

13           MS. WIGHT:  I think its 38-1.

14           THE WITNESS:  I believe that may say 5, April, 2012.

15  BY MR. WARREN: (Continuing)

16  Q.    Okay.

17  A.    Does that sound accurate?

18  Q.    That sounds right.  We'll put that up here on this board,

19  if that's okay.

20       So we've got -- I'll just put "Special Agent H."  Is that

21  fair?  My writing isn't so good.  Do you agree with that?

22  That's what it says?  2012?

23  A.    The shipping label does say '12.  April '12.

24  Q.    Okay.  2012; right?  April '12?  2012?

25  A.    We'll presume that's correct.

Hultgren - X

1    MR. WARREN:  Okay.  Thank you.  You can take that
2    down now.
3    BY MR. WARREN: (Continuing)
4    Q.   Then you were in charge of the Kia Sorento search.  Well,
5    you were in charge of the searches that occurred at
6    Mr. Mahler's residence.  I was the -- I was the evidence
7    custodian.  I was not the team leader.  I simply logged the
8    evidence.
9        Oh, I see.  And you were present when Mr. Mahler was there
10   during the search?
11   A.   I do believe he was there for a portion of the time, if
12   not all of it.
13   Q.   Okay.  And he was cooperating, as best you could tell?
14   A.   I do not recall any uncooperation.
15   Q.   Okay.  And the gun that you found, did you also see that
16   it was fingerprinted and fingerprint tested?
17   A.   The one in the vehicle?
18   Q.   Yes.
19   A.   It had been.  Correct.
20   Q.   Okay.  And do you know the results of those fingerprint
21   tests?
22   A.   I do not have those.  I do not have that knowledge
23   immediately.
24           MR. WARREN:  No further questions.  Thank you.
25           THE COURT:  Anything further?

Hultgren - X

1          MS. WIGHT:  No, Your Honor.

2          THE COURT:  May this witness be excused?

3          MS. WIGHT:  Yes.

4          MR. WARREN:  Yes.

5          THE COURT:  Thank you.  You're free to go.

6          MS. WIGHT:  Your Honor, we were just -- we had an

7   additional witness show up.  We were going to check in with you

8   to see if now is the time to deal with that, or should we talk

9   about that later?

10         THE COURT:  You want to talk with Mr. Warren and see

11  what you can agree on?  And, if not, we'll take a recess.

12         MS. WIGHT:  Now would be a good time.

13         THE COURT:  There's an agreement reached that we're

14  going to call the witness out of order?

15         MR. WARREN:  We can call the witness out of order.

16  It's the extent of what documents are going to come in.

17         THE COURT:  Let's take a brief break.

18      Members of the jury, I'll have you out.  And everybody

19  will have a bathroom break, and we'll have you back in.  I know

20  what the issue is, and I don't think it's going to take too

21  long to resolve.

22                      (Jury not present.)

23         THE COURT:  I guess, from my standpoint, I -- reading

24  the tea leaves, I believe Mr. Daggett is back; is that right?

25         MS. WIGHT:  That's correct, Your Honor.

Hultgren - X

1          THE COURT:  You want to call him at this time?

2          MS. WIGHT:  Yes, he is -- he just came off work, and

3   I would like to --

4          THE COURT:  I can step away from the bench if the two

5   of you need to continue to talk or if you've resolved how you

6   want to proceed.  Because I know I have these late exhibits as

7   well.

8          MS. WIGHT:  And that's our -- I think we're only

9   planing on offering these two.  We believe we have a very solid

10  hearsay exception to them.  Mr. Warren would like to offer the

11  rest of the bundle, which we don't believe has an exception to

12  admit.

13         MR. WARREN:  Yeah, and --

14         THE COURT:  I haven't seen it, so I don't know what's

15  in it.

16         MR. WARREN:  Your Honor, if I may approach you?

17         THE COURT:  Sure.

18         MR. WARREN:  These are conversations back and forth

19  between both Daggetts and Mr. Mahler that had been previously

20  provided to Mr. Mahler's other attorney, not provided to me.

21      So some of the comments, statements in yellow, I believe

22  are from the Daggetts.  And so I think they're relevant and

23  they give context to all of the statements that were -- that

24  were made in January of 2016 regarding the events that led to

25  ATF being involved.  And I think they're relevant.  I think

Hultgren - X

1   they're statements that, had I known of these, I would have

2   cross-examined Mrs. Connie Daggett about them, and she speaks

3   on them, and we mentioned that they have had conversations in

4   opening statements, and those are the actual texts.

5           MS. WIGHT:  And, Your Honor, we did presume that

6   defense had these, since we received them from defense, and so

7   these are not our exhibits.  These are not government exhibits.

8           MR. WARREN:  They are government exhibits, if they're

9   going to admit them now.

10          MS. WIGHT:  Oh, that's correct, but --

11          THE COURT:  Don't.  Stop.  Don't talk over one

12  another, please.

13      Anything else I need to hear?

14          MR. WARREN:  Yes.  I believe they're admissible

15  because of the fact that Ms. Daggett talked about conversations

16  she had with Mr. Mahler out of town, and those authenticate

17  those conversations she's had with them out of town.  They were

18  texts.

19          MS. WIGHT:  I do not believe, though, that

20  Mr. Daggett will be able to authenticate those.  I do

21  understand Mr. Warren's position that if he had realized he had

22  these documents or had gotten them from prior counsel earlier,

23  he might have been able to talk to Ms. Daggett about these, and

24  he was not given the opportunity to do so.

25          MR. WARREN:  I think that Mr. Daggett can

Hultgren - X

1  authenticate them because those were texts to his phone.  So

2  they weren't from two separate phones.  They were from

3  Mr. Bill Daggett's phone, and I think he can -- I think he

4  knows what his wife was texting to Mr. Mahler as well.

5          MS. WIGHT:  I believe Mr. Daggett will say that he

6  did allow Connie to use his phone to text.  I do not believe

7  he'll know what Connie said or her statements.

8      Also, those are text messages from different dates,

9  Your Honor.  Although, it is in a series, we're looking to just

10 enter an exhibit of one day.

11         THE COURT:  So these were text messages from

12 Mr. Daggett's phone, copied and provided to the defense counsel

13 in discovery?

14         MS. WIGHT:  No, they were actually text messages from

15 Mr. Mahler's phone that Mr. Mahler and his counsel provided to

16 us prior to the last trial date.

17         MR. WARREN:  No.  No.  No, I didn't provide these.

18         MS. WIGHT:  Oh, from Mr. Mahler's other attorney from

19 the last trial date.

20         THE COURT:  You're the third lawyer, so they were

21 provided by the previous lawyer; is that right?

22         MS. WIGHT:  Mr. Tindell.

23         THE COURT:  Mr. Tindell.

24         MR. WARREN:  Yes.

25         THE COURT:  You're asking for the two documents, and

Hultgren - X

1   you're asking for all of them to be admitted.

2             MR. WARREN:  Yes.

3             THE COURT:  They are relevant.  They come from the

4   phone.  I'm going to allow them to be admitted as a package.

5   You can cross-examine as you choose.  I think it is clear they

6   come -- they're relevant, and there is some corroborating

7   information in there that bolsters, I think, the testimony; but

8   as a package, I think it best is admitted, and you're allowed

9   to cross-examine.  You can stay with the two you want.

10            MS. WIGHT:  Thank you, Your Honor.

11            THE COURT:  All right.  Here's the two.  Just admit

12  the whole package.  We'll admit the whole package, and then you

13  can use the top two or the rest of it as you choose.

14       The whole packet will be admitted as Government's 100.

15            MS. WIGHT:  Also, Your Honor, we only have our two

16  pages loaded up electronically, but I'm assuming we can work

17  the Elmo for the others.

18            MR. WARREN:  That's fine.

19            THE COURT:  Is there a way we can go back,

20  Ms. Kramer, and scan the remaining documents in and email them

21  all to the government?

22            MS. WIGHT:  I think we have them scanned.  How long

23  will that take, Doug?

24            THE COURT:  Will it work that way?

25            MR. ANGEL:  The problem, Your Honor, is it's -- the

Hultgren - X

1  difficulty, Your Honor, is it's multiple text messages in

2  different order, so I'm not sure what order to put them in.

3          THE COURT:  We'll use the Elmo because I suspect your

4  counsel, Ms. Wight, will not use as many of the exhibits, and

5  if Mr. Warren wants to use them, he can pull them out.

6          MR. ANGEL:  That's fine to have those two ready.

7          THE COURT:  Mr. Warren, you're familiar with the

8  Elmo, and you can use that.

9          MR. WARREN:  He's going to assist me with that.

10         THE COURT:  Ms. Kramer can help too.

11         MR. WARREN:  Somebody showed me something yesterday.

12  The document camera.

13         MS. WIGHT:  So that's on and off.

14         MR. WARREN:  Okay.  Yeah.  Okay.

15         THE COURT:  Let's put one up there and take a look.

16  That's fine.  It works.

17         MS. WIGHT:  Your Honor, may I take a quick break?

18         THE COURT:  We'll take a break because I let the jury

19  out for a little bit; so five minutes, and then we'll start

20  back up.

21         MS. WIGHT:  Okay.

22         DEPUTY COURTROOM CLERK:  Court is in recess.

23                     (Recess taken.)

24                     (Jury present.)

25         THE COURT:  Counsel, the jury is back.  Why don't we

W. Daggett - D

1    call our witness that we want to re-call.  I know we have a

2    technical issue about the Elmo.  We can work that out when

3    Mr. Warren is up for cross-examination.

4              MS. WIGHT:  Yes, Your Honor.  The government would

5    like to re-call Mr. William Daggett to the stand.

6              THE COURT:  Please come forward.  Let's take the

7    stand.  I would remind you you're still under oath, under

8    penalty of perjury.  Please take the stand today.  State your

9    name.

10             THE WITNESS:  William Alan Daggett.

11

12                    WILLIAM ALAN DAGGETT,

13   called as a witness on behalf of the Plaintiff, being

14   previously duly sworn, is examined and testified as follows:

15

16                     DIRECT EXAMINATION

17   BY MS. WIGHT:

18   Q.   Good afternoon, Mr. Daggett -- or good morning.

19   A.   Good morning.

20   Q.   Welcome back.  We just want to ask you a few questions

21   that we didn't get to yesterday.  So you told us about your

22   friendship with Mr. Mahler; is that correct?  You told us about

23   that yesterday?

24   A.   Uh-huh.

25   Q.   Do you remember if you ever communicated with Mr. Mahler

W. Daggett - D

1   by telephone?

2   A.    Oh, yeah.  We called each other and texted.

3   Q.    So you did use a cell phone sometimes to talk?

4   A.    Yes, yes.

5   Q.    And you mentioned that you actually texted each other?

6   A.    Uh-huh.

7   Q.    When you texted with Mr. Mahler, was it always you texting

8   him, or did he sometimes text you?

9   A.    Both ways, yeah.

10  Q.    And do you remember if you guys were -- had already

11  started texting back in 2016?

12  A.    I'm going to assume we did.  You know, I mean --

13  Q.    Do you remember around the time that the warrants happened

14  at your house?

15  A.    Yeah.

16  Q.    That was about February of 2016?

17  A.    Okay.  Yeah.

18  Q.    Do you remember if you ever had a conversation with

19  Mr. Mahler about him being ready to come by and pick up his

20  stuff?

21  A.    Yeah.  We had several of those.

22  Q.    And was that after a lot of requests before of him

23  asking -- of you asking him to get his stuff and now he is

24  finally ready to get it?

25  A.    Uh-huh.  Yes.

W. Daggett - D

1   Q.   And we have a -- this is not preadmitted -- oh, this is

2   preadmitted.  This is preadmitted.  Preadmitted Government

3   Exhibit 100, and we are going to turn to the second-to-the-last

4   page of that document.

5       So, Mr. Daggett, this is already an admitted piece of

6   evidence.  I believe the jury can also see that on their

7   screens.

8       Go ahead and just take a look at this for a moment,

9   Mr. Daggett.

10   A.   (Witness viewing document.)

11   Q.   And then once you finish -- there's just a little bit more

12   on a second page.

13   A.   Okay.  Go ahead.

14   Q.   Turn the page.  Take a look at this page as well.

15       Mr. Daggett, do you remember having a conversation like

16   this with Mr. Mahler?

17   A.   Yeah, I do.

18   Q.   In this document, does it say that he is going to come out

19   and actually pick up his items from your garage?  Is that his

20   request?

21   A.   Yeah, that's what we -- we were trying to get some of that

22   stuff out of there.

23   Q.   And does it look like he's trying to set a date for

24   January 17th?

25   A.   Yes, it does.

W. Daggett - D

1    Q.    If you look at the bottom of the second page, the very

2    bottom, does it say that this was sent on January 16, 2016?

3    A.    Yes.

4    Q.    If we go back to the first page -- I apologize.  If you

5    take a look at this, how many trips does he say it might take

6    for him to get all of that stuff?

7    A.    He says, "I might be able to make two trips."

8    Q.    And does he tell you how he's going to actually come pick

9    it up?

10   A.    Yes.

11   Q.    And what does he say?  What's he going to be driving?

12   A.    Driving Kris's SUV and towing a trailer.

13   Q.    Each trip would be an SUV full and a trailer full?

14   A.    Yes.

15   Q.    Now, prior to this text message, before, if Mr. Mahler

16   wanted to come pick up his stuff, would you have arranged for

17   him to do so?

18   A.    Oh, yeah.  Yeah, I think we were trying to get things out

19   of there.

20   Q.    Now, this time, though, on January 16, 2016, do you

21   remember whether or not he actually came and got the stuff?

22   Did you set up a date?  What's your memory of the situation?

23   A.    No, that never happened.

24   Q.    Do you have any idea why that might not have happened at

25   that time?

W. Daggett - D/X

1  A.   I think we were trying to figure out what to do about the

2  firearms because we found out about his felonies.

3  Q.   Were you concerned that Mr. Mahler was coming to get his

4  firearms?

5  A.   Yeah.

6        MS. WIGHT:  No further questions.

7        THE COURT:  Cross?

8        MR. WARREN:  Yes, thank you.

9

10                       CROSS-EXAMINATION

11  BY MR. WARREN:

12  Q.   Mr. Daggett, do you know a barber in Silverton named

13  Curtis Allen?

14  A.   Yeah, I know who he is.  Don't know if I could pick him

15  out of a crowd, but --

16  Q.   Okay.  Does he have any relationship to your ex-wife,

17  Connie Daggett?

18  A.   I couldn't tell you.  I don't know.

19  Q.   Okay.  Thank you.  Excuse me one moment.

20        MR. WARREN:  Let me have those exhibits, please.

21  BY MR. WARREN: (Continuing)

22  Q.   I would like to ask you a few questions about the full --

23  about all of these text messages.  Can you read that okay?  I

24  know it's kind of -- I don't know how to make it better.

25        MS. WIGHT:  Can you focus the Elmo?

W. Daggett - X

1        MR. WARREN:  Okay.

2   BY MR. WARREN: (Continuing)

3   Q.    Okay.  Maybe it's best I read it.  It kind of has a glare.

4   It says:  Hi, Bill.  Please let me know the engine

5   manufacturer, et cetera, of the Army truck.  Casey said he

6   usually finds those types of parts on eBay and Amazon.  We do

7   have a home internet provider, so I will visit the library to

8   use their service.  Hope the kids are feeling better.  My sore

9   throat, cough, and congestion took a downturn the past couple

10  of days, also had a lower intestinal problem.  Ugh.  Let's get

11  together for some more radio training when I'm 6 x 6 so I can

12  order the right filter.  Am feeling better.  Still a slight

13  cough, but no more congestion.  Let's get together the week

14  after next.  Have been asked to act as best man at a buddy's

15  wedding.  Kris and I are flying out Thursday and will be in

16  Florida for a week.  We can get some -- something to eat and/or

17  plan some radio training, and I'll give you a shout when we

18  return.  Take care.  See you soon, and give my best to Connie,

19  Thomas, and Theresa.  Bob.

20       Do you recall receiving that email -- text?

21  A.    I don't recall receiving that; but, I mean, it looks

22  vaguely familiar.

23  Q.    Okay.  Fair enough.  This next one we see is

24  September 6th.  It says -- oh, January 6, 2016.  "Hi, Bill.

25  Let me know what you think: www.sunburstech.com/firebelow.

W. Daggett - X

1    Hope I spelled your last name right.  Bob."

2         Do you recall receiving that text?

3         Doesn't ring a bell?

4         It's okay.

5         How about this:  Hi, Bob.  Chickens haven't laid an egg in

6    weeks.  I think the engine is cummins.  Might check out your

7    paperwork for it.  I need to bring everything back to your

8    house.  We have -- back to your house.  We are cleaning out

9    everything we can.  Need to get the place emptied out and

10   cleaned up.  When you get back, I need you to come get the

11   trailer that's parked out back.  Hopefully the ground will be

12   frozen so we can pull it up to the road without sinking too

13   bad.  If you can't find a filter soon, we need to get it towed

14   to your house anyway.  Have a good trip and give me a buzz when

15   you get back because I have to get it done ASAP.  Thanks, Bill.

16        Do you recall that message -- sending that text?

17   A.   It looks familiar.

18   Q.   Okay.

19   A.   I mean --

20   Q.   And on this one it says that it was received January 6,

21   2016.  So is that a little familiar?

22   A.   What's that?

23   Q.   It says, "Thanks, Bill," at the bottom.  It says received

24   January 6, 2016.

25   A.   Okay.

W. Daggett - X

1   Q.    Okay.  Do you agree or disagree with that, or is that

2   okay?  We need your approval if you were the author of that

3   text.

4   A.    I'm going to assume so, yeah.

5   Q.    Okay.  Thanks.  Thank you.

6   A.    You're welcome.

7   Q.    Okay.  And here is one.  It says, "Howdy, Bill.  Let us

8   know when the chickens start to roost again.  Wow.  Sounds like

9   you're getting ready to sell the place.  Are you thinking about

10  moving?  Are you speaking of the travel trailer with our supply

11  of food?  We can get that moved when it dries out and I get the

12  F-250 back from our mechanic.  He says it needs two injectors.

13  The F-250 has the fifth wheel setup to move the trailer.  I'll

14  need some help placing the hitch in the truck bed.  Would you

15  or Thomas be able to help?  Let me know how you are doing with

16  the alfalfa.  How are your mom and dad doing?  See ya soon.

17  Thank you for the engine name.  I thought there might be a

18  manual somewhere in the truck cab.  Will look to buy the fuel

19  filter.  Can you pull the old one out so I can take it to the

20  truck parts supply store and try for a match?  I'll check

21  online.  Bob."  Sent January 6, 2016.

22        Is that vaguely familiar?

23  A.    Yeah.

24  Q.    Okay.  This is a text that says, "Bill, we are in Chicago.

25  We will be into PDX around midnight.  Tried to call, but your

1   voicemail has not been set up.  Hope all is well.  Please call.

2   See ya soon.  Bob."  Sent January 14, 2016.

3        Is that familiar?

4   A.   Yeah, it is.

5   Q.   And it says, "Bob, I'm wondering if you got my messages

6   about removing my name from the manuscript before you publish?"

7   And that was received January 14, 2016.

8        Do you see that?

9   A.   Do I see it?  Yes.

10  Q.   Okay.  Now, we understand that you allowed -- I mean, all

11  of us do -- our wives to use our cell phones.

12       Could that have been a message from your wife to Bob -- to

13  Robert Mahler?

14  A.   It's what it looks like, yes.

15  Q.   This one says, "Please ring me.  We will be at your place

16  promptly at 8:00 to start moving other items from your garage.

17  Please call me if you would like us to start at a later time."

18  I would need certain -- "I was not certain who wrote the

19  previous note to delete a name from the *Fire Below's*

20  acknowledgment.  If an identifier had been included, the

21  correction would have been done immediately.  The message, I

22  thought, since it was his phone, was from Bill.  Sincerely,

23  Bob."  Sent January 15, 2016.

24       Do you recall that text?

25       I took it off too fast.

W. Daggett - X

1   A.    It's vaguely familiar.

2   Q.    Okay.  This one says:  Why you would have done it anyway?

3   We had more than one discussion about it.  I am sorry you

4   laughed me off and didn't take me seriously, but I was dead

5   fucking serious and am way more than a little upset that you

6   completely disregarded my request.  It is unfuckingacceptable,

7   Connie.

8         Received January 15, 2016.

9         So that would have been Connie, from your cell phone,

10  texting to Bob?

11  A.    Yes.

12  Q.    And then it goes on to say:  Hi, Connie and Bill, I really

13  do not remember a discussion where you, Connie, forbade the use

14  of your name, married or maiden, for your contribution as an

15  editor regarding *Fire Below*.  I can imagine Connie being upset.

16  If I had remembered you, Connie -- your request, your name

17  surely would not be garnered any literary credit in the book.

18  Connie, please accept my apology for not remembering.  Your

19  name, Connie, will be deleted in all future references to --

20  all future references to *Fire Below*.  As you probably are

21  aware, publishers print a proof of the book so corrections can

22  be made.  That is the point we are now -- that is the point we

23  are now.  I thought you would probably know that from your

24  previous work experience.  It is an easy fix, and that

25  knowledge should help your upset feelings.  Again, I firmly

W. Daggett - X

1   apologize for not remembering.  My blatant memory is the cause

2   for your feelings, and I do take responsibility.  Bill, please

3   ring me.

4        We will.

5        Do you remember that text back from Mr. Mahler to Connie

6   and you?

7   A.    You know, I remember them going back and forth over text,

8   over that book.

9   Q.    Okay.  "Hi Connie.  Okay.  Checking now.  The previous

10  message was received at 17:49, January 14.  This is starting to

11  get weird."  Exclamation mark.  "Please let me know the dates

12  of the messages from you to me and me to you that say 'Connie

13  here,'" question mark, "Thanks, Bob."  Sent January 15, 2016.

14        And then it says, "Connie, do you show any texts from my

15  phone?"  And then it goes on.

16             MS. WIGHT:  Your Honor, are we planning on reading

17  every text message here?  We have a relevance objection as we

18  start getting to the *Fire Below* publication.

19             MR. WARREN:  Well, yes.  I do intend to read every

20  text message because that's the only way I can convey a

21  question and refresh Mr. Daggett's recollection.

22             THE COURT:  Well, I believe he testified, and this

23  packet has already been admitted.

24             MR. WARREN:  Oh, yes.

25             THE COURT:  It's all admitted, and you obviously can

W. Daggett - X

1  use it in argument, but I don't think you have to go through

2  every page because the whole exhibit has been admitted.

3          MR. WARREN:  Okay.

4          THE COURT:  If you have questions and want to ask a

5  question that relates to one specific email, that would be

6  great.

7          MR. WARREN:  Okay.  Okay.  In that regard,

8  Your Honor, I have no further -- one moment.

9  BY MR. WARREN: (Continuing)

10 Q.    Do you recall if there was texts that said that they

11 weren't being received, texts that you were sending to

12 Mr. Mahler or Connie Daggett was sending to Mr. Mahler and back

13 and forth -- kind of a back and forth, like they were out of

14 sequence, because he was in Florida and you were in Oregon?

15 A.    No, I don't recall.  I know they went back and forth, you

16 know.  And Connie and I shared one phone.  You know, she didn't

17 have her own; I didn't have my own.  It was kind of our phone;

18 so whoever needed it, used it.

19 Q.    Do you also have a son named Dominic Garcia?

20 A.    Yeah, he's my stepson.  He's Connie's son.

21 Q.    That was her oldest child before you all got together?

22 A.    Yes.

23          MS. WIGHT:  Object to this.  Relevance.

24          MR. WARREN:  Well, we were trying to tie the fact

25 that Curtis Allen, Connie Daggett --

W. Daggett - X

1          THE COURT:  Overruled.

2  BY MR. WARREN: (Continuing)

3  Q.   And did Dominic Garcia -- are you aware he went to school

4  with Curtis Allen?

5  A.   No, I'm not.

6          MR. WARREN:  Your Honor, we have reviewed it all.  No

7  further questions.

8          THE COURT:  Anything else?

9          MS. WIGHT:  No further questions either.

10         THE COURT:  Thank you.  Now may this witness be

11 formally excused?

12         MS. WIGHT:  Yes, Your Honor.

13         THE COURT:  Mr. Warren?

14         MR. WARREN:  Yes.

15         THE COURT:  All right.  You're free to go.  Thank

16 you.

17         THE WITNESS:  You're welcome.

18         MS. WIGHT:  Thank you for taking the time today.

19         THE COURT:  Call your next.

20         MS. WIGHT:  The government calls Karl Deering.

21         THE COURT:  Please come forward.  Is that the

22 witness?  Please come forward and be sworn.

23         DEPUTY COURTROOM CLERK:  Please raise your right

24 hand.

25

Deering - D

1                        KARL DEERING,

2    called as a witness in behalf of the Plaintiff, being first

3    duly sworn, is examined and testified as follows:

4

5              THE WITNESS:  Yes.

6              DEPUTY COURTROOM CLERK:  Thank you.  Please have a

7    seat.  Please state your full name and spell it for the record.

8              THE WITNESS:  My name is Karl Deering.  K-a-r-l.

9    D-e-e-r-i-n-g.

10

11                      DIRECT EXAMINATION

12   BY MS. WIGHT:

13   Q.   Good morning, Karl.

14   A.   Good morning.

15   Q.   Please tell the Court and jury where you work.

16   A.   I work with the Oregon State Police, and I'm a latent

17   print examiner.

18   Q.   Mr. Deering, how long have you held that position?

19   A.   With the Oregon State Police, about 18 years.  Previous

20   employment with the Western Australia Police Service.

21   Q.   Mr. Deering, I'll have to ask -- ask you to talk really

22   slow.  That way we can get it all on the record.

23        So prior to your time with Western Australia Police

24   Service, were you also a police officer?

25   A.   Yes, I was.

Deering - D

1    Q.    And what was your position?

2    A.    I was a sworn police officer, and I also trained in

3    forensic crime scenes and latent print analysis and was, after

4    a period of time, accredited, certified by an Australian Board

5    of Examiners.

6    Q.    Was that for almost ten years?

7    A.    Yes.

8    Q.    How many total years have you now worked in law

9    enforcement?

10   A.    Almost 30 years, I believe.

11   Q.    Tell us just a little bit about your educational

12   background and any certificates that you have.

13   A.    I did all my schooling in Western Australia.  I graduated

14   high school, and then when I joined the police service, I

15   undertook studies where -- to become a fingerprint expert by --

16   I was examined before my peers, and then I had to be examined

17   again before a national examiner's board.

18   Q.    Did you actually receive a certificate of expertise, then,

19   in that area of fingerprint examination?

20   A.    Yes, I did.  I achieved that in 1997.

21   Q.    And then in 2001 did you receive a certificate in primary

22   examination, as well, for -- it looks like latent print

23   comparison?

24   A.    Yes.  Every couple of years -- it was every year at one

25   point.  I think we changed it now to every couple of years.  We

Deering - D

1    are required to undergo proficiency testing in comparison --

2    latent print comparison work and also processing.

3    Q.    Have you participated in any other specialized training or

4    coursework related to your duties as a forensic examiner?

5    A.    Yes.    There's ongoing training all the time.    A lot of

6    that training I received in Western Australia.    There was a

7    crime scene course that I attended, photography, bomb scene

8    examination.    And then we are, on a regular basis, trained with

9    our Automated Fingerprint Identification System.    I'm also on a

10   disaster team where I receive training and go to conferences

11   and learn more about identifying deceased.

12   Q.    You said identifying the deceased?

13   A.    Yes.    Through fingerprints.

14   Q.    Is that something you still do through your work?

15   A.    Yes.    I'm also employed by the Federal Government, Health

16   and Human Services, and I do that on a need -- need basis

17   whenever there's a disaster and I'm called upon.

18   Q.    So you would actually fly from Oregon to someplace else

19   where there's a disaster?

20   A.    Yes.

21   Q.    Have you previously testified as a latent print examiner

22   expert in a trial before?

23   A.    Yes, I have.

24   Q.    Can you just tell the Court and the jury what some of your

25   general responsibilities are as a latent print examiner?

Deering - D

1   A.    So as a latent print examiner, I am involved with

2   processing evidence that comes through our laboratory.  So a

3   police agency might want some items fingerprinted that they

4   collected from a scene.  Then using alternative light sources

5   and different chemicals that we have, I processed those items.

6   And if there's any fingerprints on those items, then I also go

7   to the length of doing a comparison, trying to find a match for

8   those fingerprints, and that can be through receiving a

9   subject's name that I can compare with a known exemplar or

10  standard, or I can search that fingerprint through the

11  Automated Fingerprint Identification System, what we commonly

12  refer to as AFIS, and I can look for a match, in that regard,

13  based on the information I put into that system.

14       Part of my duties also is testifying in court and also

15  attending to the medical examiners' requests and trying to

16  identify deceased persons.

17  Q.    Let's focus on your duties with just the fingerprint

18  analysis.  What is a latent print?

19  A.    A latent print is the reproduction of the patterns of the

20  ridge detail that you see on the underside of your fingers and

21  thumbs, and there it's usually recorded in perspiration on a

22  surface and we use ink, or nowadays we also use Live Scan in

23  order to record that impression.

24       So "latent" actually means hidden until readily visible.

25  Q.    Then does it become an inked print or some other type of

Deering - D

1  print?

2  A.    Yes.

3  Q.    What are some of the factors that you consider when you

4  are evaluating the source of a fingerprint?

5  A.    Well, the first thing that I need to be mindful of is is

6  this fingerprint sufficient for me to do any comparison work,

7  and so we have -- Oregon State Police has a standard that we --

8  that we use where we need to determine if a fingerprint is

9  suitable for comparison or not, or sufficient, and so with

10 that, generally, we would say that most fingerprint impressions

11 contain seven what we call minutia within that -- within those

12 ridge detail.  Ridge details, I was talking about earlier, and

13 we need to find seven of those in order for a fingerprint -- in

14 order to progress further.  So we can actually also do that on

15 less minutia, and there is no set standard throughout the U.S.

16 Q.    Let's talk about the surfaces that people leave

17 fingerprints on.  Are some surfaces better or others as far as

18 finding fingerprints?

19 A.    So I can find fingerprints on porous, like, paper,

20 cardboard; semi-porous, like plastics; nonporous, glass,

21 different kinds of plastics.  Again, generally, anything that

22 is smooth is really good for fingerprints.

23 Q.    Can you tell the jury how you typically conduct an

24 examination of a surface in order to identify the fingerprints

25 with your system?

Deering - D

1   A.    Can you repeat the question again?

2   Q.    Can you tell the jury how you typically conduct an

3   examination and what sort of methods you use for that -- the

4   examination itself?

5   A.    Oh, okay.  So you mean the processing portion; correct?

6   Q.    Yes.  Thank you.  Yes.

7   A.    Okay.  So when an item comes into our laboratory, I will

8   do a visual exam that can be just with ambient light or I use

9   an alternative light source.  We have a strong, high-intensity

10  light which has different wavelengths that range from UV to

11  green-blue and orange colors, and each of those colors can help

12  and assist us in determining what a fingerprint looks like or

13  if there's any fingerprints on that item.

14      And we also do that in case there's any trace evidence

15  that might be on that evidence so that I can collect that prior

16  to doing any of the processing that might damage that evidence.

17      So I do that, and then I determine, looking at the

18  evidence, how am I going to process this?  What is my best

19  option?  I formulate an idea, a plan, in my head.

20      Generally, most items that come in, if they are nonporous,

21  will receive cyanoacrylate ester or, in simple terms, super

22  glue treatment.

23  Q.    Can you repeat that word again one more time?

24  A.    Cyanoacrylate ester.

25  Q.    Or super glue?

Deering - D

1    A.    Or super glue.

2    Q.    Thank you.

3    A.    I can refer to it as "super glue" if you want me to from

4    now on.  It's a lot easier to say and spell.

5    Q.    Okay.

6    A.    And then usually after that we use a dye stain.  There's a

7    number of different dye stains we can use.  Our laboratory

8    chooses to use a dye stain called R.A.M., which is a

9    combination of three actual dye stains combined into one.  And

10   then the last step that we usually use depends on the contrast

11   of the evidence, and so we can use something called PSS, which

12   is a powder suspension solution, and it's generally black in

13   color.  So we would want to use that on a light-colored

14   surface.

15         We also have something called white -- oh, and we make

16   that ourselves.  We buy the ingredients, and then we make that

17   ourselves.

18         And we also have something called white Wetwop, which is a

19   manufactured item that we purchase, and we can use that on

20   items.  As the name suggests, it's white, so we would want to

21   use that on black surfaces, generally.

22         And those are the three main -- four main things that we

23   would use for nonporous.

24         In regards to porous, there are other chemicals that we

25   can use, and I'll just name a couple quickly.  Hydrin, DFO and

Deering - D

1  physical developer.

2  Q.   Somewhere in that process, does it -- is it the reason why

3  we get evidence back and it's covered with a white powder?

4  A.   If white Wetwop was used or a white powder, yes.

5  Q.   Mr. Deering, in your capacity as a latent print examiner,

6  were you asked to examine some firearms in the case of United

7  States v. Robert Mahler?

8  A.   Two different times, I was, yes.

9  Q.   Do you also know if this -- the submissions in this case

10  qualified for DNA analysis?

11  A.   As part of our routine procedure, we collect DNA off all

12  of the firearms.  In this particular instance, the DNA was

13  collected from the firearms the two times that the items were

14  submitted, but they did not meet the standard that the DNA unit

15  currently has.

16  Q.   So the current guidelines -- this particular case didn't

17  qualify for DNA testing?

18  A.   Yes.  I mean, there could be exceptions made with that,

19  but you need to contact the laboratory director.

20  Q.   But in your capacity as latent print examiner, you were

21  asked to examine the firearms for latent prints?

22  A.   Yes.

23  Q.   So during your examination, how many total separate

24  exhibits did you actually test for latent prints?

25  A.   So we're talking the two times, right, because there was

Deering - D

1  two different submissions.

2  Q.    That's correct.

3  A.    Do you mind if I refer to my notes?

4      So back in 2016, July 11, 2016, our laboratory received 10

5  exhibits, 10 items, that I labeled as Exhibits 1 through 10.

6  Q.    And then how many additional exhibits?

7  A.    And then on August the 23rd of 2018 of this year, I

8  received an additional -- exhibit marked 11 through 21, and

9  then there was 21.1, 21.2, 22, 22.2, 23, 23.2, 24, 24.2.1.

10     So there were a number of additional exhibits that were

11 submitted.

12 Q.    From those exhibits, do you recall if your examination

13 included a 7 mm Ruger bolt-action rifle, model 77?

14 A.    Are you referring to Exhibit No. 21?

15 Q.    Is 21 a 7 mm Ruger bolt-action rifle, model 77?

16 A.    Yes.  And Agency Exhibit No. 100 it has a serial number of

17 7818623.

18 Q.    Do you also recall in your examination included a

19 .22 caliber Winchester rifle, model 74?

20 A.    Yes.  I have that listed as Exhibit No. 22 and Agency No.

21 029.

22 Q.    And the serial number on that item?

23 A.    Serial number is 101360.

24 Q.    Can you describe what you did with these firearms and the

25 other firearms during your examination?  What process did you

Deering - D

1  use?

2  A.    Sorry.  I was just double-checking something here to make

3  sure that serial number was right on Exhibit 21.

4  Q.    Was it okay?

5  A.    Yeah.  Because when that was initially submitted, there

6  was a number missing, and I added that to my notes.  So, yes,

7  the three was missing on the end of that when I initially

8  received that.

9  Q.    And that's correct?

10  A.    That's correct.

11        So go ahead with the question again.

12  Q.    So for these two firearms and then also for the other

13  items in your examination, what process did you use?

14  A.    I've already mentioned a lot of those, but for these, I

15  used the visual technique.  I then used the cyanoacrylate

16  ester/super glue technique.  I then did a dye stain, the R.A.M.

17  technique.  And then, depending on the contrasting -- the

18  contrast of these two items, it was either a PSS -- the powder

19  suspension solution -- or the white Wetwop.

20  Q.    Were you able to find any latent prints?

21  A.    Yes, I was.  On both of those items.

22  Q.    How many?

23  A.    On Exhibit 21, which is the 7 mm Ruger bolt-action rifle,

24  model M77, there were four fingerprints that were developed,

25  and I marked those as P-1, P-2, P-3 and, P-7.

Deering - D

1    On Exhibit 22, which is the .22 caliber Winchester rifle,

2 model 74, I developed three fingerprints, and that's P-4, P-5

3 and P-6.

4 Q.   Did you compare these latent prints to the known

5 elimination print standards of the defendant, Robert Mahler?

6 A.   Four of those fingerprints I did as part of my analysis.

7 So when we compare a fingerprint, we do an analysis first.  And

8 as part of that, I determined that what -- there were three of

9 those fingerprints that were actually not sufficient for

10 comparison, so those fingerprints were not compared to the

11 subject.  The other four were.

12 Q.   What was the quality of those print standards that you

13 received from Defendant Mahler?

14 A.   The fingerprint standard that I initially received was

15 actually good quality.  Except there was writing -- inked

16 writing over the top some of the ridge detail that I needed,

17 and so I wasn't able to use that standard.

18    That writing, I am not sure how that got on there.  I

19 think it was a result of cut-and-paste and using -- they

20 generally try to submit the best standards.  So as a result of

21 doing that, I think some of that overlapped onto that ridge

22 detail.  So I requested that additional standards --

23 fingerprint standards be submitted.

24    Also, two of these latent prints that I developed were --

25 were palm prints.  And the subject did not have palm print

Deering - D/X

1  standards, and so I requested that those be submitted to our

2  laboratory.  And I also checked the FBI database and also

3  California Department of Justice to see if there was any palm

4  print standards there, and they did not have any.

5       So I had these two latent prints that were really

6  nice-looking palm prints, but I didn't have anything to compare

7  them with.

8  Q.   What was your final analysis, then, of your comparison?

9  A.   I was inconclusive.  "Inconclusive," meaning that I wasn't

10  able to come to a conclusion because of the quality of the

11  standard, and because it was in complete, and also because on

12  some of these prints the quality of those prints was not

13  fantastic.

14            MS. WIGHT:  Thank you, Mr. Deering.  No further

15  questions.

16            THE WITNESS:  Okay.

17

18                      CROSS-EXAMINATION

19  BY MR. WARREN:

20  Q.   Hello, Mr. Deering.

21  A.   Hello.

22  Q.   You work at the Oregon Department of State Police Forensic

23  Laboratory?

24  A.   Yes.  At the Portland Forensic Laboratory.

25  Q.   Oh, okay.  Not at the one in Clackamas, Oregon?

Deering - X

1    A.    That is the one.  They're one in the same.

2    Q.    Oh, I see.  The one out in Clackamas?

3    A.    Yes.

4    Q.    On 84th?

5    A.    Yes.  Just across from WinCo.

6    Q.    Yes.  Are you on an emergency response team?

7    A.    Yes, I am.

8    Q.    Could you tell me a little bit about that?

9    A.    I am on a response team with the State and also with the

10   Federal Government.  So if there's a natural disaster that

11   happens locally, or like Hurricane Katrina, when that happened,

12   I was mobilized to assist in the mortuary identifying the

13   deceased.

14   Q.    Down in Louisiana?

15   A.    Yes.

16   Q.    Okay.  Do they have community emergency response teams,

17   that you know of?

18   A.    They do.  And if they are overwhelmed and they cannot

19   handle those responses, then Health and Human Services, who was

20   my employer at the moment, they get together and determine what

21   they need.  They send out an assessment team to determine the

22   needs and work with the local coroner.

23   Q.    Are there also local community emergency response teams

24   here in Oregon, that you know of?

25   A.    I'm part of one of those teams, and I do believe there are

Deering - X

1    smaller teams, depending on the size of the catastrophe, the

2    nature of the disaster.

3    Q.    Do you know if there are any smaller teams in places like

4    Mt. Angel, Oregon?

5    A.    There might be.  I'm not aware of any.  There might be

6    just small groups that come together to assist with maybe a

7    body recovery somewhere in the mountains.  Smaller -- I'm not

8    part of those kind of recovery efforts.  I'm based more in a

9    morgue -- mortuary setting where the body comes -- deceased

10   comes to me, and I try to identify who that individual is.

11   Q.    Thank you.

12         Now, can a fingerprint be taken off of one object and put

13   onto another object?

14   A.    There can be a transfer, yes.  It depends on the type of

15   surface.  For instance, paper versus paper, it could transfer

16   one fingerprint from one side of that paper to the other side,

17   and then we would need to look at that image as horizontally

18   flipped.

19   Q.    In your expertise as an -- over 19 years of experience,

20   have you ever seen a transfer from one object to another of

21   fingerprints?

22   A.    Yes, I have.

23   Q.    And over the years, I presume that fingerprint technology

24   has gotten -- has improved?

25   A.    Oh, yes.  Lights are more intense.  Equipment is more

Deering - X

1  practical and versatile for us to use.  Believe it or not, we

2  still use some of the old methods as well that still work just

3  as good, so --

4  Q.    I think there has been a movement where fingerprint

5  analysis has tried to become more universal.  Is that correct?

6  A.    Yes.  Yes.

7  Q.    And in certain places, like Europe, they only use so many

8  ridges or points on a fingerprint to determine -- to try to

9  identify if it belongs to somebody; correct?

10  A.    That's correct.

11  Q.    In the United States, we use more because we're trying to

12  really identify the correct people when we do fingerprint

13  analysis?

14  A.    There is no set standard, and there is an accreditation

15  that happens throughout the U.S.  Not everybody takes upon

16  themselves that accreditation standard.  The Oregon State

17  Police does have an accredited standard where we are required

18  to meet certain standards throughout -- throughout the

19  governing board.

20  Q.    When we go to take a person's fingerprint, they still do

21  it an old-fashioned way.  They kind of roll the ink on the palm

22  and the fingers and then suppress them on cards?

23  A.    That is one method.  There's also the Live Scan method

24  where gel is actually put onto your hand, and it's placed on a

25  scanner, and it captures that information electronically.  And

Deering - X

1   the beauty of that is that it gets sent off to the depository

2   down in Salem very quickly.

3   Q.   So they put a gel on your hand, and it's kind of a, I

4   don't know, some kind of screen -- some kind of electronic

5   screen the person puts their hand on?

6   A.   Yes.   It's just like a scanner.

7   Q.   And then --

8   A.   It's called Live Scan, yes.

9   Q.   And then it operates, and it tells you if you got a good

10  scan?

11  A.   You can check that, yes.

12  Q.   Okay.   So on January 25th of 2017, you wrote an analytical

13  report regarding fingerprint analysis; is that correct?

14  A.   Yes, I have that report in front of me here of January 25,

15  2017.

16  Q.   And, basically, you checked a 9 mm Parabellum caliber

17  pistol, Exhibit No. 1?

18  A.   Oh, there it is.   That is correct.   Agency No. 007.   Our

19  Exhibit No. 1.

20  Q.   You had five empty black magazines that were evaluated by

21  you?

22  A.   That's correct.

23  Q.   You had one Sig Sauer .40 caliber pistol?

24  A.   That's correct.   Marked as Exhibit 7.   Agency No. 091.

25  Q.   You had another Sig Sauer, model P250, .357?

Deering - X

1  A.   That's correct.  I have that as Exhibit 8.  Agency

2  No. 091.

3  Q.   You had one Glock, model 21, .45 semiautomatic pistol?

4  A.   Marked as Exhibit 9.  Agency No. 124.

5  Q.   And one Glock, 13-cartridge capacity black magazine,

6  empty?

7  A.   Marked as Exhibit 10.  Agency No. 124.

8       That was all that I received on -- that was submitted to

9  our laboratory on July 11, 2016.

10 Q.   And I don't think we explained, but you do actually swab

11 these items for DNA; is that correct?

12 A.   Yes.  Certain areas of these firearms and magazines, when

13 they came in, we generally swab the textured areas.  We don't

14 want to swab an area where we think that there's going to be

15 fingerprints that are going to be ruined through our swabbing

16 technique.  Generally, the textured areas of the magazines.  I

17 swab the feeder areas, which is at the top of the magazine

18 where you're putting in the cartridges.

19 Q.   And in January 25, 2017, in your report, you told Special

20 Agent Amanda Johnson that it wasn't -- they didn't meet the

21 guidelines for DNA analysis, but you preserved those swabs

22 anyway; is that correct?

23 A.   That's correct.

24 Q.   Okay.  Now, with respect to all these exhibits, you did

25 not find any latent fingerprints that say Mr. Mahler had been

Deering - X

1   in possession of any of these items?

2   A.   I did not, no.

3   Q.   Now, you have another report that was just made last week.

4   September 12, 2018; correct?

5   A.   That's correct.

6   Q.   You say the fingerprint standard came from Special Agent

7   Amanda Johnson; correct?

8   A.   She is the one that submitted it.

9   Q.   She provided it to you?

10  A.   Right.  She is not the one that collected those

11  fingerprints.

12  Q.   Correct.  So Portland Police Bureau Fingerprint Technician

13  Ms. Yada collected those fingerprints.  Is that your

14  understanding?

15  A.   Yes.

16  Q.   She's certified and verified to collect fingerprints for

17  law enforcement agencies?

18  A.   I'm assuming, yes.  I don't know her.

19  Q.   You don't know her?

20  A.   No.  I know who she is, but I don't know what her -- I

21  don't know what role she plays.

22  Q.   I see.  So you don't know if she rolled and swabbed and --

23  A.   Per our conversation, I can tell you that she told me that

24  she had attempted to get fingerprints and palm print standards

25  from the defendant and she had tried inking those and also

Deering - X

1   using the Live Scan method.

2   Q.    Thank you.  And there's also this database of

3   fingerprints.  Automated Biometric Identification System?

4   A.    Yes.

5   Q.    And that's probably an international database, or is it?

6   A.    No.  It's a United States database, and it hooks up also

7   with the federal government, FBI, that we can search

8   nationwide.

9   Q.    Fantastic.

10        This time you analyzed over 30 different items.  We won't

11  read them all.  Is that correct?

12  A.    I'm glad we don't have to read them all because there's a

13  lot.  Yes.

14  Q.    And, just, it's fair to say that there are pistols?

15  Pistols?  Some of the things were pistols?

16  A.    Yes.  Looks like there's four pistols that were submitted

17  with -- with magazines.

18  Q.    And there were long arms?

19  A.    Rifles?

20  Q.    Yes.

21  A.    Yes.  And the remainder were rifles.

22  Q.    And there were also magazines that were empty.  If I

23  can --

24  A.    Yes.  Yes -- not on all of those items, but on some of

25  those items, yes, there were magazines that were empty.

Deering - X

1   Q.    And all these items -- you were inconclusive that

2   Mr. Mahler's prints were on all of these items; is that true?

3   A.    No, that is not true.

4   Q.    Did you find a print on Mr. Mahler's --

5   A.    The way that you worded that, it sounded like every single

6   item I was inconclusive on.  That is not correct.

7   Q.    Oh, well, thank you.  Please clarify it.

8   A.    Okay.  So Exhibit 21 and Exhibit 22 are the two items that

9   I was able to develop fingerprints on.

10  Q.    Yes.

11  A.    And I was inconclusive on -- so there were seven total,

12  and I was inconclusive on four of those comparisons because the

13  other three were not sufficient for comparison.  So I never

14  even compared the subject to those.

15  Q.    Thank you.  But you --

16  A.    But I was inconclusive to the remainder of those prints,

17  yes.

18  Q.    Okay.  So you had some prints that you did develop, but

19  you were only asked to compare them to Mr. Mahler's prints;

20  correct?

21  A.    That's correct.  I did not have any other information or

22  any other subject that I was asked to compare.

23          MR. WARREN:  One moment, please.  And thank you too.

24      No further questions.  Thank you.

25          THE COURT:  Anything further, Counsel?

Deering - X

1          MS. WIGHT:  No further questions.

2          THE COURT:  May this witness be excused?

3          MS. WIGHT:  Yes, Your Honor.

4          MR. WARREN:  Yes.

5          THE COURT:  You're free to go.

6          THE WITNESS:  Thank you.

7          THE COURT:  Call your next.

8          MS. WIGHT:  The government calls Special Agent

9  Roland Jacobs.

10         THE COURT:  Please come forward to be sworn.

11         DEPUTY COURTROOM CLERK:  Please raise your right

12 hand.

13

14                    ROLAND JACOBS,

15 called as a witness in behalf of the Plaintiff, being first

16 duly sworn, is examined and testified as follows:

17

18         THE WITNESS:  I do.

19         DEPUTY COURTROOM CLERK:  Thank you.  Please have a

20 seat.  Please state your full name and spell it for the record.

21         THE WITNESS:  Roland Jacobs.  R-o-l-a-n-d.

22 J-a-c-o-b-s.

23

24 ///

25 ///

Jacobs - D

1                          DIRECT EXAMINATION

2    BY MS. WIGHT:

3    Q.    Good morning, Agent Jacobs.

4    A.    Good morning.

5    Q.    Tell us where you're employed.

6    A.    I'm a special agent with Bureau of Alcohol, Tobacco,

7    Firearms & Explosives.

8    Q.    That's ATF?

9    A.    Yep.

10   Q.    As part of your duties as an ATF agent, do you participate

11   in search warrants?

12   A.    Yes.

13   Q.    If you can give us a ballpark, how many search warrants

14   have you participated in?

15   A.    Conservatively, about 200.  Probably over that.

16   Q.    Were you involved in the execution of a search warrant on

17   February 16, 2016, related to the investigation of

18   Robert Mahler?

19   A.    Yes.

20   Q.    Do you remember what your first responsibility was on that

21   date or that first duty?

22   A.    Yes.  To set up surveillance on that residence.

23   Q.    And what did that involve?  Tell us what you did that day.

24   A.    I arrived at the -- there's a -- there's a

25   restaurant/tavern right at the entry of his driveway, so I

Jacobs - D

1  pulled in there approximately 3:47 p.m.  Timing was such that

2  Mr. Mahler arrived there about the same time.  So I set up

3  surveillance right there in the parking lot.  I saw him open

4  his gate and proceed to his residence.

5  Q.    Did you continue surveilling him even after he got to his

6  residence?

7  A.    I stayed put, yes.

8  Q.    And what did you see after that?

9  A.    Well, Agent Miller arrived, I think, within 40 minutes of

10  me being there and was able to set up a different vantage point

11  where he could see the garage and the front door, I believe,

12  and he was able to -- we had radio communication, so I had the

13  driveway, and he was able to see some of the movement in the

14  house.

15  Q.    Did Mr. Mahler ever leave the residence?

16  A.    Yes.

17  Q.    Do you remember what time that was about?

18  A.    It was a little after 6:00.

19  Q.    And what happened?

20  A.    I saw him leave the driveway.  He proceeded west on Pine

21  Street where, via the radio, he was stopped by local law

22  enforcement and ATF.

23  Q.    Did you participate in that stop?

24  A.    No, I didn't.

25  Q.    What did you do after you heard he was stopped?  What was

Jacobs - D

1  the next thing you did?

2  A.    Approximately 20 minutes after the stop was made, I was

3  asked to accompany Agent Hobaugh in driving Mr. Mahler's

4  vehicle back to the police station so it could be searched.

5  Q.    Why would the vehicle be driven back to the police station

6  to be searched?

7  A.    Pine Street, there near Silverton, is a pretty busy

8  street.  So for officer safety purposes and for the safety of

9  civilians going by on the street, a decision was made to move

10  the car to the police department.

11  Q.    Did you participate in the search of the vehicle?

12  A.    No, I did not.

13  Q.    You just dropped it off at the station?

14  A.    Myself and Agent Hobaugh, who was driving, we drove the

15  vehicle.  Agent Hobaugh drove the vehicle.  I was in the

16  passenger's seat.  We drove it to the police department and

17  dropped it off.

18  Q.    Then what did you do?

19  A.    I returned to my surveillance point.  Probably returned to

20  my vehicle first, got my vehicle, and then returned to the

21  parking lot of the restaurant or tavern.

22  Q.    Back to surveil Mr. Mahler's residence?

23  A.    Correct.  The driveway.

24  Q.    And then what happened?

25  A.    Then approximately 7:15 Kristine Yates, his wife, showed

Jacobs - D

1   up at the property, was opening the gate, and we contacted her

2   at the gate.

3   Q.   Did Ms. Yates allow you to enter the residence?

4   A.   Yes.  I informed her that I was with ATF.  I identified

5   myself and Agent Miller.  We -- I informed her that we had a

6   search warrant for the residence, and I asked for her

7   cooperation to gain some officer safety information, as in who

8   was there and what condition the house was in.

9        She told me that nobody was home, and Gillette, their dog,

10  should be inside -- Juliette.

11  Q.   Did Ms. Yates talk to you?  Did she ask you questions

12  about the warrant?

13  A.   Yes, she did.

14  Q.   Did you ask Ms. Yates if she knew that Mr. Mahler was a

15  felon?

16  A.   She did not know that he was a felon.  He had told her he

17  had a concealed weapons permit.

18  Q.   So what was her reaction?  How did she respond?

19  A.   She was very bewildered and frustrated, kind of, with the

20  whole situation, knowing that we were there and she didn't --

21  wasn't aware of what was going on.

22  Q.   So what did Ms. Yates do, then, while you guys were

23  conducting the warrant?

24  A.   What happened was is there -- the gate for the property is

25  approximately 50 to 100 yards from the residence.  Probably a

Jacobs - D

1   hundred yards is probably too far.  But I did not want her

2   driving up there by herself, so I asked her if I could get in

3   the vehicle with her to drive to the front door.  So I got in

4   the vehicle with her.  We got to the front door.  She used a

5   key to open it, and then -- well, let me back up for a second.

6   We did not proceed to the house until Agent Zeismer and

7   Agent Hobaugh were there to assist us in clearing the house for

8   officer safety.

9        We proceeded to the house.  She opened the door with a

10  key, and then we secured Juliette.  I stayed with

11  Kristine Yates and Juliette while the other agents cleared the

12  house.

13  Q.   Do you know if all the agents -- if they were able to

14  clear the house by going into every room?

15  A.   No, they were not.  There were two doors that were locked

16  inside the residence.  Kristine Yates said that she did not

17  have access to those rooms and that Mr. Mahler -- Mahler had

18  the key.

19  Q.   Did the ATF have to break into the rooms?

20  A.   Due to the situation, we did not break into the room.

21  Q.   What happened?

22  A.   After that, Agent Zeismer must have -- a decision was made

23  for Ms. Yates to go back to the police department to be

24  interviewed.  That left myself and Agent Miller at the

25  residence to secure the residence until the other agents

Jacobs - D

1   were -- to come back.  It was -- it was kind of unusual to

2   leave -- to be in a residence with two locked rooms.  We --

3   that doesn't happen very often.

4   Q.    What were you waiting for?

5   A.    We were waiting for the other guys to arrive, the other

6   members of the search team, to take photos, to proceed with

7   normal search warrant procedure.

8   Q.    In the end, were you able to get into those two rooms?

9   A.    Yes.

10  Q.    Do you know how you got in?

11  A.    Yeah.  Approximately 8:50 or so, Mr. Mahler, along with

12  the agents, arrived at the house.  He was brought inside, and I

13  believe Agent Zeismer was able to obtain keys from Mr. Mahler,

14  and the doors were opened.

15  Q.    Were you assigned to search one of those two rooms?

16  A.    Yes.

17  Q.    Which room was your assignment?

18  A.    It was determined to be his bedroom.

19  Q.    During your search, did you find any firearms in that

20  bedroom?

21  A.    Yes, I did.

22  Q.    Do you know how many firearms you found?

23  A.    Five.

24  Q.    When you walked into that room, describe what you saw.

25  A.    As you entered the bedroom, there was a

Jacobs - D

1   dresser/armoire-type piece of furniture on your right as you

2   entered.  The bed was centered in the middle.  On the -- as you

3   look straight ahead, there was another dresser.  Closet was on

4   your left, and the bed was -- I noticed that there was very

5   little floor space.  The room was stacked with clothing and

6   other items; boxes, ammo boxes.

7   Q.    You mentioned you found five firearms.

8   A.    Correct.

9   Q.    Do you remember the first firearm that you found?

10  A.    Yes.  After the video was taken of the house and the

11  rooms, there was so much stuff in that bedroom, I believe

12  Agent McNall and I decided that we were going to move some

13  stuff and use the bed as a place to put it, so we searched the

14  bed first.  I picked up a pillow, and one of the firearms was

15  located under the pillow.

16  Q.    Agent Jacobs, I'm going to hand you what's been marked

17  Government's Exhibit 13.

18        Please take a look at it.

19        What is that?

20  A.    This is a Kimber, model CDPII, .45 caliber pistol.  Serial

21  number "K," as in "King," 301647.

22  Q.    Is that firearm loaded right now?

23  A.    It is not right now.

24  Q.    Was it loaded when you found it?

25  A.    Yes.

Jacobs - D

1  Q.   Can you describe -- was it loaded?  Was there an

2  additional round in that chamber of that firearm?

3  A.   Yes.  It had one in the chamber and eight in the magazine

4  inside a holster.

5  Q.   Is that firearm there zip-tied up and has an exhibit tag

6  on it?

7  A.   Yes.

8  Q.   Otherwise, is it in substantially the same condition that

9  it was when you found it on February 16, 2016, in the bedroom

10  of Robert Mahler?

11  A.   Yes.  It's zip-tied for safety, but it was loaded when I

12  found it.  It's empty now.

13  Q.   Can you also take a look now at your screen at

14  Government's Exhibit 48-1?  What are we looking at here?

15  A.   That's a picture of the bed.

16  Q.   Can we zoom in a little bit on this picture?

17  A.   After finding the gun underneath the pillow, I had the

18  photographer come back in, and I placed the pillow next to the

19  pistol to signify that it was found on the bed, underneath the

20  pillow.  That is not the exact location of where the gun was

21  found because we didn't know it was there to start with.

22  Q.   Thank you.  And now 48-2, what is this?

23  A.   That's the condition of the gun after I made it safe.

24  Full magazine, extra round out of the chamber, and a holster

25  that it was housed in.

Jacobs - D

Q.    Is this the particular way you would display a weapon that
had a round in the chamber and was removed?

A.    Well, it just happened to be that the bed was flat, and
I -- I chose to do it that way to get an extra picture of the
condition of the gun when it was found.

Q.    And this picture is the same gun that is Exhibit No. 13
that you found in Mr. Mahler's bedroom?

A.    Yes.

Q.    After you found this firearm, what did you -- what did you
do with it?

A.    What did I do with it?  I put it in this box.

Q.    Tagged it and --

A.    Tagged it.  We're responsible during search warrants -- if
you find a piece of evidence, you fill out the evidence tag.  I
filled out the evidence tag, to the best that I could, and took
it to Agent Hultgren who was handling the evidence.

Q.    Where did you search next in the bedroom?

A.    I think a decision was made for Agent McNall to stay on
the right side of the bed and the right side of the room.  I
think I stayed on the left-hand side of the room and started in
one of the corners, probably at the head of the bed.

Q.    I'm going to hand you now what's been marked as
Government's Exhibit 14.

A.    Can I stand up?

      THE COURT:  Yes, of course.

Jacobs - D

1  BY MS. WIGHT: (Continuing)

2  Q.    Please take a look at that and let me know, Agent Jacobs,

3  what is that?

4  A.    This is a Benelli, model M2, 12 gauge shotgun.  Serial

5  number "M," as in "Mary," 814228, "P," as in "Paul."

6  Q.    Do you remember where you found that shotgun?

7  A.    It was inside a black nylon case, loaded with eight

8  rounds, inside the right-hand side of the closet.

9  Q.    And do you recognize that as a firearm that was found in

10 Mr. Mahler's bedroom on February 2, 2016?

11 A.    Yes.

12 Q.    Oh, February 16th.  Thank you.

13       Is it in substantially the same condition that it was in

14 when you located it on that date?

15 A.    Other than I unloaded it and put a safety strap on it and

16 an evidence tag on it.

17 Q.    Let's have you take a look at your screen now at

18 Exhibit 58-1.  Tell us what we're looking at here.

19 A.    That's the closet area of the bedroom.

20 Q.    Is that the area that you began to search after you found

21 the gun under the pillow?

22 A.    Yes, I would have worked my way down the wall underneath

23 the window, through the dresser, into the closet.

24 Q.    Now, can you show us 97-1?  What is this exhibit?

25 A.    That's a picture of two black nylon rifle cases and some

Jacobs - D

1  additional ammunition slung over one of the items.

2  Q.    Is that on the right-hand side of the closet?

3  A.    Yes, it is.

4  Q.    I'll show you Exhibit 59-1.  What is this?

5  A.    So you saw the picture of the two black nylon cases

6  stacked on the right-hand side of the closet.  This particular

7  case would have been taken from the inside of those two

8  firearms because I didn't want the other ones to fall.  So

9  that -- this is the Benelli shotgun inside a black case.  I

10  unloaded the eight rounds that were in it, and we took a

11  picture of it after I removed it from the closet.

12  Q.    Is that you in the photograph there?

13  A.    That is me.

14  Q.    And this picture shows where you found that Benelli

15  shotgun in Robert Mahler's bedroom on February 16, 2016?

16  A.    Well, this in particular doesn't show the exact location

17  of the gun, but it was after I moved it out of the closet, laid

18  it open, that you could see what it was.

19  Q.    Did you find any other long guns or rifles?

20  A.    Yes.  The other black case that was stacked right to it

21  contained a firearm.  Next to it.

22  Q.    I'm going to show you what's been marked as Government's

23  Exhibit 15.

24       I'll take the shotgun from you.  We can do a switcheroo.

25       What are we looking at here?

Jacobs - D

1    A.    This is a Springfield Armory, model M1A .308 caliber

2    rifle, serial number 104710.

3    Q.    Do you remember if this item was loaded when you found it?

4    A.    Yes.  This magazine was inside the firearm, loaded with 19

5    rounds.

6    Q.    Apart from the zip tie and the exhibit tag that's on

7    there, is it in substantially the same condition it was in when

8    you found it on February 16, 2016?

9    A.    Except the magazine was loaded inside the rifle.

10   Q.    We're also going to show you Exhibit 58-2.  What's going

11   on in this exhibit?

12   A.    That is the rifle as I pulled it away from the closet and

13   opened up the black nylon rifle case.

14   Q.    Is that you again there in the photograph?

15   A.    Yes, it is.

16   Q.    Is the firearm in this photo the firearm that you just

17   showed us in court?  Government's Exhibit 15?

18   A.    Yes.

19   Q.    Can you tell us what else is in that photograph over in

20   the corner?

21   A.    Over in the corner?

22   Q.    Left-hand corner.  I apologize.  Bottom left.

23   A.    Bottom left?  It looks like an ammo box.

24   Q.    You mentioned that there were ammo boxes in the room.  Was

25   there ammo just sitting out in the room, or did you have to

Jacobs - D

1   search for that?

2   A.    I think these ammo boxes were stacked just as you see in

3   the picture, and they had to be opened up.  Other than the

4   camouflage carrier that was slung over that rifle in the

5   closet, there was a camouflage ammo carrier draped over the

6   black case that contained that rifle.

7   Q.    That was in one of the earlier exhibits that we looked at?

8   A.    Yes.  That was in an earlier photograph of the two rifles.

9   You see the camouflage case there?

10  Q.    That's an ammunition carrier?

11  A.    Yes, it is.

12        There were three .308 magazines in there full of 19 rounds

13  apiece, slung over this rifle.

14  Q.    So after you searched the right-hand side of the closet,

15  did you search the left-hand side, or did you go somewhere

16  else?

17  A.    I continued to search the closet.

18  Q.    So on the left-hand side of the closet, did you find any

19  firearms?

20  A.    Yes.

21  Q.    I think before we get to the left-hand side of the closet,

22  did you actually -- before we get to there, did you actually go

23  back to the bed -- did you go back to the bed and search?

24  A.    At one point we searched -- underneath the bed was a bunch

25  of boxes and some other items.  I mean, the -- underneath the

Jacobs - D

1  bed was full of items.   I remember boxes with knives and I

2  believe some flashlights and other items.

3  Q.    Did you ever find a firearm under the bed?

4  A.    Yes, I did.   There was a black SentrySafe located

5  underneath the bed.

6  Q.    Like a locked safe, like a locked gun safe?

7  A.    Correct.

8  Q.    Were you able to open it right away?

9  A.    No, I was not.

10 Q.    Did you have to break in to the box?

11 A.    No.   I asked Special Agent Hobaugh to assist me in asking

12 Mr. Mahler for the combination or key to the safe so we didn't

13 have to break it open.

14 Q.    Do you remember if he provided you a combination, or do

15 you not --

16 A.    Agent Hobaugh provided the key and opened the safe.

17 Q.    We are going to now show you Government Exhibit 16.

18       You can give me that other one.   You got it?

19           MS. WIGHT:   That's a heavy one.

20 BY MS. WIGHT: (Continuing)

21 Q.    If you can take a look at 16.   What do you have there?

22 A.    This is a Smith & Wesson, model 686, .357 caliber

23 revolver.   Serial number "C" as in "Charlie," "B" as in "Boy."

24 "A" as in "Apple."   8949.

25 Q.    And apart from the zip tie and the exhibit tag, is it in

Jacobs - D

1   substantially the same condition as it was in when you found it

2   on February 16, 2016?

3   A.    Yep.  It was unloaded in that black SentrySafe, along with

4   two boxes of ammunition.  One .357 caliber and one .38 Special.

5   50 rounds apiece.

6   Q.    Let's see 49-1.  We'll show you Exhibit 49-1.

7         What is going on here?

8   A.    That's the condition of the bed after we lifted the

9   mattress.  Those items underneath are what we had to search

10  through.

11  Q.    And then 50-2.

12  A.    That's the SentrySafe as it's opened up.  There's two

13  boxes of ammunition, a holster, and the firearm.

14  Q.    Is this the firearm that you just showed us that's

15  Government Exhibit 16?

16  A.    Yes, I have.

17  Q.    The Smith & Wesson?

18  A.    Yes.

19  Q.    In the photograph, are those keys?  Is it your

20  understanding those are the keys that actually open the

21  SentrySafe?

22  A.    Well, I can't say that because Special Agent Hobaugh is

23  the one that opened the safe.

24  Q.    Thank you.

25  A.    I located the safe under the bed, pulled it out, and asked

Jacobs - D

1  him to go see if he could retrieve the keys so we didn't have

2  to break it.

3  Q.    Okay.  That's good.

4       So once you found the Smith & Wesson -- I do want to get

5  back to the left side of the closet.  When you searched the

6  left side of the closet, did you find a firearm in there?

7  A.    Yes, I did.

8  Q.    I'm going to hand you what's been admitted as Government's

9  Exhibit 17.

10  A.    You want the pistol back?

11  Q.    Thank you.  Agent Jacobs, what is that?

12  A.    This is a Surplus Ammo and Arms Company, model LOW15.

13  It's listed as a multi caliber, but it was actually a .223

14  upper on it.  Serial number "S," as in "Sam," "A," as in

15  "Apple"  05062.

16  Q.    Is this the firearm that you found on the left-hand side

17  of Mr. Mahler's closet --

18  A.    Yes.

19  Q.    -- on February 16, 2016?

20  A.    Yes.  It was inside a black nylon case.

21  Q.    It was in substantially the same condition it was in?

22  A.    Other than the zip tie and the evidence tag, yes.

23  Q.    Is this firearm one that might be known as an AR-style

24  firearm?

25  A.    Yes, it is.

Jacobs - D/X

1    Q.   Can you please take a look at 60-1?  Tell us about that

2    exhibit.

3    A.   That's the left-hand side of the closet and the nylon case

4    that's leaned up against the wall.  On the left is the nylon

5    case that contain the firearm just described.

6    Q.   And 60-2.  And what about this exhibit?

7    A.   That's when I removed -- the picture was taken after I

8    removed the firearm from the black case.

9    Q.   Is that your foot in the photograph there?

10   A.   Yes, it is.

11   Q.   And is that the same firearm that you just showed us

12   that's Government Exhibit 17, the Surplus Ammo and Arms rifle?

13   A.   Yes, it is.

14   Q.   Agent Jacobs, are these all the firearms you found in

15   Mr. Mahler's bedroom on February 16, 2016?

16   A.   Yes, they are.

17             MS. WIGHT:  No further questions.

18             THE COURT:  Okay.

19             MR. WARREN:  Thank you, Your Honor.

20

21                        CROSS-EXAMINATION

22   BY MR. WARREN:

23   Q.   I believe all these have already been preadmitted; is that

24   correct?

25        Well, first of all, I would like to show you these marked

Jacobs - X

1   101-D, 101-B, 101-E, and 101-C.  Do you recognize those photos?

2   A.   Yeah, I recognize the picture hanging on the wall.

3   Q.   Yes.

4   A.   I believe that's the closet area to Mr. Mahler's bedroom.

5   Q.   Okay.

6   A.   I do not recognize the person there.

7   Q.   Okay.  Okay.

8   A.   You want me to look through all of them here?

9   Q.   Yes.  Please.  They're pretty much similar.

10         MS. WIGHT:  I would like to remind the witness not to

11   testify about these exhibits until they have been admitted.

12      Thank you, Agent Jacobs.

13         THE COURT:  Wait, wait.  I didn't hear what you said.

14         MS. WIGHT:  I just wanted to remind him not to

15   testify about the content of the images until they have been

16   admitted.

17         THE COURT:  Do you recognize those exhibits?

18         THE WITNESS:  I recognize the photographs.

19         THE COURT:  Okay.  There we go.

20   BY MR. WARREN:  (Continuing)

21   Q.   And what do you recognize the photographs as?

22         MS. WIGHT:  Objection, Your Honor.  I believe he

23   might have misunderstood.  He said, "Do you recognize the

24   photographs?"  Do you recognize what's located in the

25   photograph?  Is that how you were responding?

Jacobs - X

1          THE WITNESS:  I recognize a photograph of a picture

2     that was hanging in Mr. Mahler's bedroom.

3          MS. WIGHT:  Okay.

4          THE COURT:  Okay.  That's enough?

5          MR. WARREN:  That's enough.

6          THE COURT:  What's the next --

7          MR. WARREN:  Thank you.

8     BY MR. WARREN: (Continuing)

9     Q.   So do you recognize that as a picture and part of the

10    closet that was in Mr. Mahler's bedroom?

11    A.   I do not recognize the Team USA Parking Only banner.  I

12    recognize that picture for being inside the left-hand entry

13    door of his bedroom.  And that would signify that's his closet

14    because it's got a divider in the middle.  But that's the only

15    thing I recognize from the picture.

16    Q.   Thank you.  Thank you.  That's a unique picture that

17    was -- that you recognize and recall was in Mr. Mahler's

18    bedroom -- spare bedroom?

19    A.   Yes.

20    Q.   Yes.  Thank you.

21         But you don't recognize this person?

22    A.   No, I don't.

23    Q.   Okay.  You do recall speaking with his wife,

24    Ms. Kristine Yates, on -- when you wrote your report on

25    February 16th of 2016?

Jacobs - X

1    A.    Yes, I do.

2    Q.    And you actually stated in your direct examination that --

3    that she didn't know that Mr. Mahler had previously been

4    convicted of a felony?

5    A.    That's true.

6    Q.    And you also asked her about firearms she -- that he was

7    being investigated for firearms and firearms had been found in

8    his vehicle; is that correct?

9    A.    Yes.  At that point, when we made entry, there must have

10   been some radio chatter, or I must have had information that a

11   firearm was found in his vehicle prior, yes.

12   Q.    And Ms. Yates told you she had not known Mr. Mahler to

13   have firearms?

14   A.    That's correct.

15   Q.    Is that true?

16        She also told you that she knows that he had gotten in

17   trouble in the past because his wife sent several firearms out

18   of the country; is that true?

19   A.    That's what she told me.  Yes, she was aware of that.

20   Q.    So you didn't recognize the person in this picture as

21   being his wife?

22   A.    No.  I'm sorry.  I haven't -- she -- I spent a total of

23   maybe -- well, this has been two years, a little over two

24   years, and I spent a total of approximately less than 15

25   minutes or 20 minutes with her.

Jacobs - X

1        MR. WARREN:  Thank you.  No further questions.

2        THE COURT:  Go ahead.

3        MS. WIGHT:  Your Honor, this may be something you

4    want to take up at a break just regarding whether or not a door

5    has been opened on a particular topic.

6        THE COURT:  Well, members of the jury, I'll have you

7    out right now and take this issue up.

8        Go ahead and take them.

9                    (Jury not present.)

10        THE COURT:  Because the witness is still here, let's

11    address the issue.  Go ahead.  What is the issue?

12        MS. WIGHT:  Your Honor, we believe the door has been

13    opened by Mr. Warren regarding the nature of defendant's prior

14    convictions.  He just submitted testimony in evidence before

15    the jury that suggested that his wife had sent several firearms

16    out of the country, basically replacing his wife for his prior

17    conviction.

18        MR. WARREN:  Your Honor, the wife said she did not

19    know that he had been convicted of a felony, and that's not

20    opening the door to any prior felony.

21        MS. WIGHT:  We are concerned that there might be some

22    confusion to the jury as to that specific conduct.

23        THE COURT:  I'm going to deny your request at this

24    time.  I'll take it up later if I need to, but I don't see that

25    that opens the door.  It was an answer given, and people can

Jacobs - X

1    make their arguments, but I'm not going to allow it any

2    further.

3              MS. WIGHT:  Thank you, Your Honor.

4              THE COURT:  Are we done with this witness, then?

5              MS. WIGHT:  Yes, we are.

6              THE COURT:  May this witness be excused?

7              MR. WARREN:  Yes.

8              THE COURT:  You may step down.  Who's our next

9    witness?

10        Wait.  What exhibit is still here?

11             THE WITNESS:  The rifle.

12             THE COURT:  We'll get it.

13             MS. WIGHT:  Thank you.

14             THE COURT:  Who's your next witness?

15             MS. WIGHT:  The next witness is Resident Agent in

16   Charge Mike McNall, from ATF.

17             THE COURT:  Mike McNall.  He's a 30-minute witness.

18             MS. WIGHT:  He may be even shorter.

19             THE COURT:  We're going to take him because I've been

20   up here long enough to know that if I keep the jury until

21   12:30, they might be able to actually get out and get lunch.

22        If we start now, they will be in too long a line.  I

23   thought we could go until 12:30.

24             MS. WIGHT:  Okay.

25             THE COURT:  Let's call the next witness and have the

Jacobs - X

1    jury back.

2         By the way, the jury passed on, through, at my request,

3    Ms. Kramer, that they're happy to run long and work later to

4    get done shorter.  So this is an accommodation to them.

5         If you can wait there at the pew, the first pew, and then

6    we'll call you when the jury comes in.

7                        (Jury present.)

8              THE COURT:  We finished with that last witness.

9              DEPUTY COURTROOM CLERK:  There's one more.

10             THE COURT:  I see that.  There's an empty chair.

11   Just to catch you up, we excused the last witness, and we're

12   going to call another witness whose, at most, maybe a 30-minute

13   witness.  I'm doing that because if we go a little longer the

14   lines at the places to grab some lunch, I think, will be

15   shorter.

16        All right.  How is that?  Okay.  Thank you.

17        Come forward.  Call your next.

18             MS. WIGHT:  Government calls Resident Agent in Charge

19   Michael McNall.

20             DEPUTY COURTROOM CLERK:  Please raise your right

21   hand.

22

23   ///

24   ///

25   ///

McNall - D

1                    MICHAEL MCNALL,

2  called as a witness on behalf of the Plaintiff, being first

3  duly sworn, is examined and testified as follows:

4

5              THE WITNESS:  I do.

6              DEPUTY COURTROOM CLERK:  Please have a seat.  State

7  your full name and spell it for the record.

8              THE WITNESS:  It's Michael McNall.  M-i-c-h-a-e-l,

9  M-c-N-a-l-l.

10

11                    DIRECT EXAMINATION

12  BY MS. WIGHT:

13  Q.    Good afternoon, Mr. McNall.  Can you tell us where you're

14  currently employed.

15  A.    I'm currently still with ATF in Spokane, Washington.

16  Q.    And what is your position there?

17  A.    I'm the supervisor there.

18  Q.    How long have you worked for ATF?

19  A.    A little over 29 years.

20  Q.    Were you a special agent in Oregon during the

21  investigation of Robert Mahler?

22  A.    Yes, I was.

23  Q.    Did you participate in a search warrant on February 16,

24  2016?

25  A.    I did.

McNall - D

1    Q.    And what were your responsibilities during that search

2    warrant?  What areas were you involved in?

3    A.    I searched the vehicle, and then I searched the bedroom in

4    the residence.

5    Q.    Well, we just heard from Special Agent Jacobs.  So let's

6    start in the bedroom of the residence.

7    A.    Okay.

8    Q.    Describe for us what the room looked like when you got

9    there.

10   A.    When I arrived, the address was secured, so I just went

11   into one of the bedrooms with SA Jacobs, and it was somewhat

12   cluttered.

13   Q.    Did you find any firearms in that bedroom?

14   A.    I did.

15   Q.    And how many did you find?

16   A.    I found one.

17   Q.    Where was that firearm located?

18   A.    It was next to the bed in a nylon -- black nylon case.

19   Q.    Do you remember which side of the bed?

20   A.    Yes.  It would have been the right side because I had the

21   right side of the room.  I mean, from looking at it, it was the

22   right side.

23   Q.    I'm going to hand you what's been marked as Government's

24   Exhibit 12.

25         Can you please take a look at that?

McNall - D

1    A.    Sure.  Let me put my glasses on.

2          Yes.

3    Q.    What is that?

4    A.    This is a Charles Daly, .45 caliber pistol, with a serial

5    number on it CD001908.

6    Q.    Do you recognize that as the pistol you located next to

7    the bed in Robert Mahler's bedroom?

8    A.    I do.

9    Q.    Was that on February 16, 2016?

10   A.    Yes.

11   Q.    And that firearm there, does it have a zip tie to secure

12   it?

13   A.    Yes, it does.

14   Q.    Does it have an exhibit tag?

15   A.    Yes, it does.

16   Q.    Is it otherwise in substantially the same condition it was

17   in when you found it on that date?

18   A.    I believe so, yes.

19   Q.    I'm going to direct your attention to the screen and pull

20   up Government Exhibit 45-1.  Tell us what you see in this

21   exhibit.

22   A.    Oh, boy.  I can't really see this thing.

23   Q.    I think it tilts.

24   A.    Does it tilt?  Oh, there it is.

25             DEPUTY COURTROOM CLERK:  Is that better?

McNall - D

1          THE WITNESS:  Yeah, that's better.  Okay.  That's all

2   right.

3   BY MS. WIGHT: (Continuing)

4   Q.    What do you see in this Exhibit 45-1?

5   A.    I see the bedroom that we started in.

6   Q.    Can you identify the area where you found --

7   A.    Yes.  Yeah.  It was between, I think, the bed and that

8   little nightstand maybe.

9   Q.    We'll zoom in on that area, and let's see.

10         That black bag that's between the bed and the nightstand.

11  Is that what you're referring to?

12  A.    Yes.  I can't really see it on here; but, yeah, there was

13  something down in between there.

14  Q.    Let's look at 47-1.  A closeup.

15         What about 47-2?  What is this?

16  A.    Yeah, there was a nylon bag that I found, and when I

17  opened it, there was another nylon bag inside.  And then I

18  opened that nylon bag, and then there was the gun and some

19  ammunition and magazines.

20  Q.    Let's look at 47-3.  What is this an exhibit of?

21  A.    This looks like the gun that's right here.

22  Q.    So is that gun in the photo the gun that you found next to

23  the nightstand in Robert Mahler's bedroom?

24  A.    Yes.

25  Q.    And that's the firearm you have in front of you?

McNall - D

1   Government's Exhibit 12?

2   A.    That's correct.

3   Q.    Once you found this gun, what did you do with it?

4   A.    I had the photographer take a picture of it, and then I

5   wrote out an evidence tag and tagged it, secured it, made sure

6   it was empty.  That's the first thing we did.  And then we put

7   the tag on it, documented it, and then gave it to the evidence

8   custodian for processing.

9   Q.    And you said that you only found that one firearm in his

10  bedroom?

11  A.    Yes.

12  Q.    Let's turn now, then -- you said you also searched the

13  car.  That same day?

14  A.    Yes.  That was prior to the search warrants at the

15  residence.

16  Q.    So we'll go back to the car that you first searched.  Do

17  you remember where the search of the car took place?

18  A.    I think they brought it back to the PD parking lot.

19  Q.    To the police department?

20  A.    Yes.  In Silverton.

21  Q.    Did you search a particular area of the car, or did you

22  just search the whole thing?

23  A.    No.  I -- I searched the front compartment, more or less.

24  I mean, we double-checked our work, so eventually we -- we went

25  around the whole thing; but, yeah, there was other agents there

McNall - D

1  helping, but I had the front portion of it by the driver's side
2  and the front compartments in the glovebox -- not the -- the
3  center console, I guess, I should say.
4  Q.    Do you remember if a firearm was found in that car?
5  A.    Yes.
6  Q.    Did you personally find that firearm?
7  A.    No.  I think SA Hultgren was with me searching that car,
8  and he found it.
9  Q.    Did you find anything else in that car that you seized?
10 A.    Yes, I did.  I found a piece of -- I found a bunch of
11 keys, but I found a piece of paper that had some sort of
12 combination on it.
13 Q.    Can you take a look at Government's Exhibit 67-1?  Tell us
14 what is going on in this exhibit.
15 A.    Yeah.  Okay.  So that's not where I found it, but that's a
16 picture of it after it was found.  It's the right one right on
17 the far right.
18 Q.    The bigger piece of paper?
19 A.    Yeah, right there.
20 Q.    You mentioned that wasn't where you found it.  Do you
21 remember kind of where you found it?
22 A.    Yeah.  I think it was in the -- there was a compartment in
23 front of, like, the gearshift.
24 Q.    Of the console area?
25 A.    Yeah.  Somewhere in there.

McNall - D/X

1    Q.   Do we have a -- let's look at 69-1.  Is this the document

2    that you found and seized from the car?

3    A.   I believe so, yes.

4    Q.   And that's a combination on there?

5    A.   To me, it is.

6    Q.   At that time did you know what that combination went to?

7    A.   No, I didn't.

8              MS. WIGHT:  Thank you.  I have no further questions.

9              THE COURT:  Cross?

10             MR. WARREN:  Yes.

11

12                       CROSS-EXAMINATION

13   BY MR. WARREN:

14   Q.   Special Agent in Charge McNall, you were assigned to

15   Portland at that time when this search went on back in 2016?

16   A.   That's correct.

17   Q.   And now you're in charge up in Spokane?

18   A.   Well, I wasn't in charge here.  I was just a special agent

19   here, and then I promoted out to be a boss in Spokane.

20   Q.   Okay.  And you were part of the search of the vehicle, the

21   Kia Sorento; is that correct?

22   A.   That's correct.

23   Q.   Were there other vehicles located at the residence you

24   recall?

25   A.   I don't know.

McNall - X

1  Q.   Did you have any intel on -- intelligence on Mr. Mahler

2  and who he was?

3  A.   Yes.  A little bit.

4  Q.   Okay.  When he was at the -- would it be the Silverton

5  Police Department? -- did you take DNA of him?

6  A.   I did.

7  Q.   And did you do the standard DNA test with gloves and swab

8  his -- inside of his mouth and put it in a holding container?

9  A.   Yeah.  I mean, I don't know if it was a holding container;

10 but, yeah, we sealed it and took the DNA.  Yes, we did.

11 Q.   Okay.  And --

12 A.   Or I did.

13 Q.   And he was cooperative?

14 A.   Yeah.  Very cooperative.

15 Q.   And you assisted in the search of the bedroom; is that

16 correct?

17 A.   Well, I didn't really know what it was in the beginning,

18 but it became clear that it appeared to be Mr. Mahler's

19 bedroom.

20 Q.   I would like to show you some exhibits that had previously

21 been shown to Special Agent Jacobs.  Do you recognize that

22 exhibit?

23 A.   No.

24 Q.   Okay.  They're all about the same?

25 A.   Are they?

McNall - X

1   Q.    Yeah.   Do you recognize the person in the exhibit?

2   A.    No, I really don't.

3               MR. WARREN:   Okay.   Nothing further, Your Honor.

4               MS. WIGHT:   Nothing further for the government.

5               THE COURT:   May this witness be excused?

6               MS. WIGHT:   Yes.

7               MR. WARREN:   Yes.

8               THE COURT:   Thank you.   You're free to go.   We'll

9   take the exhibit.   Cathy, do you want to get that exhibit?

10              DEPUTY COURTROOM CLERK:   Yes.

11              THE COURT:   Do you have another witness?

12              MS. WIGHT:   We do.   We probably have time for one

13  more, Your Honor.

14              THE COURT:   Go ahead.

15              MS. WIGHT:   The government calls Special Agent

16  Leland Stice.   Oh, retired Special Agent Leland Stice.   I

17  apologize.

18              THE COURT:   Please come forward and be sworn.

19              DEPUTY COURTROOM CLERK:   Please raise your right

20  hand.

21                          LELAND STICE,

22  called as a witness in behalf of the Plaintiff, being first

23  duly sworn, is examined and testified as follows:

24

25              THE WITNESS:   Yes, I do.

Stice - D

1          DEPUTY COURTROOM CLERK:  Please state your full name

2   and spell it for the record.

3          THE WITNESS:  Leland Stice.  L-e-l-a-n-d.  S-t-i-c-e.

4

5                      DIRECT EXAMINATION

6   BY MS. WIGHT:

7   Q.    Mr. Stice, were you a special agent with the ATF?

8   A.    Yes, I was.

9   Q.    And what do you do now?

10  A.    I retired from ATF about a year ago, and now I'm a

11  civilian employee.  I work for a private contracting company

12  called Five Stones Intelligence.

13  Q.    I will ask you to slow down.  I can tell already you're a

14  fast taker.

15        So you retired about a year ago.  How long did you

16  actually work for the ATF?

17  A.    About 30 years.

18  Q.    And what do you do in your new capacity as a contractor?

19  A.    My title is I'm a seized property investigator, and I

20  actually work as a contractor with ATF to inventory evidence

21  vaults and track property.

22  Q.    So you still work with the ATF?

23  A.    Yes, I do.

24  Q.    Were you involved in an investigation that focused on the

25  defendant, Robert Mahler?

Stice - D

1   A.    Yes.

2   Q.    And were you aware that there were search warrants in that

3   investigation?

4   A.    Yes.

5   Q.    And were you involved with the search warrant that was

6   executed on February 16, 2016?

7   A.    Yes, I was.

8   Q.    What was your first role or assignment during that search?

9   A.    I was stationed at the Silverton Police Department with

10  the case agent, Special Agent Johnson, and we had the initial

11  contact with the defendant.

12  Q.    Did that assignment actually include a search of the

13  defendant, Robert Mahler?

14  A.    Yes.

15  Q.    And did that search take place at the Silverton Police

16  Department?

17  A.    Yes.

18  Q.    During that search, did you find any items that you

19  seized?

20  A.    Yes.  He had a set of keys and a wallet.

21  Q.    I'm showing you what's been marked -- if you can direct

22  your attention to that screen -- 82-2.

23        And what are we looking at here?

24  A.    Yeah, that is a table at the -- in the room at the

25  Silverton Police Department, and that is the -- the keys, the

Stice - D

1   set of keys, and the wallet that were laying on that table for

2   a photograph.

3   Q.   Did you search the wallet as well?

4   A.   Yes, I later searched the wallet.

5   Q.   You didn't search the wallet at the police station?

6   A.   No.  Not entirely.

7   Q.   So where did the search of the wallet take place?

8   A.   That took place later when we returned to his residence

9   for the search warrant there.

10  Q.   Do you remember why you had to return to the residence?

11  A.   They had us -- we had a search warrant for his residence

12  location.

13  Q.   And do you remember why they needed Mr. Mahler back at the

14  residence?

15  A.   I don't remember specifically, but it's very common to

16  allow access to get in the front door and have keys and that

17  sort of thing, yes.

18  Q.   So once you were back at the residence and you searched

19  the wallet, what did you find?

20  A.   I found -- we had all sorts of cards and things in there

21  and other paperwork; but I also found, like, a little note with

22  a handwritten safe combination -- what appeared to be a safe

23  combination on the note.

24  Q.   I'm going to show you what's been marked as

25  Government's Exhibit 82-3.  What is this?

Stice - D

1  A.    That is --

2  Q.    What are we seeing in this picture?

3  A.    I see a note with a combination of 6-61-29-87, and then

4  there's some -- appears to be handwritten notes below that

5  where it says, "Clear, left, stop, zero left, six right,"

6  et cetera.

7  Q.    When you found this combination, at that time did you know

8  what this combination was to?

9  A.    No.

10 Q.    During your search on February 16, 2016, was that the only

11 document you found that had a combination on it?

12 A.    That was the only document I believe I took from the

13 wallet, but I did assist at the search and the house, and I

14 found a document during that search.

15 Q.    Let's talk about the search of the house, then.  What part

16 of the house were you responsible for searching?

17 A.    Well, I don't know if I was responsible for any one area,

18 but I do recall assisting in different areas of the house.  One

19 of them being, like, the living room, the kitchen, and I

20 believe I might have helped in one of the bedrooms at some

21 point.

22 Q.    And this document that you mentioned with a combination,

23 do you remember what room that was found in?

24 A.    I believe it was in the living room.  It was right by a

25 big lounge chair.

Stice - D

1  Q.   I'm going to show you what's been marked as Government's

2  Exhibit 52-2.

3  A.   Yes.

4  Q.   What are we looking at here?

5  A.   That is me holding a document that is titled -- it's two

6  pages, actually, but the first page, the top of it says

7  "Liberty Safe" and I can't quite make out the rest, but I think

8  it has model number -- there you go.  Model FX-23.  It has a

9  serial number.  It says "combination."  Then down below it it

10 has a combination of 6-61-29-87.  Then it has direction, it

11 appears.  Stop at zero, left at six, right two times past zero

12 to 61, left two times past zero to 29, then left to 87.

13 Q.   You said left to 87?

14 A.   Yes.

15       MS. WIGHT:  Doug, can you zoom in on the bottom part

16 of that document?

17 BY MS. WIGHT:  (Continuing)

18 Q.   So just to note this, the end of that document says "left

19 to 87"?

20 A.   Yes.

21       MS. WIGHT:  Can you pull up the other combination

22 that we just saw, which was 82-3?

23 BY MS. WIGHT:  (Continuing)

24 Q.   And is this combination handwritten?

25 A.   Yes.  It appears it's handwritten.

Stice - D

1    Q.    And what does the bottom line say?

2    A.    The bottom line appears to say "right" with a little

3    arrow, and then it says "87."

4    Q.    So are these two combinations exactly the same?

5    A.    The numbers appear to be the same, but the direction

6    turning -- which you would be turning the cylinder appears to

7    be different.

8    Q.    Okay.  If you can hold on just one second.  It will be one

9    second.

10        I apologize.  We'll just be one second.

11        Thank you for your patience.  We are going to show you one

12   more exhibit.  Thank you.

13        Okay.  This is Exhibit 95-2.  So this is preadmitted

14   Exhibit 95-2.  Please take a look at this.

15   A.    Okay.  I see it.

16   Q.    Does this appear to be the same combination that we just

17   looked at on those past two exhibits?

18   A.    6-61-29-87.  Yeah, I believe that's the same.

19   Q.    If we go straight to the bottom, what is unique about this

20   exhibit?

21   A.    Well, the last instruction is in bold print.  It says,

22   "Left to 87," in quotations, but "left" has been -- appears to

23   be penned out with a pen, and below it there's a handwritten

24   "R."

25   Q.    So we now have two copies of the safe -- the consensus

Stice - D/X

1  that it's two copies with an "R" and still one with the "left"?

2  A.   Yeah, the handwritten previous exhibit showed "right," and

3  this appears to be corrected to "right" as well.

4  Q.   If we can go back one last time to the exhibit from the

5  bedroom -- or from the living room, does this appear to be

6  the -- if we can zoom out -- a similar -- basically, the same

7  printout of the safe combination but without the writing on the

8  bottom?

9  A.   Yes.  It appears to be the same.

10           MS. WIGHT:  Thank you.  No further questions.

11           THE COURT:  Anything else?

12           MR. WARREN:  Yes.

13           THE COURT:  Cross?

14           MR. WARREN:  Yes.  A few questions.

15

16                 CROSS-EXAMINATION

17  BY MR. WARREN:

18  Q.   Special Agent Stice -- well, Mr. Stice, did you assist in

19  reading Mr. Mahler his *Miranda* rights at the time of his

20  arrest?

21  A.   I don't remember if I read them, but I was present when

22  they were read, yes.  It was either myself or Special Agent

23  Johnson.

24  Q.   Was that at the Silverton Police Department?

25  A.   Yes.

Stice - X

1  Q.   Did you have occasion to interview anyone in association

2  with this investigation -- any person?

3  A.   No.

4  Q.   Okay.  Do you recall seeing Mr. Mahler's wife?

5  A.   Yes.  Yes.  We did talk to her, or Special Agent Johnson.

6  I was present during that interview, yes.  At least partially

7  of it.

8  Q.   I would like to show you what's been marked as

9  Exhibit 101-C.  Do you recognize the person in that photograph?

10  A.   To be honest, I don't remember.  I don't remember who that

11  is.

12          MR. WARREN:  Okay.

13          THE WITNESS:  It's been a while.  Sorry.

14          MR. WARREN:  Thank you.  I have no further questions,

15  Your Honor.

16          THE COURT:  Anything else?

17          MS. WIGHT:  No further questions.

18          THE COURT:  May this witness be excused?

19          MS. WIGHT:  Yes.

20          THE COURT:  You may step down and be excused.

21      Is there an exhibit up there?  No, I don't think so.

22      We'll take a noon recess.  I think our timing worked well.

23  I believe I'm going to talk to the lawyers after I excuse you,

24  and I'll have an update on where we are for the afternoon.

25  Have a great lunch.

Stice - X

1    Is an hour long enough?  Okay.  We'll be back here --

2    please be back in the jury room at 1:30.

3         MS. WIGHT:  Your Honor, depending on what may or may

4    not happen after the lunch, a little bit longer lunch, if that

5    could be requested, would be preferred.  Maybe a little bit

6    longer.

7         THE COURT:  How much longer?

8         MS. WIGHT:  At least an hour and 15, hour and a half,

9    if we're preparing for the resolution of trial.

10        THE COURT:  Quarter to 2:00.  Come on back at a

11   quarter to 2:00.  Thank you.

12                   (Jury not present.)

13        THE COURT:  What does your afternoon look like?

14        MS. WIGHT:  Witness-wise?

15        THE COURT:  Where do you think you are?  Are you

16   ahead or behind?

17        MS. WIGHT:  We're very ahead.  We only have one

18   planned, and that is the case agent, Ms. Amanda Johnson.  So I

19   think that is it.  So we will rest after that and --

20        THE COURT:  She's listed for an hour.  Is that still

21   a good assumption?

22        MS. WIGHT:  No.  It's significantly shorter now, but

23   we do have some -- a meeting to have before we finalize her

24   testimony.

25        THE COURT:  I can't hear you.

1          MS. WIGHT:  Oh, sorry.  It will probably be a lot

2   shorter, but she and I need to meet for a little bit and

3   discuss the nature of her final testimony.  She will be our

4   last witness.

5          THE COURT:  All right.  So, theoretically, you could

6   be done by 3:00?

7          MS. WIGHT:  Oh, certainly, yes.  The lunch will go to

8   1:00.

9          THE COURT:  Quarter to 2:00.

10         MS. WIGHT:  Okay.

11         THE COURT:  So if it's an hour, we can give you some

12  room for maneuvering.  3:00, I guess.  You'll be shorter than

13  that.

14     Mr. Warren, I just want to make sure you're ready to go.

15  What's the status of your witness count at this point?

16         MR. WARREN:  Well, we only have two maybe witnesses

17  at this point, and so we have to -- I have to talk it over with

18  my client.

19         THE COURT:  Okay.  This would be a good time to do

20  that.

21         MR. WARREN:  Yes.

22         THE COURT:  Over the lunch hour.

23     See you back here at quarter to 2:00.  Is there anything

24  else we need to take up?

25         MS. WIGHT:  No.  If we -- are we planning to go to

Stice - X

1  6:00 today?  Are we trying to finish it out today if we can?

2          MR. WARREN:  Yeah.

3          THE COURT:  I'll talk to the jury when they come

4  back.  All right?  Thank you.

5          MS. WIGHT:  Yes.

6          MR. WARREN:  Court is in recess.

7          THE COURT:  I like to break at natural breaks.  If we

8  get the evidence in, we may finish the evidence, and maybe

9  we're done ahead of time, and we'll have a jury conference, so

10  I can excuse the jury early and come back tomorrow.  It will

11  just be your arguments that will have to be factored in.  If I

12  get all the evidence in, I'll let them go home early, and we'll

13  do our work, and then we'll be ready to go in the morning.

14      Again, I like to do natural breaks, so it's easy on the

15  jury.

16          MS. WIGHT:  Okay.

17          THE COURT:  Plan accordingly.  Thanks.  We're in

18  recess.

19                  (Lunch recess taken.)

20          DEPUTY COURTROOM CLERK:  I'm bringing in the jury

21  now.

22                  (Jury present.)

23          THE COURT:  Please be seated.

24          MS. WIGHT:  Your Honor, we're waiting for Mr. Warren.

25          DEPUTY COURTROOM CLERK:  He's in the restroom,

Stice - X

1  Your Honor.

2  THE COURT:  Can you pull the door, Mr. Warren?  Can

3  you pull the door?  We had a brief scheduling conference, and I

4  think you'll be pleasantly surprised when we get to the point

5  where I can sort of update you with what we're going to do and

6  how we're going to progress and how I've got this organized.

7  We'll finish now for the last witness for the government;

8  correct?

9  MS. WIGHT:  That's correct.

10  THE COURT:  Call your next.

11  MS. WIGHT:  The government calls Special Agent Amanda

12  Johnson.

13  THE COURT:  Thank you.  Please come forward and be

14  sworn.

15  DEPUTY COURTROOM CLERK:  Please raise your right

16  hand.

17  AMANDA JOHNSON,

18  called as a witness in behalf of the Plaintiff, being first

19  duly sworn, is examined and testified as follows:

20

21  THE WITNESS:  I do.

22  DEPUTY COURTROOM CLERK:  Thank you.  Please have a

23  seat.  Please state your full name and spell it for the record.

24  THE WITNESS:  Special Agent Amanda Johnson.

25  A-m-a-n-d-a.  J-o-h-n-s-o-n.

Johnson - D

1              DIRECT EXAMINATION

2  BY MS. WIGHT:

3  Q.    Good afternoon, Agent Johnson.

4  A.    Good afternoon.

5  Q.    Where do you work?

6  A.    I work for the Bureau of Alcohol, Tobacco, Firearms &

7  Explosives.

8  Q.    How long have you been a special agent for ATF?

9  A.    Approximately four years.

10  Q.    Were you involved with the investigation of Robert Mahler?

11  A.    I was.

12  Q.    What was your role in that investigation?

13  A.    I'm the case agent.

14  Q.    Can you just tell us what does a case agent do in these

15  cases?

16  A.    It means the case is assigned to me.  So the overall

17  investigative steps that are taken, I'm generally the lead

18  person on that case; but we're a pretty small office, and so we

19  all work together as a team.

20  Q.    Let's talk about your investigation.  Do you remember when

21  this case was first assigned to you?

22  A.    Yes.  It ultimately became my case due to a phone call

23  with Ms. Connie Daggett that I had with her on January 19,

24  2016.

25  Q.    You had a call from Ms. Connie Daggett.  What did you do

1   in response to that phone call?

2   A.    In response to her phone call, I conducted additional

3   phone calls, as well as subsequent interviews, and then did my

4   own research to determine what she was saying, which was that

5   Mr. Mahler was prohibited from possessing firearms.  And so

6   through any research, I determined that he was indeed

7   prohibited.

8   Q.    You verified that he was a felon?

9   A.    Yes, I did.

10  Q.    After this initial investigation, what steps did you take?

11  A.    From there, I applied for and obtained three search

12  warrants for the locking safes or containers that Mr. Mahler

13  was storing at the Daggetts' residence.

14  Q.    How many total search warrants did you have for the whole

15  investigation?

16  A.    Six.

17  Q.    And you were the affiant on all of those?

18  A.    Yes.

19  Q.    What dates were they executed?

20  A.    The first search warrant -- or the first three, excuse me,

21  search warrants were executed on February 3, 2016, and the

22  second three search warrants were executed on February 16,

23  2016.

24  Q.    First, for that February 3rd warrant at the Daggetts, what

25  was your role or assignment that you had?

Johnson - D

1  A.    At that particular location, I was the evidence custodian

2  for Safe 1.  Also known as the Liberty Safe.

3  Q.    What does an evidence custodian do?

4  A.    It's my responsibility to log all of the evidence that is

5  found within that location.  So in this particular situation,

6  another agent was searching that safe, and then I logged

7  everything that he found.

8  Q.    And as lead case agent, are you aware of the total number

9  of firearms that were seized for the purpose of this case on

10  February 2, 2016?

11  A.    February 3rd of 2016?

12  Q.    Yes, I apologize.

13  A.    Yes, I am.

14  Q.    What was the total number?

15  A.    34.

16  Q.    Are you also aware of the approximate number of rounds of

17  ammunition that were seized on February 3rd of 2016?

18  A.    I am.

19  Q.    And what was that?

20  A.    Approximately 32,000 rounds.

21  Q.    Were you also present for the February 16, 2016, warrants?

22  A.    Yes, I was.

23  Q.    And as lead case agent, are you aware of the total number

24  of firearms that were seized on that date?

25  A.    Yes.  Total number of firearms seized between the

Johnson - D

1    residence and the vehicle were seven firearms.

2    Q.    And is that six at the residence and one in the vehicle?

3    A.    That's correct.

4    Q.    And what about the approximate number of ammunition

5    rounds?

6    A.    Approximately 6,000 rounds.

7    Q.    So for the February 16th search warrant, what was your

8    role for that on that day?

9    A.    My primary role was making contact with Mr. Mahler at the

10   Silverton Police Department.  I also made contact with his wife

11   at the Silverton Police Department, and then I later returned

12   to the residence to assist with executing the search warrant of

13   the residence.

14   Q.    And when you went back to the residence to search, what

15   was your role?

16   A.    I was a searcher.

17   Q.    So in your role as a searcher, did you personally find any

18   firearms?

19   A.    I did not, no.

20   Q.    Did you find any evidence to be seized?

21   A.    The evidence that I found that we seized were keys.

22   Q.    And why were you looking for keys?

23   A.    The purpose of the search for the keys was to see if we

24   could locate any keys that successfully were associated with

25   the safes that Mr. Mahler was storing at the Daggetts'

Johnson - D

1  residence.

2  Q.   So in Mr. Mahler's residence, what room did you find keys

3  in?

4  A.   I found the keys from the bedroom.

5  Q.   So keys were found elsewhere, but you found --

6  A.   Yes.  Yes.

7  Q.   And inside the bedroom, do you remember where in the

8  bedroom you found the keys?

9  A.   Yeah.  The keys that I seized were associated with the

10  dresser or armoire that you heard previously described.  There

11  was a bowl of keys located on top of the dresser, a bowl of

12  keys located inside the dresser, as well as several keys

13  located on a brass bar key ring inside the dresser.

14  Q.   So before we get into the details of those keys, just tell

15  us generally, as lead case agent, what happened after all these

16  warrants and you collect all this evidence?  Where does it go?

17  What do you guys do with it?

18  A.   Once evidence is collected, it is logged on an evidence

19  log at the search warrant.  From there, we transport the

20  evidence back to our office, where, again, it is logged into

21  our computer database that essentially keeps a running list of

22  all the property seized for a particular case.  And then from

23  there it is submitted into our evidence vault for secure

24  storage.

25  Q.   And as lead case agent, are you familiar with the property

Johnson - D

1  logs and the evidence collected in this case?

2  A.    I am familiar with them, yes.

3  Q.    So let's talk about the keys that you seized during --

4  let's talk about all the keys seized during the investigation.

5  A.    Okay.

6  Q.    Once you found these keys, what did you do with them?

7  A.    So after they were logged at the search warrant, put into

8  evidence, myself and another agent checked out the keys and

9  went and tested them on the safes that Mr. Mahler was storing

10  on the Daggetts' residence.

11  Q.    And by "tested," you tested to see if they fit inside the

12  lock?

13  A.    Yes, we did essentially two separate occasions.  On the

14  first occasion, all we did was test to see if they fit.

15  Q.    On that part, when you just test to see if they fit, how

16  many keys actually fit those three safes?

17  A.    21.

18  Q.    21 total?

19  A.    21 total.

20  Q.    So of the total 21 keys, how many of those keys actually

21  turned in those locks?

22  A.    We went back on a separate trip to turn the locks, and six

23  keys successfully turned the locks or effected the movement of

24  the dial for the three safes.

25  Q.    And when you say "effected the movement of the dial," are

Johnson - D

1    you referring to the Liberty Safe?

2    A.    Yes.

3    Q.    So there were six keys.  Let's talk about those.  How many

4    of those six keys from the bedroom -- oh, these were -- hold

5    on.  I'm sorry.  Let's talk about the six keys.  How many of

6    those keys fit the Liberty Safe?  Just the Liberty Safe.

7    A.    Two.

8    Q.    So let's pull up Exhibit 89.2 -- or -2.  What are we

9    looking at here?

10   A.    This is a photo of the two keys associated with the

11   Liberty Safe.  Excuse me.

12   Q.    And when was this -- do you know when this photograph was

13   taken?

14   A.    Yes.  Is that August 31st, I believe, 2018?

15   Q.    And at what point of your process of key testing did

16   you -- was this photograph taken?

17   A.    After the keys were tested.

18   Q.    And you said these two keys were the ones that fit the

19   safe?

20   A.    That's correct.

21   Q.    And how do you know that, looking at this photograph?

22   What are those red dots on there?

23   A.    While it's not expressly identified on the tag, I

24   individually labeled all 21 keys with an appropriate number,

25   and I know that number one corresponds with the key that was

Johnson - D

1  previously seized from Mr. Mahler's office, and number 17

2  associates with the key that was previously seized from

3  Mr. Mahler's bedroom.

4  Q.    Okay.  So let's now move to the Knaack toolbox.

5  A.    Yes.

6  Q.    How many of those seized -- six seized keys turned the

7  locks on the Knaack toolbox?

8  A.    Three.

9  Q.    Let's look at Exhibit 84-2.  What are we looking at here?

10  A.    Those are the three keys we were just talking about.

11  Q.    Where were these keys seized from?

12  A.    Again, while it's not expressly stated on the tag with the

13  identifying numbers that I placed on each key, I know that key

14  number 6 was previously seized from Mr. Mahler's person and

15  keys number 9 and 10 were previously seized from Mr. Mahler's

16  bedroom.

17  Q.    Finally, let's talk about the footlocker, the low safe.

18  A.    Yes.

19  Q.    Of those six keys, how many fit the footlocker safe?

20  A.    One.

21  Q.    And I'm going to show you what's been marked as

22  Government's Exhibit 88-3.

23  A.    Okay.

24  Q.    What is this?

25  A.    This is a photograph of the key that we were just talking

Johnson - D/X

1   about.

2   Q.    And how do you recognize that?

3   A.    Again, from the number that I gave this key, I know that

4   item number 20 -- or, excuse me, key number 20 was previously

5   seized from Mr. Mahler's bedroom.

6   Q.    So of the six keys that fit in the safe and turned the

7   locks, if you just had the keys that you found in Mr. Mahler's

8   locked bedroom, which of the storage containers would open?

9   A.    All of them.

10              MS. WIGHT:  No further questions.

11              THE COURT:  Go ahead.

12              MR. WARREN:  Thank you.

13

14                       CROSS-EXAMINATION

15  BY MR. WARREN:

16  Q.    Good afternoon, Special Agent Amanda Johnson.

17  A.    Good afternoon.

18  Q.    On January 19, 2016, you opened your report on this

19  investigation of Robert Evans Mahler?

20  A.    I actually opened my case on January 26, 2016.  The case

21  began as a result of the phone call on January 19, 2016.

22  Q.    And that was a voicemail from Connie Daggett?

23  A.    I received an initial voicemail, and I had a follow-up

24  phone call with her on that same day.

25  Q.    That was my next question.  You returned the call?

Johnson - X

1  A.    Yes, I did.

2  Q.    And she told you she lived in Molalla, Oregon; right?

3  A.    I don't know if she expressly stated that, but I

4  determined her address was in Molalla.

5  Q.    And she says basically she is storing personal property

6  for Mr. Mahler, including firearms, at her residence?

7  A.    That's correct.

8  Q.    Ms. Daggett states she took the property a couple of years

9  ago?

10 A.    I think at the time of the initial phone call, the timing

11 wasn't completely ironed out.  Through the course of my

12 investigation, through additional interviews, we determined

13 that it was within the last couple of years.

14 Q.    And in that initial interview, she says she doesn't know

15 when she began storing firearms for Mr. Mahler?

16 A.    Correct.

17 Q.    In that initial interview, she says she has a disagreement

18 with Mr. Mahler about a transcript -- a manuscript of a book

19 that Mr. Mahler wrote?

20 A.    That's correct.

21 Q.    And you heard her the other day say she didn't tell you

22 about that?

23 A.    We had more than one conversation about it.  The -- where

24 we really got into the details of the conversation with the

25 book was actually in my in-person interview with her.

Johnson - X

1   Q.   She said that she had discovered on an internet search

2   that Mr. Mahler had a prior record?

3   A.   Yes.   More or less.   She discovered an article that

4   indicated Mr. Mahler had done some prison time is what she told

5   me.

6   Q.   And when you met with her face to face, she said that she

7   may have discovered that sometime maybe months earlier than the

8   date of the call?

9   A.   That's correct.

10  Q.   And she said that she had last spoke with Mr. Mahler on

11  Saturday, January 16 of 2016.   Was that correct?

12  A.   Yes.   And I think for -- I think for -- both Bill and

13  Connie told me that they had previously -- recently had

14  previous conversations with Mr. Mahler.

15  Q.   From the evidence, it looks more like it was text

16  messaging back and forth now?

17  A.   That's what it appears to be.

18  Q.   Ms. Mahler -- not Ms. Mahler.   Ms. Daggett didn't say that

19  Mr. Mahler and his wife, Kristine Yates, happened to be on a

20  vacation in Florida prior to the call?

21  A.   It was not expressly stated that Mr. Mahler and his wife

22  were in Florida.   They did tell me that they had recently

23  returned some food products to Mr. Mahler's residence and

24  that -- while he was out of town.

25  Q.   Did they tell you that who -- that the way they gained

Johnson - X

1  entrance to his residence, that his stepdaughter Kara Sully was

2  there?

3  A.   At the time of our conversations, I don't have any

4  recollection of that coming to light; but in recent

5  conversations, I have heard the name "Kara" mentioned with

6  regards to letting them have access to the property.

7  Q.   Ms. Daggett didn't tell you initially that Special Agent

8  Adam Sully was her brother?

9  A.   I've had multiple conversations with Ms. Daggett as well

10 as Special Agent Adam Sully, and he's a Bureau of Land

11 Management special agent; so I was well aware that Adam was her

12 brother.

13 Q.   In the first interview on -- that you wrote on January --

14 in the first conversation you had with Ms. Daggett, did she

15 tell you that Special Agent Adam Sully was her brother?

16 A.   I don't specifically recall that from the first

17 conversation.

18 Q.   But you subsequently found out that Special Agent Adam

19 Sully was Ms. Daggett's brother?

20 A.   I did.

21 Q.   That Special Agent Adam Sully's wife, Kara, was

22 Mr. Mahler's stepdaughter?

23 A.   Yes, I'm aware.

24 Q.   Did you get the impression when Ms. Daggett told you she

25 had already took items back to Mr. Mahler's residence, that he

Johnson - X

1  wasn't present at the time when she took them back?

2  A.    I would have to refer specifically to my report, but I

3  think throughout the conversation it does mention that he was

4  out of town.

5  Q.    Okay.  And, subsequently, I'd say on about January 20th of

6  2017, you did actually speak with Special Agent Adam Sully?

7  A.    I did.

8  Q.    Special Agent Adam Sully stated that Mr. Mahler married

9  his mother-in-law approximately ten years ago?

10 A.    Correct.

11 Q.    Special Agent Adam Sully also said that he never saw

12 firearms at Mr. Mahler's residence?

13 A.    Correct.

14 Q.    In a subsequent conversation with Ms. Daggett, you learned

15 that Mr. Mahler had a travel trailer on her property?

16 A.    Again, I would have to refer to my report for the exact

17 phone call or conversation it was, but I'm well aware of that

18 information.

19 Q.    And do you recall if Ms. Daggett said she had that travel

20 trailer approximately two or three years on her property at the

21 time of your interview with her?

22 A.    That sounds about right.

23 Q.    At some point did Ms. Daggett tell you that she had keys

24 to the safes and the toolbox that was in her garage?

25 A.    I actually think that that was more of a conversation that

Johnson - X

1  I had with Mr. Daggett.

2  Q.    Okay.  Were you present when they executed the search

3  warrant at the residence of the Daggetts?

4  A.    I was.

5  Q.    Who gave the keys to the special agents at that time?

6  A.    I don't expressly remember if somebody handed it to them,

7  but what I do recall is that when we arrived at the Daggetts'

8  residence, Connie was the only one present at that time, and

9  the keys and combination were out for us.

10 Q.    Okay.  Ms. Daggett told you that she did have a key to the

11 toolbox and that she had actually went in the toolbox and

12 accessed the toolbox?

13 A.    She did not tell me about a key for the toolbox when she

14 accessed it, but she did make mention that she had previously

15 accessed the toolbox, which was how she was able to describe to

16 me what was in the toolbox.

17 Q.    And somehow Ms. Daggett knew that there were only food

18 items in the travel trailer?

19 A.    That's what both Mr. and Mrs. Daggett expressed to me, was

20 that they had no other indication but food items were contained

21 in the travel trailer.

22 Q.    Did you ever think it good to search the travel trailer

23 for firearms?

24 A.    I had no indication that there were firearms or ammunition

25 inside that travel trailer, so I had no reason to search it.

Johnson - X

1  Q.    One of the things you talked with Ms. Daggett about was

2  the agreement that she had with Mr. Mahler to store items at

3  her property?

4  A.    Yes.

5  Q.    Did it sound like a rental agreement?

6  A.    I don't want to interpret for her, but it sounded to me as

7  though there was an agreement to store property at their

8  residence and that there was a discussion of rent to be paid

9  but that that was never fulfilled.

10  Q.    And it's true that Mr. Mahler never had access to come and

11  go on her property as he pleased?

12  A.    Correct.  I expressly asked that as a part of this

13  agreement, and they told me he did not have access to come and

14  go as he pleased.

15  Q.    The only access he would ever have would be at the

16  discretion of Mr. and Mrs. Daggett?

17  A.    That would be my interpretation, but that would be up to

18  them.

19  Q.    Now, when you first interviewed the Daggetts in person, it

20  was at their business, at Victoria Prints, in Silverton,

21  Oregon?

22  A.    Victory Prints?

23  Q.    Victory Prints.

24  A.    Yes.

25  Q.    And they got right into the fact that they started storing

Johnson - X

1  things for Mr. Daggett a couple of years earlier?

2  A.   Yeah, they expressed to me that they had been storing

3  items for Mr. Mahler.

4  Q.   Now, isn't it true that Liberty Safe was stored for a time

5  at the Daggetts' business?

6  A.   I don't -- I don't have the answer to that.

7  Q.   Now, Mr. Bill Daggett said he never counted the number of

8  firearms that were at his residence.

9  A.   Correct.  Every interaction that I had with him was an

10 estimate.

11 Q.   And he told you that he had keys and a combination to both

12 safes and the toolbox?

13 A.   Yes.

14 Q.   Did they ever clarify with you that at one point the

15 toolbox had first been stored at their business?

16 A.   That's what I recall.  I do not recall the Liberty Safe

17 being previously stored at their business.  I do recall the

18 toolbox being previously stored at their business.

19 Q.   So the toolbox probably had been in their possession for

20 more than two years?

21 A.   I wouldn't be able to answer that.

22 Q.   One of the reasons that it's hard to answer is because

23 both Daggetts never really could pin down specific dates.  Is

24 that true?

25 A.   In most of my conversations with both Mr. and

Johnson - X

1  Mrs. Daggett, it was an estimate of time of when they started

2  storing items for Mr. Mahler.

3  Q.    Didn't Ms. Daggett say once that she discovers that

4  Mr. Mahler has a prior record, her sister-in-law, Kara Sully,

5  tells her that she can't return the safe and the firearms to

6  Mr. Mahler?

7  A.    I do recall that part of the conversation, and that would

8  be correct.  There's a federal statute, 18 U.S.C. § 922(d),

9  that would prohibit you from returning -- from knowingly

10  transferring firearms to somebody that you know is a felon.

11  Q.    Thank you for saying that.

12        Isn't there another statute that you have to have a

13  federal firearms license to transport firearms through the U.S.

14  Postal Service?

15  A.    I don't know.

16  Q.    Okay.  Do you know about federal firearms licenses?

17  A.    I'm familiar with them.  We have a whole other side of ATF

18  that actually handles the regulatory aspect for our federal

19  firearms licensees.

20  Q.    For example, we heard about how Bill Daggett had a

21  cashier's check made in his name to J & G -- J & G.  I think

22  that's what the name of the company was.

23  A.    J & G Sales.

24  Q.    J & G Sales.

25        That, I'm assuming, is a fire -- licensed federal firearms

Johnson - X

1  distributor?

2  A.    I would have to actually check, but based on an internet

3  search, I think they do sell firearms and they also sell

4  ammunition.

5  Q.    And so then there is an order placed to J & G Sales, and

6  it's placed in the name of Mr. Bill Daggett; is that correct?

7  A.    That's correct.

8  Q.    J & G Sales is located in Prescott, Arizona?

9  A.    That's correct.

10 Q.    And then somehow J & G Sales has this ammunition, over

11 $5,000 worth of ammunition, delivered to Mr. Daggett at his

12 business, Victory Prints.

13 A.    That's correct.  I think, based on Ms. Daggett's

14 testimony, it was delivered via FedEx, not Postal Service.

15 Q.    Okay.  Yeah, so I'm wondering how that happens, that you

16 can get a big -- it sounded like it was a very big delivery of

17 ammunition.

18 A.    I'm not sure what the requirements are for that specific

19 type of transport utilizing a shipping company.  I would

20 imagine that there's probably some additional regulations that

21 that would fall under.

22 Q.    Well, somehow, though, Mr. Bill Daggett would have

23 qualified to receive that ammunition in quite that way, because

24 he received it?

25 A.    It would appear so.

Johnson - X

1   Q.    Now, Mr. Daggett, when he replaced -- when he returns food

2   items to Mr. Mahler, he puts it in his barn shop area.  Is that

3   your understanding?

4   A.    Yeah.  I think I mention that in a couple of different

5   reports.  In one report I do mention it's outside the shop, so

6   in the area of the barn and shop.

7   Q.    Around the time, I believe February 16, 2016, you were, of

8   course, part of the ATF team that searched Mr. Daggett's -- I'm

9   sorry, Mr. Mahler's residence?

10  A.    I was, yes.

11  Q.    Yes.  And that included a barn -- the barn area?

12  A.    It did.

13  Q.    Did you inspect that area during this search?

14  A.    Yes, I did assist.  There were multiple agents inside the

15  barn and shop, and I was one of them.

16  Q.    And did you see those food items anywhere in that area?

17  A.    That barn is very full of a lot of different stuff.  I

18  don't specifically remember food items.

19  Q.    But you do recall that it was searched thoroughly?

20  A.    The search was executed on the barn and shop as well as

21  the residence -- or barn or shop, I guess.

22  Q.    And of course you became aware from U.S. Pretrial Services

23  that two days later in that barn there were firearms?

24  A.    I'm aware.

25  Q.    And Mr. Mahler voluntarily brings it to U.S. Pretrial's

Johnson - X

1   attention, and they are confiscated?

2   A.   I'm aware.

3   Q.   Did Ms. Daggett tell you that -- and I have the page

4   number paragraph if you need it.  Did Ms. Daggett tell you that

5   Mr. Mahler paid her $200 up front to proofread his book?

6   A.   She did.

7   Q.   And the understanding was that she was to be paid more

8   once the book was published?

9   A.   That's what was communicated to me during that

10  conversation.

11  Q.   I would like to approach you.  You have seen these before?

12  A.   Yes.

13  Q.   Do you recognize the person in the photo?

14  A.   To me, I think that --

15       MS. WIGHT:  Objection just for a moment.

16  Before you answer, the question is just posed if you

17  recognize the person in the photo.  Before you talk about the

18  content before it was submitted.

19       THE WITNESS:  Sure.  I think I do.

20  BY MR. WARREN: (Continuing)

21  Q.   Who do you think that person is?

22       MS. WIGHT:  Your Honor, before we talk about the

23  content, we object to the use of this exhibit.  It hasn't been

24  admitted into evidence yet.

25       THE COURT:  It hasn't been admitted into evidence,

Johnson - X

1   and I don't think she can --

2           MR. WARREN:  I'm laying a foundation for it.

3   BY MR. WARREN: (Continuing)

4   Q.   Yeah, do you recognize who that person is?

5           THE COURT:  Wait.

6           MR. WARREN:  I'm sorry.

7           THE COURT:  I am going to ask that the jury go out.

8   I'm going to take this up outside your presence.

9                       (Jury not present.)

10          THE COURT:  So you handed this picture to two

11  different people.  It's not been identified, and it's not been

12  marked or received.

13          MR. WARREN:  Yes, Your Honor.

14          THE COURT:  It's marked, but it's not been received.

15          MR. WARREN:  No, it has not been received yet, and I

16  haven't offered it yet.  Those people all identified that

17  photograph as the -- as Mr. Mahler's spare bedroom that they

18  searched.  They recognize it because it has --

19          THE COURT:  Right.

20          MR. WARREN:  -- a very telling --

21          THE COURT:  Except the one witness said there was a

22  banner that was not there, and he's not sure he recognized the

23  person in the room.

24          MR. WARREN:  Right.

25          THE COURT:  Right.

Johnson - X

1    MR. WARREN:  So this is recognized as the room, and

2  so I asked Special Agent Johnson did she recognize the person

3  in the photograph.

4    THE COURT:  And I believe she hasn't said -- I think

5  the answer was, correct me if I'm wrong, you thought you did;

6  right?

7    THE WITNESS:  I think I recognize the person.

8    THE COURT:  Right.

9    MS. WIGHT:  Your Honor, I think, to correct the

10  record, only one witness said they recognized one of the rooms.

11  But these pictures are different.  They didn't go over every

12  photo to say which photo is the room and which photo is another

13  room.

14    THE COURT:  There's only one photograph identified

15  with the last witness.

16    MS. WIGHT:  We gave him a packet.  And there's a

17  whole --

18    THE COURT:  He really only spoke about one.

19    MS. WIGHT:  I don't even know which one he was

20  showing him at that time actually.  There are different dates

21  on these; different locations, it appears.

22    MR. WARREN:  So, no, they're all the same date on

23  this -- on these -- on the photos.

24    MS. WIGHT:  The packet?  Which date are you showing

25  her?

Johnson - X

1          MR. WARREN:  I'm showing her the 9/10/2016 packet.

2          MS. WIGHT:  9/10/2016?

3          THE COURT:  Talk to your client.  I don't know what

4     he's motioning to me about.

5          THE DEFENDANT:  Sorry, Your Honor.

6          THE COURT:  No, please talk to your lawyer.

7          MR. WARREN:  Your Honor, may my client go to the

8     restroom?

9          THE COURT:  Do you object to us continuing this

10    discussion, Mr. Mahler, while you go to the bathroom?

11         THE DEFENDANT:  No, ma'am.  No, Your Honor.

12         THE COURT:  Go ahead.

13     Maybe just to get to the point, what are we doing?  What

14    is the context?  What are we doing?

15         MR. WARREN:  Well, we're identifying these -- these

16    photographs, if we can, through these witnesses that they're

17    all the same room that they've identified, and the only thing

18    that wasn't identified was the person in the room, and we're

19    trying to identify this as being Mr. Mahler's room with

20    Mr. Mahler's wife in the room.

21         MS. WIGHT:  I believe that's on the date of

22    September 10, 2016, though.  That's seven months after the

23    search warrant was issued.

24         MR. WARREN:  That's correct.

25         THE COURT:  What's the purpose?

Johnson - X

1          MR. WARREN:  Well, the purpose is to show that that's

2    Mr. Waller's wife, and Mr. Waller's -- I keep getting his name

3    wrong.  Mr. Mahler's wife and Mr. Mahler's bedroom.

4          THE COURT:  It's irrelevant.  It's seven months after

5    the date.  It's not within the context of this issue, and lots

6    of things could have changed after the search, so I'm going

7    to -- I'm going to assume there's going to be an offer to have

8    those admitted, but they're not -- it's not going to be

9    allowed.

10          MR. WARREN:  Okay.  Thank you.

11          THE COURT:  Is that --

12          MR. WARREN:  We made a record.  I can accept that.

13          THE COURT:  You made a record.  Is there anything

14    else you need to add to the record?  It's seven months after

15    the execution of the search warrant; correct?

16          MS. WIGHT:  That's correct, Your Honor.

17          THE COURT:  So anything else?

18          MR. WARREN:  No.  No.  I can live with that.

19          THE COURT:  All right.  Let's have the jury back.

20       We need to wait a second for Mr. Mahler to come back from

21    the bathroom.

22          MR. WARREN:  I think it would only be fair that we

23    explain that ruling to Mr. Mahler too.

24          THE COURT:  While we're waiting, again, I do want to

25    just put the basis of your objection on the record.

Johnson - X

1          MS. WIGHT:  Oh, sure.  Our objection is to the

2    exhibits that he's been showing to Special Agent Johnson and

3    the previous agents is that the exhibits have a date and time

4    stamp of September 10, 2016, that they are not relevant, that

5    this occurred seven months after the search warrant, and they

6    have not properly been identified.  There's a lack of

7    foundation.

8          THE COURT:  Anything you need to add, Mr. Warren?

9          MR. WARREN:  Well, I tried to -- I tried to offer

10    these photos of Mr. Mahler's bedroom to show what the bedroom

11    looked like in these photos, as well as to identify his wife in

12    the photo.

13          THE COURT:  My ruling stands.  They're not going --

14    the objection is sustained.

15       I guess I want to revise my schedule.  If we finish much

16    in a short fashion, which I suspect you're probably getting

17    close to finishing with this witness, and I have the jury

18    instructions ready to hand out, I'm going to ask the jury what

19    their preference will be.  So I don't want to catch you

20    offguard.

21          MS. WIGHT:  That's fine, Your Honor.

22          THE COURT:  We're finishing much sooner than I would

23    guess.

24          MS. WIGHT:  It will be a nice brief closing.

25          THE COURT:  Yes.  Please go get the jury.  Thank you

Johnson - X

1   for shutting the door.

2           MR. WARREN:  Mr. Mahler, the judge has denied the

3   relevance of these because of the date of these and the fact

4   that no witness can identify these.  The date is not relevant

5   to the date of the search or of anything of interest in this.

6                        (Jury present.)

7           THE COURT:  Go ahead, Mr. Warren.

8           MR. WARREN:  Thank you.

9   BY MR. WARREN: (Continuing)

10  Q.    So, Special Agent Amanda Johnson, on January 27 of 2016,

11  you are aware that Special Agent Sadowski and another officer

12  put up a surveillance camera in the garage of the Daggetts'

13  residence?

14  A.    Yes.

15  Q.    What was the purpose of that?

16  A.    That the purpose of that was that we had already

17  identified, through our witnesses, that Mr. Mahler was storing

18  these containers at their residence, and we believed that they

19  had firearms and ammunition in them.  And while I was

20  applying -- getting ready for search warrants, we set up a

21  surveillance camera basically just to have an extra set of eyes

22  on them to make sure nobody accessed them.

23  Q.    And no one accessed them because there were no images on

24  the surveillance camera?

25  A.    After my review, I noted that we set up the camera on

Johnson - X

1  January 27, 2016.  And upon my review, it looks like the camera

2  cut out on January 30, 2016.  We executed our warrants on

3  February 3, 2016.  But between the days of January 27th and

4  January 30th, I did not observe anybody accessing the Liberty

5  Safe or Safe 2, the footlocker, which is where the camera --

6  that was the angle that the camera had.

7  Q.    One of the issues that you had to go around with, with

8  Connie Daggett, was if she added or removed items from the gun

9  safes or toolbox?

10 A.    Specifically, our conversation was about the toolbox.

11 Q.    And she said that she had never took things -- items from

12 the toolbox but added things to them; is that right?

13 A.    She did tell me that, yes.

14        MR. WARREN:  Nothing further, Your Honor.

15        THE COURT:  Counsel?

16        MS. WIGHT:  Nothing further from the government.

17        THE COURT:  You may stand down.

18    Further witnesses?

19        MS. WIGHT:  Your Honor, government rests.

20              (Government rests.)

21

22 (Whereupon the trial was concluded and a change of plea took

23 place.)

24

25

1                    C E R T I F I C A T E

2

3        United States of America v. Robert Evans Mahler

4                    3:16-cr-00105-AA-1

5                        TRIAL DAY 2

6                    September 18, 2018

7

8            I certify, by signing below, that the foregoing is a

9    true and correct transcript of the record, taken by

10   stenographic means, of the proceedings in the above-entitled

11   cause.  A transcript without an original signature, conformed

12   signature, or digitally signed signature is not certified.

13

14   /s/Jill L. Jessup, CSR, RMR, RDR, CRR, CRC
     _____
15
     Official Court Reporter        Signature Date: 11/25/19
16   Oregon CSR No. 98-0346          CSR Expiration Date:  9/30/20

17

18

19

20

21

22

23

24

25